UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS
-------------------------------------------------------------------X
In re:

BUHRE BEVERAGE DISTRIBUTION, INC.,

                Debtor.
-------------------------------------------------------------------X

WILLIAM SANCHEZ,

                Plaintiff,

  -against-

BUHRE BEVERAGE DISTRIBUTION, INC.,
BHAVEEN SAPRA, BRUCKNER BEVERAGE, INC.
and PEPSI-COLA BOTTLING COMPANY OF NEW
YORK, INC.,

                Defendants.
-------------------------------------------------------------------X

Chapter 11

Case No. 14-22048-rdd

Adv. Pro. No.:

## COMPLAINT

    WILLIAM SANCHEZ (alternatively, "Sanchez" and the "Plaintiff"), by and through his counsel, The Law Offices of Michael G. Mc Auliffe, Esq., as and for his complaint against BUHRE BEVERAGE DISTRIBUTION, INC., BHAVEEN SAPRA, BRUCKNER BEVERAGE INC. and PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC., respectfully alleges, upon information and belief:

    1.    On or about January 13, 2014, (the "Filing Date"), Buhre Beverage Distribution, Inc. (alternatively, "Buhre" and the "Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

    2.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (K).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157 and 11 U.S.C. Section 105, as well as Rules 7001(a)(2), (a)(7) and (a)(9) of the Federal Rules of Bankruptcy Procedure as this action arises in and under the Debtor's pending Chapter 11 case.

5. At all times relevant herein, Sanchez is an individual residing in the state of Connecticut at 145 Georgetown Road, Weston CT 06883.

6. At all times relevant herein, the Debtor is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 22 Stony Hollow, Chappaqua, NY 10514.

7. At all times relevant herein, Bhaveen Sapra ("B. Sapra") is an individual residing in the state of New York at 22 Stony Hollow, Chappaqua, NY 10514.

8. At all times relevant herein, Bruckner Beverage, Inc. ("Bruckner") is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 22 Stony Hollow, Chappaqua, NY 10514.

9. Upon information and belief, at all times relevant herein, Pepsi-Cola Bottling Company of New York, Inc. ("Pepsi") is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 650 Brush Avenue, Bronx, NY 10465.

## BACKGROUND

10. Since 1995, Sanchez has been the owner/operator of various soda distribution routes of Pepsi.

11. At all times relevant herein, prior to July 31, 2013 Sanchez was the 100% owner of Buhre.

12. Buhre is, and at all times relevant herein was, the owner of a certain Pepsi

distribution route that covered certain territory in the Bronx, New York (the "Buhre Pepsi Route"), together with two delivery trucks, and other miscellaneous assets.

13. In or about September 2012, Sanchez decided to sell the Pepsi route that he owned and operated through Buhre.

14. B. Sapra wanted to take over the Buhre Pepsi Route, and in order to do this, his father Pratap Sapra ("P. Sapra") arranged for him to purchase said Route from Sanchez.

15. Sanchez agreed to sell Buhre's assets, including the Buhre Pepsi Route, to B. Sapra for $1,175,000.00 (which sum was later voluntarily reduced by Sanchez to $1,153,000.00), and as B. Sapra did not have sufficient cash to close on the transaction, it was agreed that Sanchez would hold a note in the sum of $900,000.00 for the balance of the purchase price, and take back a purchase money security interest in Buhre's assets until such time as the note was paid in full.

16. All operators of Pepsi distribution routes must be approved by Pepsi, and as such, B. Sapra applied to Pepsi for approval to operate such a route.

17. At an interview with Pepsi's Transfer Committee on December 13, 2013, Pepsi denied B. Sapra's application based on his lack of experience and the fact that he did not hold a Commercial Driver's License ("CDL") or a green card, and Pepsi advised B. Sapra that in order to obtain approval from Pepsi he would need to secure a green card and a CDL, and provided him with criteria to follow in order to gain the requisite experience.

