UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS
------------------------------------------------------------X
In re:

BUHRE BEVERAGE DISTRIBUTION, INC.,

                Debtor.

Chapter 11

Case No. 14-22048-rdd

------------------------------------------------------------X

WILLIAM SANCHEZ,

                Plaintiff,

-against-

BUHRE BEVERAGE DISTRIBUTION, INC.,
BHAVEEN SAPRA and BRUCKNER BEVERAGE, INC.

                Defendants.

Adv. Pro. No.: 14-08218-rdd

------------------------------------------------------------X

**PLAINTIFF'S STATEMENT UNDER LOCAL RULE 7056-1 OF THIS
COURT, OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO
BE TRIED, IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7056**

        WILLIAM SANCHEZ (alternatively, "Sanchez" and the "Plaintiff")[1], the Plaintiff in this adversary proceeding, by and through his counsel, the Law Office of Michael G. Mc Auliffe, Esq., respectfully submit the following Statement of Material Facts as to Which He Contends There are No Genuine Issues to be Tried, pursuant to Local Bankruptcy Rule 7056-1 of this Court (the "Rule 7056-1 Statement"), in support of his Motion for Summary Judgment on the claim for relief in Plaintiff's complaint in this adversary proceeding against BUHRE BEVERAGE DISTRIBUTION, INC. (alternatively, "Buhre" and the "Debtor"), BHAVEEN

---

[1] All capitalized terms not defined in this Rule 7056-1 Statement shall have the meanings ascribed to them in Plaintiff's Complaint, or if not defined in the Complaint or in this Rule 7056-1 Statement, as said terms are defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

SAPRA ("B. Spara"), and BRUCKNER BEVERAGE, INC. ("Bruckner") (collectively, the "Defendants")[2] pursuant to Federal Rule of Bankruptcy Procedure 7056, and states as follows: A copy of the Complaint in this action is annexed hereto at Exhibit "A", and a copy of the Defendants' Answer is annexed hereto at Exhibit "B".

1. At all times relevant herein, Sanchez is an individual residing in the state of Connecticut at 145 Georgetown Road, Weston CT 06883. (See Exhibit "A" paragraph 5, and Exhibit "B" paragraph 5.)

2. At all times relevant herein, the Debtor is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 22 Stony Hollow, Chappaqua, NY 10514. (See Exhibit "A" paragraph 6, and Exhibit "B" paragraph 6.)

3. At all times relevant herein, Bhaveen Sapra ("B. Sapra") is an individual residing in the state of New York at 22 Stony Hollow, Chappaqua, NY 10514. (See Exhibit "A" paragraph 7, and Exhibit "B" paragraph 7.)

4. At all times relevant herein, Bruckner Beverage, Inc. ("Bruckner") is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 22 Stony Hollow, Chappaqua, NY 10514. (See Exhibit "A" paragraph 8, and Exhibit "B" paragraph 8.)

5. Upon information and belief, at all times relevant herein, Pepsi-Cola Bottling Company of New York, Inc. ("Pepsi") is a corporation organized and existing under the laws of

---

[2] PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. ("Pepsi") was originally a defendant in this adversary proceeding, but the adversary proceeding was dismissed as against Pepsi, with prejudice, pursuant to a Stipulation between Sanchez and Pepsi which was "so ordered" by this Court on July 24, 2014.

the State of New York and maintains its principal place of business at 650 Brush Avenue, Bronx, NY 10465. (See Exhibit "A" paragraph 9, and Exhibit "B" paragraph 9.)

**BACKGROUND**

6. Since 1995, Sanchez has been the owner/operator of various soda distribution routes of Pepsi. (See Exhibit "A" paragraph 10, and Exhibit "B" paragraph 10.) (See also paragraph 2 of the Affidavit of William Sanchez [the "Sanchez Affidavit"], a copy of which is annexed hereto at Exhibit "C".)

7. At all times relevant herein, prior to July 31, 2013 Sanchez was the 100% owner of Buhre. (See paragraph 3 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

8. Buhre is, and at all times relevant herein was, the owner of a certain Pepsi distribution route that covered certain territory in the Bronx, New York (the "Buhre Pepsi Route"), together with two delivery trucks, and other miscellaneous assets. (See Exhibit "A" paragraph 12, and Exhibit "B" paragraph 12.) (See also paragraph 4 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

9. In or about September 2012, Sanchez decided to sell the Pepsi route that he owned and operated through Buhre. (See paragraph 5 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

10. B. Sapra wanted to take over the Buhre Pepsi Route, and in order to do this, his father Pratap Sapra ("P. Sapra") arranged for him to purchase said Route from Sanchez. (See Exhibit "A" paragraph 14, and Exhibit "B" paragraph 14.) (See also paragraph 6 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