18. On December 27, 2012, Sanchez entered into a contract for the sale (the "December 2012 Contract", a copy of which is annexed hereto at Exhibit "A") of Buhre's assets to PBR Beverage, Inc. ("PBR"), a corporation wholly owned by B. Sapra. The parties anticipated that B. Sapra would expeditiously satisfy the requirements that would enable him to obtain the requisite approval from Pepsi, and that a closing on the December 2012 Contract

would take place in January or February of 2013.

19. In accordance with the terms of the December 2012 Contract, certain documents were prepared that would effectuate the sale pursuant to said Contract. These documents (collectively, the "2012 Documents" copies of which are annexed hereto at Exhibit "B") were:

    a. A promissory note with PBR as "maker" and Buhre as "payee", pursuant to which PBR promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 ½ percent interest;

    b. A security agreement with PBR as "debtor" and Buhre as "secured party", pursuant to which PBR granted Buhre a security interest in the Pepsi Cola Distributor Agreement, together with all accounts receivable and equipment;

    c. A bill of sale listing Buhre as "seller" and PBR as "purchaser"; and

    d. Two motor vehicle bills of sale for the two trucks owned by Buhre, listing Buhre as "seller" and PBR as "buyer".

20. In accordance with the terms of the 2012 Documents, B. Sapra secured a green card, and Sanchez allowed B. Sapra to work the route with him in order to gain the necessary experience.

21. B. Sapra, however, never obtained his CDL, and in or about April 2013, Pepsi again denied his application for approval.

22. B. Sapra then determined to enter into a partnership with John Brown ("Brown[1]") to purchase the Buhre Pepsi Route, as Brown had the requisite experience and CDL, and had been previously approved by Pepsi as a route operator. Approval from Pepsi was obtained and a closing date was fixed for mid-July, but on the day of the closing, Sanchez was advised that the closing was being adjourned due to alleged "concerns about Brown."

---

[1] Brown worked as a driver for Buhre while it was operated by Sanchez, and remained with the Debtor upon it's sale to B. Sapra.

23. Over the next several days the parties engaged in various discussions. During these discussions, it was determined that B. Sapra did not have the cash available that was required at the closing (the December 2012 Contract required the payment of $100,000.00 cash at the closing), and Sanchez agreed to reduce the purchase price by $22,000.00 and to take the balance due in the form of a promissory note in the sum of $78,000.00 payable on or before November 1, 2013, instead of cash. As the parties had resolved Sapra's cash deficiency problem, the alleged "concerns about Brown" evaporated and it was agreed that the parties would move forward with a closing.

24. B. Sapra was anxious to close as soon as possible as it was July and the Summer months are the most lucrative for a soda distribution route.

25. On July 31, 2013, a meeting was held (the "July 31st Meeting") between B. Sapra, his counsel John Lettera, Esq. ("Lettera"), Sanchez and his counsel Allan Stern, Esq. ("Stern"), which meeting was held at Lettera's office.

26. At the July 31st Meeting, the parties agreed that due to Brown and Pepsi's unavailability to close in August, the parties would amend the December 2012 Contract to provide for a sale of the stock of Buhre to B. Sapra's corporation instead of a sale of the assets, which transaction could be effectuated without the participation of Brown or Pepsi.

27. To that end, at the July 31st Meeting, the parties negotiated and entered into a second contract of sale dated July 31, 2013 (the "July 2013 Contract", a copy of which is annexed hereto at Exhibit "C") between Sanchez and Bruckner, a corporation wholly owned by B. Sapra, for the sale of 100% of the shares in Buhre to Bruckner. Paragraph 1 of the July 2013 Contract expressly incorporated the terms of the December 2012 Contract.