11. Sanchez agreed to sell Buhre's assets, including the Buhre Pepsi Route, to B. Sapra for $1,175,000.00 (which sum was later voluntarily reduced by Sanchez to $1,153,000.00), and as B. Sapra did not have sufficient cash to close on the transaction, it was agreed that Sanchez would hold a note in the sum of $900,000.00 for the balance of the purchase price, and take back a purchase money security interest in Buhre's assets until such time as the note was paid in full. (See paragraph 7 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

12. All operators of Pepsi distribution routes must be approved by Pepsi, and as such, B. Sapra applied to Pepsi for approval to operate such a route. (See Exhibit "A" paragraph 16, and Exhibit "B" paragraph 16.) (See also paragraph 8 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

13. At an interview with Pepsi's Transfer Committee on December 13, 2013, Pepsi denied B. Sapra's application based on his lack of experience and the fact that he did not hold a Commercial Driver's License ("CDL") or a green card, and Pepsi advised B. Sapra that in order to obtain approval from Pepsi he would need to secure a green card and a CDL, and provided him with criteria to follow in order to gain the requisite experience. (See paragraph 9 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

14. On December 27, 2012, Sanchez entered into a contract for the sale (the "December 2012 Contract", a copy of which is annexed hereto at Exhibit "D") of Buhre's assets to PBR Beverage, Inc. ("PBR"), a corporation wholly owned by B. Sapra. The parties anticipated that B. Sapra would expeditiously satisfy the requirements that would enable him to obtain the requisite approval from Pepsi, and that a closing on the December 2012 Contract would take place in January or February of 2013. (See paragraph 10 of the Sanchez Affidavit, a

4

copy of which is annexed hereto at Exhibit "C".) (See also paragraph 9 of the Affidavit of Allan Stern, Esq. [the "Stern Affidavit"], a copy of which is annexed hereto at Exhibit "E".)

15. In accordance with the terms of the December 2012 Contract, certain documents were prepared that would effectuate the sale pursuant to said Contract. These documents (collectively, the "2012 Documents" copies of which are annexed hereto at Exhibit "F") were:

   a. A promissory note with PBR as "maker" and Buhre as "payee", pursuant to which PBR promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 ½ percent interest;

   b. A security agreement with PBR as "debtor" and Buhre as "secured party", pursuant to which PBR granted Buhre a security interest in the Pepsi Cola Distributor Agreement, together with all accounts receivable and equipment;

   c. A bill of sale listing Buhre as "seller" and PBR as "purchaser"; and

   d. Two motor vehicle bills of sale for the two trucks owned by Buhre, listing Buhre as "seller" and PBR as "buyer".

   (See paragraph 11 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 9 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

16. In accordance with the terms of the 2012 Documents, B. Sapra secured a green card, and Sanchez allowed B. Sapra to work the route with him in order to gain the necessary experience. (See paragraph 12 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 10 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

17. B. Sapra, however, never obtained his CDL, and in or about April 2013, Pepsi again denied his application for approval. (See Exhibit "A" paragraph 21, and Exhibit "B" paragraph 21.) (See also paragraph 13 of the Sanchez Affidavit, a copy of which is annexed

hereto at Exhibit "C".) (See also paragraph 10 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

18.     B. Sapra then determined to enter into a partnership with John Brown ("Brown[3]") to purchase the Buhre Pepsi Route, as Brown had the requisite experience and CDL, and had been previously approved by Pepsi as a route operator. Approval from Pepsi was obtained and memorialized in a letter from Peter Gaudet, Vice President of Labor Relations at Pepsi (the "Pepsi Approval Letter", a copy of which is annexed hereto at Exhibit "G"), and a closing date was fixed for mid-July, but on the day of the closing, Sanchez was advised that the closing was being adjourned due to alleged "concerns about Brown." (See paragraph 14 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

19.     Over the next several days the parties engaged in various discussions. During these discussions, it was determined that B. Sapra did not have the cash available that was required at the closing (the December 2012 Contract required the payment of $100,000.00 cash at the closing), and Sanchez agreed to reduce the purchase price by $22,000.00 and to take the balance due in the form of a promissory note in the sum of $78,000.00 payable on or before November 1, 2013, instead of cash. As the parties had resolved Sapra's cash deficiency problem, the alleged "concerns about Brown" evaporated and it was agreed that the parties would move forward with a closing. (See paragraph 15 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 12 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

---

[3]  Brown worked as a driver for Buhre while it was operated by Sanchez, and remained with the Debtor upon it's sale to B. Sapra.