28.     At the July 31st Meeting, the parties confirmed the terms of the transfer of the shares of Buhre from Sanchez to Bruckner (the "Agreed-Upon Transaction") as follows: (a) Sanchez would transfer 100% of the shares in Buhre to Bruckner for the sum of $1,153,000.00, payable by way of $175,000.00 at the closing and two promissory notes for the balance; (b) Sanchez would receive two promissory notes from Bruckner, one in the sum of $78,000.00 payable on or before November 1, 2013 and one in the sum of $900,000.00 payable over 144 months at 6 ½ percent interest; (c) Sanchez would receive a security interest in the shares of Buhre and all of it's tangible and intangible assets, including the Buhre Pepsi Route which was initially held under the distributor agreement between Buhre and Pepsi, and would later be held under a distributor agreement between Bruckner and Pepsi (once B. Sapra was able to obtain same); (d) Sanchez would retain one share of stock in Buhre until such time as Bruckner obtained its distributor agreement with Pepsi, at which time the remaining one share in Buhre would be transferred by Sanchez to Bruckner for no further consideration.

29.     During the course of the July 31st Meeting, the parties discussed the documents necessary to effectuate the Agreed-Upon Transaction, and such documents were drafted by Lettera at the Meeting.

30.     The closing on the July 2013 Contract took place at the July 31st Meeting, at which time the parties executed various documents (the "Inaccurate Documents") for the purpose of effectuating the Agreed-Upon Transaction.

31.     Unfortunately, the Inaccurate Documents inadvertently contained several mistakes that served to potentially alter the effectiveness of the Inaccurate Documents. Specifically, the Inaccurate Documents, and the mistakes contained therein, were:

a. A promissory note with Bruckner as "maker" and Buhre as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 ½ percent interest (the "900K Promissory Note", a copy of which is annexed hereto at Exhibit "D"). The "payee" on the 900K Promissory Note should have been Sanchez, not Buhre;

b. A promissory note with Bruckner as "maker" and Sanchez as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $78,000.00 on or before November 1, 2013, with interest to accrue at 12% only if the full balance was not paid in full by November 1, 2013 (the "78K Promissory Note", a copy of which is annexed hereto at Exhibit "E"). There were no mistakes contained in this document;

c. A security agreement with Bruckner as "debtor" and Buhre as "secured party", pursuant to which Bruckner granted Buhre a security interest in the shares of Buhre and the Pepsi Cola Distributor territory, together with all accounts receivable and equipment related thereto (the "2013 Security Agreement", a copy of which is annexed hereto at Exhibit "F"). The "secured party" should have been Sanchez, not Buhre, and the collateral description should have been:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013

d. A bill of sale listing Sanchez as "seller" and Bruckner as "buyer"(the "2013 Bill of Sale, a copy of which is annexed to the Sanchez hereto at Exhibit "G"). There were no mistakes contained in this document;

e. A stock power pursuant to which Sanchez transferred one share of Buhre stock to Bruckner (the "Single-Share Stock Power" a copy of which is annexed hereto as Exhibit "H"). There were no mistakes contained in this document; and

f. A UCC-1 financing statement listing the "debtors" as Buhre and Bruckner

     and asserting a lien against the following collateral: (a) shares of stock of Bruckner; and (b) assets of Buhre (the "UCC-1", a copy of which is annexed hereto at Exhibit "I". This document was amended by the UCC-3 Amendment described below.

  32.  Thereafter, on or about November 4, 2013, a UCC-3 amendment (the "UCC-3 Amendment", a copy of which is annexed hereto at Exhibit "J"), was filed to amend the UCC-1, which restated the collateral as being:

     "[t]he Distributor Agreement by and between Bruckner Beverage, Inc. and the Pepsi-Cola Bottling Company of New York, Inc. and pertaining to a certain Pepsi-Cola distribution territory conveyed July 31, 2013, beverage trucks with vehicle identification numbers1HTMAAN74H607626 and 2NKMLZ9X95M100779, and pertaining to that said territory, all of the Debtor's equipment, parts, inventory, accounts receivable and the proceeds derived therefrom, now or hereinafter owned by or due the Debtor." (For the purposes of this adversary proceeding, the UCC-3 Amendment shall be included in the Inaccurate Documents.)

  33.  The collateral description contained in the UCC-3 Amendment should have read:

     A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013.