6

20. B. Sapra was anxious to close as soon as possible as it was July and the Summer months are the most lucrative for a soda distribution route. (See paragraph 16 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 13 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

21. On July 31, 2013, a meeting was held (the "July 31st Meeting") between B. Sapra, his counsel John Lettera, Esq. ("Lettera"), Sanchez and his counsel Allan Stern, Esq. ("Stern"), which meeting was held at Lettera's office. (See Exhibit "A" paragraph 25, and Exhibit "B" paragraph 25.) (See also paragraph 17 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 13 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

22. At the July 31st Meeting, the parties agreed that due to Brown and Pepsi's unavailability to close in August, the parties would amend the December 2012 Contract to provide for a sale of the stock of Buhre to B. Sapra's corporation instead of a sale of the assets, which transaction could be effectuated without the participation of Brown or Pepsi. (See paragraph 18 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 13 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

23. To that end, at the July 31st Meeting, the parties negotiated and entered into a second contract of sale dated July 31, 2013 (the "July 2013 Contract", a copy of which is annexed hereto at Exhibit "H") between Sanchez and Bruckner, a corporation wholly owned by B. Sapra, for the sale of 100% of the shares in Buhre to Bruckner. Paragraph 1 of the July 2013 Contract expressly incorporated the terms of the December 2012 Contract. (See paragraph 19 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 14 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

24. At the July 31st Meeting, the parties confirmed the terms of the transfer of the shares of Buhre from Sanchez to Bruckner (the "Agreed-Upon Transaction") as follows: (a) Sanchez would transfer 100% of the shares in Buhre to Bruckner for the sum of $1,153,000.00, payable by way of $175,000.00 at the closing and two promissory notes for the balance; (b) Sanchez would receive two promissory notes from Bruckner, one in the sum of $78,000.00 payable on or before November 1, 2013 and one in the sum of $900,000.00 payable over 144 months at 6 ½ percent interest; (c) Sanchez would receive a security interest in the shares of Buhre and all of it's tangible and intangible assets, including the Buhre Pepsi Route which was initially held under the distributor agreement between Buhre and Pepsi, and would later be held under a distributor agreement between Bruckner and Pepsi (once B. Sapra was able to obtain same); (d) Sanchez would retain one share of stock in Buhre until such time as Bruckner obtained its distributor agreement with Pepsi, at which time the remaining one share in Buhre would be transferred by Sanchez to Bruckner for no further consideration. (See paragraph 20 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 15 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

25. During the course of the July 31st Meeting, the parties discussed the documents necessary to effectuate the Agreed-Upon Transaction, and such documents were drafted by Lettera at the Meeting. (See paragraph 21 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 16 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

26. The closing on the July 2013 Contract took place at the July 31st Meeting, at which time the parties executed various documents (the "Inaccurate Documents") for the purpose of effectuating the Agreed-Upon Transaction. (See paragraph 22 of the Sanchez Affidavit, a

copy of which is annexed hereto at Exhibit "C".) (See also paragraph 16 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

27. Unfortunately, the Inaccurate Documents inadvertently contained several mistakes that served to potentially alter the effectiveness of the Inaccurate Documents. Specifically, the Inaccurate Documents, and the mistakes contained therein, were:

    a. A promissory note with Bruckner as "maker" and Buhre as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 ½ percent interest (the "900K Promissory Note", a copy of which is annexed hereto at Exhibit "I"). The "payee" on the 900K Promissory Note should have been Sanchez, not Buhre;

    b. A promissory note with Bruckner as "maker" and Sanchez as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $78,000.00 on or before November 1, 2013, with interest to accrue at 12% only if the full balance was not paid in full by November 1, 2013 (the "78K Promissory Note", a copy of which is annexed hereto at Exhibit "J"). There were no mistakes contained in this document;

    c. A security agreement with Bruckner as "debtor" and Buhre as "secured party", pursuant to which Bruckner granted Buhre a security interest in the shares of Buhre and the Pepsi Cola Distributor territory, together with all accounts receivable and equipment related thereto (the "2013 Security Agreement", a copy of which is annexed hereto at Exhibit "K"). The "secured party" should have been Sanchez, not Buhre, and the collateral description should have been:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013

    d. A bill of sale listing Sanchez as "seller" and Bruckner as "buyer"(the "2013 Bill of Sale", a copy of which is annexed to the Sanchez hereto at Exhibit "L"). There were no mistakes contained in this document;

9

e.  A stock power pursuant to which Sanchez transferred one share of Buhre stock to Bruckner (the "Single-Share Stock Power" a copy of which is annexed hereto as Exhibit "M"). There were no mistakes contained in this document; and

f.  A UCC-1 financing statement listing the "debtors" as Buhre and Bruckner and asserting a lien against the following collateral: (a) shares of stock of Bruckner; and (b) assets of Buhre (the "UCC-1", a copy of which is annexed hereto at Exhibit "N". This document was amended by the UCC-3 Amendment described below.