  34.  Despite the inadvertent mistakes contained in the Inaccurate Documents, Sanchez, B. Sapra, the Debtor and its counsel have all continued to act in compliance with the true intent of the parties regarding Agreed-Upon Transaction and what the Inaccurate Documents should have stated from the time of their execution, which is that Sanchez is the proper payee on the $900k Promissory Note, the proper secured party on the 2013 Security Agreement, and that the

collateral listed on the 2013 Security Agreement and the UCC-3 Amendment should have been as set forth above.

35. In keeping with the terms of the Agreed-Upon Transaction, the Debtor's schedules, sworn to under oath by B. Sapra, list Sanchez as a secured creditor on Schedule "D"[2]. A copy of the Debtor's Schedule "D" is annexed hereto at Exhibit "K".

36. The Debtor previously filed an Order to Show Cause with this Court dated March 10, 2014 (the "Debtor's Prior Motion"). In further keeping with the terms of the Agreed-Upon Transaction, the Debtor's Prior Motion and the affirmation of Debtor's counsel submitted with the Debtor's Prior Motion repeatedly refer to Sanchez as the secured creditor of the Debtor. See paragraphs 4 and 6 of the Debtor's Prior Motion, and paragraphs 3, 4 and 8 of the Affirmation of Anne Penachio, Esq. submitted with the Debtor's Prior Motion, which are collectively annexed hereto at Exhibit "L".

37. Subsequent to the hearing on the Debtor's Prior Motion, it appears that B. Sapra has repeatedly been taking actions with regard to the Debtor ("Sapra's Improper Actions") that have been in direct derogation of his fiduciary duty as the operator of a Debtor-In-Possession.

38. Apparently, Sapra's Improper actions began almost immediately after the hearing on the Debtor's Prior Motion.

39. Upon information and belief, of the six known checks B. Sapra has written to Pepsi, three of them have bounced, as follows: (a) March 21, 2014 - $15,976.75; (b) March 26,

---

[2] While the Debtor's Schedule "D" lists the secured obligation to Sanchez as "disputed" it is respectfully submitted that the listing as "disputed" referred to something other than secured status (such as amount), as if the Debtor truly believed that Sanchez was an unsecured creditor, the obligation would have been listed on Schedule "F".

2014 - $1,493.50; and (c) March 27, 2014 - $10,519.37, for a total of $27,989.62. The Debtor should have had sufficient monies to cover all of the bounced checks.

40. There are two trucks that are used in the Debtor's operations, Truck 112 and Truck 114. Upon information and belief, the Debtor's sales for the two (2) weeks ending March 27, 2014 were $59,102.69, $25,365.29 from the operation of Truck 112 and $33,737.40 from the operation of Truck 114. The majority of sales from the operation of Truck 114 come from one account, Tremont Beverage, the majority of which are paid in the form of checks. The majority of sales from the operation of Truck 112 are paid in cash. At the end of this period, B. Sapra showed Sanchez the Debtor's bank account on-line which, at that time, showed approximately only $33,000.00 in deposits.

41. Upon information and belief, for the two (2) weeks ending March 27, 2014, B. Sapra only deposited checks into the Debtor's bank account and failed to deposit any of the cash collected into the Debtor's bank account.

42. Had B. Sapra deposited all funds, both cash and checks, into the Debtor's bank account for the two (2) weeks ending March 27, 2014, there would have been sufficient funds to cover all of the checks written to Pepsi.

43. On March 27, 2014, Sanchez received a call from David Downs ("Downs"), the head of Bronx Sales for Pepsi, who informed Sanchez that due to the continued bounced checks, the Debtor was going to be placed on COD.

44. On March 28, 2014, Downs again called Sanchez and advised that he had spoken with B. Sapra regarding the Debtor's balance owed to Pepsi, and that B. Sapra told him that he would be coming in to the warehouse with a certified funds in the sum of $20,000.00 by 9:00

a.m. that day. Downs further advised that when B. Sapra didn't arrive by 9:00 a.m., he called him again and was advised by B. Sapra that he had been delayed, and would be coming by with certified funds in the sum of $15,000.00, instead of $20,000.00. Finally Downs advised that when B. Sapra finally appeared at 10:45 a.m., he had no certified funds, and only had $4,000.00 in cash which he turned over to Downs.