(See paragraph 23 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 16 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

28. Thereafter, on or about November 4, 2013, a UCC-3 amendment (the "UCC-3 Amendment", a copy of which is annexed hereto at Exhibit "O"), was filed to amend the UCC-1, which restated the collateral as being:

> "[t]he Distributor Agreement by and between Bruckner Beverage, Inc. and the Pepsi-Cola Bottling Company of New York, Inc. and pertaining to a certain Pepsi-Cola distribution territory conveyed July 31, 2013, beverage trucks with vehicle identification numbers1HTMAAN74H607626 and 2NKMLZ9X95M100779, and pertaining to that said territory, all of the Debtor's equipment, parts, inventory, accounts receivable and the proceeds derived therefrom, now or hereinafter owned by or due the Debtor." (For the purposes of this adversary proceeding, the UCC-3 Amendment shall be included in the Inaccurate Documents.)

(See paragraph 24 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 17 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

29. The collateral description contained in the UCC-3 Amendment should have read:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of

10

Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013.

(See paragraph 25 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraphs 17 and 20 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

30. Following the transaction through the date upon which issue was joined in this Adversary Proceeding, despite the inadvertent mistakes contained in the Inaccurate Documents, Sanchez, B. Sapra, the Debtor and its counsel continued to act in compliance with the true intent of the parties regarding Agreed-Upon Transaction and what the Inaccurate Documents should have stated from the time of their execution, which is that Sanchez is the proper payee on the $900k Promissory Note, the proper secured party on the 2013 Security Agreement, and that the collateral listed on the 2013 Security Agreement and the UCC-3 Amendment should have been as set forth above. (See paragraph 26 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".) (See also paragraph 18 of the Stern Affidavit, a copy of which is annexed hereto at Exhibit "E".)

31. In keeping with the terms of the Agreed-Upon Transaction, the Debtor's schedules, sworn to under oath by B. Sapra, list Sanchez as a secured creditor on Schedule "D"[4], a copy of which is annexed hereto at Exhibit "P". The Debtor's Schedule "D" lists the obligation to Sanchez as being secured by a UCC filed in August of 2013 giving Sanchez a security interest in the Debtor's stock and two vehicles. As of the date of this statement, the Debtor has not amended its Schedule "D", as confirmed by the Court Docket for this case, a copy of which is annexed hereto at Exhibit "Q". (See paragraph 27 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

---

[4] While the Debtor's Schedule "D" lists the secured obligation to Sanchez as "disputed" it is respectfully submitted that the listing as "disputed" referred to something other than secured status (such as amount), as if the Debtor truly believed that Sanchez was an unsecured creditor, the obligation would have been listed on Schedule "F".

11

32. On May 19, 2014, Sanchez filed a proof of claim in the Debtor's case asserting a secured claim in the sum of $978,000.00 (the "Sanchez Proof of Claim"). The Sanchez Proof of Claim annexed a copy of the Complaint in this Adversary Proceeding as the basis for perfection of the secured claim. As of the date of this statement, the Debtor has not interposed any objection to the Sanchez Proof of Claim. (See a copy of the Court's Claim Register for this chapter 11 case, a copy of which is annexed hereto at Exhibit "R".) (See also paragraph 28 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

33. The Debtor previously filed an Order to Show Cause with this Court dated March 10, 2014 (the "Debtor's Prior Motion"). In further keeping with the terms of the Agreed-Upon Transaction, the Debtor's Prior Motion and the affirmation of Debtor's counsel submitted with the Debtor's Prior Motion repeatedly refer to Sanchez as the secured creditor of the Debtor. (See paragraphs 4 and 6 of the Debtor's Prior Motion, and paragraph 4 of the Affirmation of Anne Penachio, Esq. [the "Penachio Affirmation"] submitted with the Debtor's Prior Motion, which are collectively annexed hereto at Exhibit "S".) (See also paragraph 29 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

34. Subsequent to the hearing on the Debtor's Prior Motion, it appears that B. Sapra has repeatedly been taking actions with regard to the Debtor ("Sapra's Improper Actions") that have been in direct derogation of his fiduciary duty as the operator of a Debtor-In-Possession. (See paragraph 30 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

35. Apparently, Sapra's Improper actions began almost immediately after the hearing on the Debtor's Prior Motion. (See paragraph 31 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