45. Pepsi placed the Debtor on COD effective Monday, March 31, 2014.

46. Upon information and belief, B. Sapra has not paid for Pepsi product COD, and as a result, the Debtor ceased operating effective March 31, 2014.

47. Brown, the Debtor's primary driver, tendered his resignation on March 28, 2014, effective immediately, citing an inability to work with B. Sapra.

48. Sapra's Improper Actions, including failing to deposit the Debtor's cash, continually bouncing checks to Pepsi, and failing to arrange for COD payments to Pepsi so that the Debtor can operate, have seriously jeopardized the Debtor's continued operation of the Buhre Pepsi Route, as Pepsi is likely to terminate same given Sapra's Improper Actions in accordance with the terms of the distributor agreement.

**AS AND FOR THE PLAINTIFF'S FIRST CLAIM FOR RELIEF
AGAINST THE DEBTOR, B. SAPRA AND BRUCKNER**

49. The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "48", inclusive, with the same force and effect as if set forth at length herein.

50. The true intent of the parties with regard to the Agreed-Upon Transaction was that Sanchez would sell the shares of stock in Buhre, together with all of its assets, to Bruckner (B. Sapra's corporation) for $1,153,000.00, that Sanchez would take back two promissory notes from

Bruckner, one in the sum of $900,000.00 and the other in the sum of $78,000.00, and that the payment of the monies due under the promissory notes to Sanchez would be secured by Sanchez's security interest in the shares of stock in Buhre, Buhre's distributor agreement with Pepsi regarding the Buhre Pepsi Route (and later the distributor agreement between Bruckner and Pepsi that would take over the Buhre Pepsi Route, once B. Sapra satisfied the conditions necessary to obtain such agreement), together with all other tangible and intangible assets of Buhre and Brucker.

   51. The Inaccurate Documents contained the following inadvertent mistakes:

    a. The "payee" on the 900K Promissory Note should have been Sanchez, not Buhre.

    b. The "secured party" on the 2013 Security Agreement should have been Sanchez, not Buhre.

    c. The collateral description at section 1.01 of the 2013 Security Agreement should have been:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013.

    d. The collateral description contained in section 8 of the UCC-3 Amendment should have read:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN

    2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013.

  e.  A Stock Power should have been executed evidencing the transfer by Sanchez to Bruckner of ninety-nine (99) shares of stock in Buhre on July 31, 2013.

52.  The Inaccurate Documents failed to effectuate the true intent of the parties with regard to the Agreed-Upon Transaction.

53.  The Inaccurate Documents were executed under the mutual mistake of both parties, being Sanchez and B. Sapra.

54.  There is substantial evidence demonstrating the true intent of the parties regarding the Agreed-Upon Transaction, and the mutual mistake regarding the Inaccurate Documents which improperly effectuated same.

55.  The true intent of the parties regarding the Agreed-Upon Transaction has been repeatedly confirmed by the Debtor in this case.

56.  By virtue of the foregoing, it is respectfully submitted that applicable law provides that the Inaccurate Documents should be reformed as follows:

  - the $900K Promissory Note should be reformed in that the "payee" should be changed from Buhre to William Sanchez;

  - the 2013 Security Agreement should be reformed in that the "secured party" should be changed from Buhre to William Sanchez;

  - section 1.01 of the 2013 Security Agreement should be reformed in that the collateral description set forth therein should be modified to read:

    A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005

Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013

- section 8 of the UCC-3 Amendment should be reformed in that the collateral description set forth therein should be modified to read:

A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013

- the Inaccurate Documents should be reformed to include a Stock Power evidencing the transfer by Sanchez to Bruckner of ninety-nine (99) shares of stock in Buhre on July 31, 2013.

**AS AND FOR THE PLAINTIFF'S SECOND CLAIM FOR RELIEF AGAINST PEPSI**

57. The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "56", inclusive, with the same force and effect as if set forth at length herein.