36. Upon information and belief, of the six known checks B. Sapra has written to Pepsi, three of them have bounced, as follows: (a) March 21, 2014 - $15,976.75; (b) March 26,

2014 - $1,493.50; and (c) March 27, 2014 - $10,519.37, for a total of $27,989.62. The Debtor should have had sufficient monies to cover all of the bounced checks. (See paragraph 32 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

37. There are two trucks that are used in the Debtor's operations, Truck 112 and Truck 114. Upon information and belief, the Debtor's cash sales for the two (2) weeks ending March 27, 2014 were $59,102.69, $25,365.29 from the operation of Truck 112 and $33,737.40 from the operation of Truck 114. The majority of sales from the operation of Truck 114 come from one account, Tremont Beverage, the majority of which are paid in the form of checks. The majority of sales from the operation of Truck 112 are paid in cash. At the end of this period, B. Sapra showed Sanchez the Debtor's bank account on-line which, at that time, showed approximately only $33,000.00 in deposits. (See paragraph 33 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

38. Brown, the Debtor's primary driver, advised Sanchez that subsequent to March 17, 2014, at the end of each day he gave all cash proceeds to B. Sapra. Brown further advised that B. Sapra alone had been responsible for collecting from Tremont Beverage. Sanchez was advised by Ricky at Tremont Beverage that during the two week period ending March 27, 2014, Tremont had paid B. Sapra cash in the approximate sum of $30,000.00. (See paragraph 3 of the affidavit of John Brown [the "Brown Affidavit"] a copy of which is annexed hereto at Exhibit "T".) (See also paragraph 38 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

39. Upon information and belief, for the two (2) weeks ending March 27, 2014, B. Sapra only deposited checks into the Debtor's bank account and failed to deposit any of the cash collected into the Debtor's bank account. (See paragraph 35 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

40. Had B. Sapra deposited all funds, both cash and checks, into the Debtor's bank account for the two (2) weeks ending March 27, 2014, there would have been sufficient funds to cover all of the checks written to Pepsi. (See paragraph 36 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

41. On March 27, 2014, Sanchez received a call from David Downs ("Downs"), the head of Bronx Sales for Pepsi, who informed Sanchez that due to the continued bounced checks, the Debtor was going to be placed on COD. (See paragraph 37 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

42. On March 28, 2014, Downs again called Sanchez and advised that he had spoken with B. Sapra regarding the Debtor's balance owed to Pepsi, and that B. Sapra told him that he would be coming in to the warehouse with a certified funds in the sum of $20,000.00 by 9:00 a.m. that day. Downs further advised that when B. Sapra didn't arrive by 9:00 a.m., he called him again and was advised by B. Sapra that he had been delayed, and would be coming by with certified funds in the sum of $15,000.00, instead of $20,000.00. When B. Sapra finally appeared at 10:45 a.m., at which time Sanchez was with Downs, B. Sapra advised Downs that he had no certified funds, and only had $4,000.00 in cash which Downs had him turn in to Pepsi's cashier. (See paragraph 38 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

43. Pepsi placed the Debtor on COD effective Monday, March 31, 2014. (See paragraph 39 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

44. Upon information and belief, B. Sapra has not paid for Pepsi product COD, and as a result, the Debtor ceased operating effective March 31, 2014. (See paragraph 40 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

45. Brown, the Debtor's primary driver, tendered his resignation on March 28, 2014, effective immediately, citing an inability to work with B. Sapra. (See paragraph 4 of the Brown

Affidavit, a copy of which is annexed hereto at Exhibit "T".) (See also paragraph 41 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

46. The Debtor has purposefully concealed all of it's financial information since the filing of it's Chapter 11 case by failing to file a single operating report with the Court, despite its requirement to do so. (See a copy of the Court Docket for this case, a copy of which is annexed hereto at Exhibit "Q".) (See also paragraph 42 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

47. At the Section 341(a) meeting of creditors in this case, Sanchez requested that Sapra provide him with an accounting of all of the monies, cash or otherwise, that have been collected by or on behalf of the Debtor, by B. Sapra or any other party, since the Filing Date, but none has ever been provided. (See paragraph 43 of the Sanchez Affidavit, a copy of which is annexed hereto at Exhibit "C".)

Dated: Melville, New York
September 5, 2014

LAW OFFICE OF MICHAEL G. MC AULIFFE
Counsel to the Plaintiff William Sanchez

By: _/s/ Michael G. Mc Auliffe_
Michael G. Mc Auliffe, Esq.
68 South Service Road, Suite 100
Melville, New York 11747
(631) 465-0044