58. Sapra's Improper Actions, including failing to deposit the Debtor's cash, continually bouncing checks to Pepsi, and failing to arrange for COD payments to Pepsi so that the Debtor can operate, have seriously jeopardized the Debtor's continued operation of the Buhre Pepsi Route, as Pepsi is likely to terminate same as a result of Sapra's Improper Actions.

59. Given Sapra's Improper Actions, Pepsi's termination of the Buhre Pepsi Route is likely to be imminent.

60. If Pepsi terminates the Buhre Pepsi Route, the Debtor will be stripped of its only significant asset.

61.     Under the terms of the Agreed-Upon Transaction, Sanchez has a security interest in the shares of the Debtor and all of its assets, including the Buhre Pepsi Route.

62.     If Pepsi terminates the Buhre Pepsi Route, and the Debtor is stripped of its only significant asset, Sanchez's security interest will be rendered virtually valueless.

63.     By virtue of the foregoing, Sanchez will be irreparably harmed if Pepsi terminates the Buhre Pepsi Route.

64.     The true intent of the parties with regard to the Agreed-Upon Transaction was that Sanchez would sell the shares of stock in Buhre, together with all of its assets, to Bruckner (B. Sapra's corporation) for $1,153,000.00, that Sanchez would take back two promissory notes from Bruckner, one in the sum of $900,000.00 and the other in the sum of $78,000.00, and that the payment of the monies due under the promissory notes to Sanchez would be secured by Sanchez's security interest in the shares of stock in Buhre, Buhre's distributor agreement with Pepsi regarding the Buhre Pepsi Route (and later the distributor agreement between Bruckner and Pepsi that would take over the Buhre Pepsi Route, once B. Sapra satisfied the conditions necessary to obtain such agreement), together with all other tangible and intangible assets of Buhre and Brucker.

65.     The Inaccurate Documents failed to effectuate the true intent of the parties with regard to the Agreed-Upon Transaction.

66.     The Inaccurate Documents were executed under the mutual mistake of both parties, being Sanchez and B. Sapra.

67.     There is substantial evidence demonstrating the true intent of the parties regarding the Agreed-Upon Transaction, and the mutual mistake regarding the Inaccurate Documents which improperly effectuated same.

68.     The true intent of the parties regarding the Agreed-Upon Transaction has been

repeatedly confirmed by the Debtor in this case.

69. By virtue of the foregoing, Sanchez will likely be successful in obtaining the reformation of the Inaccurate Documents requested herein.

70. By virtue of the foregoing, Sanchez is entitled to the issuance of a preliminary injunction against Pepsi prohibiting Pepsi from actively or constructively terminating the Buhre Pepsi Route.

## AS AND FOR THE PLAINTIFF'S THIRD CLAIM FOR RELIEF AGAINST THE DEBTOR AND B. SAPRA

71. The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "70", inclusive, with the same force and effect as if set forth at length herein.

72. Upon information and belief, B. Sapra has collected cash on behalf of the Debtor that has not been deposited into the Debtor's bank account.

73. B. Sapra has failed to account for all of the monies, cash or otherwise, that have been collected by or on behalf of the Debtor, by B. Sapra or any other party, since the Filing Date.

74. By virtue of the foregoing, Plaintiff is entitled to a full accounting of all of the monies, cash or otherwise, that have been collected by or on behalf of the Debtor, by B. Sapra or any other party, since the Filing Date., together with the costs and disbursements of the instant action.

**WHEREFORE,** the Plaintiff respectfully prays for judgment as requested in the claims for relief set forth herein, together with such other, further and different relief as this Court deems just and proper.

Dated: Melville, New York
      April 4, 2014

                        LAW OFFICES OF MICHAEL G. MC AULIFFE
                        Counsel to the Plaintiff William Sanchez

                        By   */s/ Michael G. Mc Auliffe*
                             Michael G. Mc Auliffe, Esq.
                             68 South Service Road, Suite 100
                             Melville, New York 11747
                             (631) 465-0044