EXHIBIT "C"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS
----------------------------------------------------------------X
In re:

BUHRE BEVERAGE DISTRIBUTION, INC.,

                         Debtor.

Chapter 11

Case No. 14-22048-rdd

----------------------------------------------------------------X

WILLIAM SANCHEZ,

                        Plaintiff,

    -against-

BUHRE BEVERAGE DISTRIBUTION, INC.,
BHAVEEN SAPRA and BRUCKNER BEVERAGE, INC.,

                        Defendants.

Adv. Pro. No.: 14-08218-rdd

----------------------------------------------------------------X

STATE OF         )
                         )ss
COUNTY OF     )

WILLIAM SANCHEZ, being duly sworn, deposes and says:

1.     I make this affidavit in support of my Motion seeking the entry of an order: (a) pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7056 and Federal Rule of Civil Procedure ("FRCP") 56 granting summary judgment against BUHRE BEVERAGE DISTRIBUTION, INC. (alternatively, "Buhre" and the "Debtor"), BHAVEEN SAPRA ("B. Spara"), and BRUCKNER BEVERAGE, INC. ("Bruckner") (collectively, the "Defendants")[1] ,

---

[1] PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. ("Pepsi") was originally a defendant in this adversary proceeding, but the adversary proceeding was dismissed as against Pepsi, with prejudice, pursuant to a Stipulation between myself and Pepsi which was "so

1

Spara"), and BRUCKNER BEVERAGE, INC. ("Bruckner") (collectively, the "Defendants")[1], the Defendants herein, on the first and third claims for relief in my complaint in this adversary proceeding; and (b); granting me such other, and further relief as the Court deems to be just and proper under the circumstances.

2. Since 1995, I have been the owner/operator of various soda distribution routes of Pepsi.

3. At all times relevant herein, prior to July 31, 2013 I was the 100% owner of Buhre.

4. Buhre is, and at all times relevant herein was, the owner of a certain Pepsi distribution route that covered certain territory in the Bronx, New York (the "Buhre Pepsi Route"), together with two delivery trucks, and other miscellaneous assets.

5. In or about September 2012, I decided to sell the Pepsi route that I owned and operated through Buhre.

6. B. Sapra wanted to take over the Buhre Pepsi Route, and in order to do this, his father Pratap Sapra ("P. Sapra") arranged for him to purchase said Route from me.

7. I agreed to sell Buhre's assets, including the Buhre Pepsi Route, to B. Sapra for $1,175,000.00 (which sum was later voluntarily reduced by me to $1,153,000.00), and as B. Sapra did not have sufficient cash to close on the transaction, it was agreed that I would hold a note in the sum of $900,000.00 for the balance of the purchase price, and take back a purchase money security interest in Buhre's assets until such time as the note was paid in full.

8. All operators of Pepsi distribution routes must be approved by Pepsi, and as such,

---

[1] PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. ("Pepsi") was originally a defendant in this adversary proceeding, but the adversary proceeding was dismissed as against Pepsi, with prejudice, pursuant to a Stipulation between myself and Pepsi which was "so ordered" by this Court on July 24, 2014.

B. Sapra applied to Pepsi for approval to operate such a route.

9. At an interview with Pepsi's Transfer Committee on December 13, 2013, Pepsi denied B. Sapra's application based on his lack of experience and the fact that he did not hold a Commercial Driver's License ("CDL") or a green card, and Pepsi advised B. Sapra that in order to obtain approval from Pepsi he would need to secure a green card and a CDL, and provided him with criteria to follow in order to gain the requisite experience.

10. On December 27, 2012, I entered into a contract for the sale (the "December 2012 Contract") of Buhre's assets to PBR Beverage, Inc. ("PBR"), a corporation wholly owned by B. Sapra. The parties anticipated that B. Sapra would expeditiously satisfy the requirements that would enable him to obtain the requisite approval from Pepsi, and that a closing on the December 2012 Contract would take place in January or February of 2013.

11. In accordance with the terms of the December 2012 Contract, certain documents were prepared that would effectuate the sale pursuant to said Contract. These documents (collectively, the "2012 Documents") were:

    a. A promissory note with PBR as "maker" and Buhre as "payee", pursuant to which PBR promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 ½ percent interest;

    b. A security agreement with PBR as "debtor" and Buhre as "secured party", pursuant to which PBR granted Buhre a security interest in the Pepsi Cola Distributor Agreement, together with all accounts receivable and equipment;

    c. A bill of sale listing Buhre as "seller" and PBR as "purchaser"; and

    d. Two motor vehicle bills of sale for the two trucks owned by Buhre, listing Buhre as "seller" and PBR as "buyer".

12. In accordance with the terms of the 2012 Documents, B. Sapra secured a green card, and I allowed B. Sapra to work the route with me in order to gain the necessary experience.

13. B. Sapra, however, never obtained his CDL, and in or about April 2013, Pepsi again denied his application for approval.

14. B. Sapra then determined to enter into a partnership with John Brown ("Brown[2]") to purchase the Buhre Pepsi Route, as Brown had the requisite experience and CDL, and had been previously approved by Pepsi as a route operator. Approval from Pepsi was obtained and memorialized in a letter from Peter Gaudet, Vice President of Labor Relations at Pepsi (the "Pepsi Approval Letter"), and a closing date was fixed for mid-July, but on the day of the closing, I was advised that the closing was being adjourned due to alleged "concerns about Brown."

15. Over the next several days the parties engaged in various discussions. During these discussions, it was determined that B. Sapra did not have the cash available that was required at the closing (the December 2012 Contract required the payment of $100,000.00 cash at the closing), and I agreed to reduce the purchase price by $22,000.00 and to take the balance due in the form of a promissory note in the sum of $78,000.00 payable on or before November 1, 2013, instead of cash. As the parties had resolved Sapra's cash deficiency problem, the alleged "concerns about Brown" evaporated and it was agreed that the parties would move forward with a closing.

16. B. Sapra was anxious to close as soon as possible as it was July and the Summer months are the most lucrative for a soda distribution route.

17. On July 31, 2013, a meeting was held (the "July 31st Meeting") between B. Sapra,

---

[2] Brown worked as a driver for Buhre while it was operated by Sanchez, and remained with the Debtor upon it's sale to B. Sapra.

his counsel John Lettera, Esq. ("Lettera"), myself and my counsel Allan Stern, Esq. ("Stern"), which meeting was held at Lettera's office.

18. At the July 31st Meeting, the parties agreed that due to Brown and Pepsi's unavailability to close in August, the parties would amend the December 2012 Contract to provide for a sale of the stock of Buhre to B. Sapra's corporation instead of a sale of the assets, which transaction could be effectuated without the participation of Brown or Pepsi.

19. To that end, at the July 31st Meeting, the parties negotiated and entered into a second contract of sale dated July 31, 2013 (the "July 2013 Contract") between myself and Bruckner, a corporation wholly owned by B. Sapra, for the sale of 100% of the shares in Buhre to Bruckner. Paragraph 1 of the July 2013 Contract expressly incorporated the terms of the December 2012 Contract.

20. At the July 31st Meeting, the parties confirmed the terms of the transfer of the shares of Buhre from me to Bruckner (the "Agreed-Upon Transaction") as follows: (a) I would transfer 100% of the shares in Buhre to Bruckner for the sum of $1,153,000.00, payable by way of $175,000.00 at the closing and two promissory notes for the balance; (b) I would receive two promissory notes from Bruckner, one in the sum of $78,000.00 payable on or before November 1, 2013 and one in the sum of $900,000.00 payable over 144 months at 6 ½ percent interest; (c) I would receive a security interest in the shares of Buhre and all of it's tangible and intangible assets, including the Buhre Pepsi Route which was initially held under the distributor agreement between Buhre and Pepsi, and would later be held under a distributor agreement between Bruckner and Pepsi (once B. Sapra was able to obtain same); (d) I would retain one share of stock in Buhre until such time as Bruckner obtained its distributor agreement with Pepsi, at

which time the remaining one share in Buhre would be transferred by me to Bruckner for no further consideration.

21.     During the course of the July 31st Meeting, the parties discussed the documents necessary to effectuate the Agreed-Upon Transaction, and such documents were drafted by Lettera at the Meeting.

22.     The closing on the July 2013 Contract took place at the July 31st Meeting, at which time the parties executed various documents (the "Inaccurate Documents") for the purpose of effectuating the Agreed-Upon Transaction.

23.     Unfortunately, the Inaccurate Documents inadvertently contained several mistakes that served to potentially alter the effectiveness of the Inaccurate Documents. Specifically, the Inaccurate Documents, and the mistakes contained therein, were:

>   a.  A promissory note with Bruckner as "maker" and Buhre as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 ½ percent interest (the "900K Promissory Note"). The "payee" on the 900K Promissory Note should have been me, not Buhre;
>
>   b.  A promissory note with Bruckner as "maker" and me as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $78,000.00 on or before November 1, 2013, with interest to accrue at 12% only if the full balance was not paid in full by November 1, 2013 (the "78K Promissory Note"). There were no mistakes contained in this document;
>
>   c.  A security agreement with Bruckner as "debtor" and Buhre as "secured party", pursuant to which Bruckner granted Buhre a security interest in the shares of Buhre and the Pepsi Cola Distributor territory, together with all accounts receivable and equipment related thereto (the "2013 Security Agreement"). The "secured party" should have been me, not Buhre, and the collateral description should have been:
>
>   > A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc.

6

and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013

    d.    A bill of sale listing me as "seller" and Bruckner as "buyer"(the "2013 Bill of Sale"). There were no mistakes contained in this document;

    e.    A stock power pursuant to which I transferred one share of Buhre stock to Bruckner (the "Single-Share Stock Power"). There were no mistakes contained in this document; and

    f.    A UCC-1 financing statement listing the "debtors" as Buhre and Bruckner and asserting a lien against the following collateral: (a) shares of stock of Bruckner; and (b) assets of Buhre (the "UCC-1"). This document was amended by the UCC-3 Amendment described below.

24.    Thereafter, on or about November 4, 2013, a UCC-3 amendment (the "UCC-3 Amendment"), was filed to amend the UCC-1, which restated the collateral as being:

> "[t]he Distributor Agreement by and between Bruckner Beverage, Inc. and the Pepsi-Cola Bottling Company of New York, Inc. and pertaining to a certain Pepsi-Cola distribution territory conveyed July 31, 2013, beverage trucks with vehicle identification numbers1HTMAAN74H607626 and 2NKMLZ9X95M100779, and pertaining to that said territory, all of the Debtor's equipment, parts, inventory, accounts receivable and the proceeds derived therefrom, now or hereinafter owned by or due the Debtor." (For the purposes of this adversary proceeding, the UCC-3 Amendment shall be included in the Inaccurate Documents.)

25.    The collateral description contained in the UCC-3 Amendment should have read:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005

7

Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013.

26. Following the transaction through the date upon which issue was joined in this Adversary Proceeding, despite the inadvertent mistakes contained in the Inaccurate Documents, B. Sapra, the Debtor, its counsel and I continued to act in compliance with the true intent of the parties regarding Agreed-Upon Transaction and what the Inaccurate Documents should have stated from the time of their execution, which is that I am the proper payee on the $900k Promissory Note, the proper secured party on the 2013 Security Agreement, and that the collateral listed on the 2013 Security Agreement and the UCC-3 Amendment should have been as set forth above.

27. In keeping with the terms of the Agreed-Upon Transaction, the Debtor's schedules, sworn to under oath by B. Sapra, list me as a secured creditor on Schedule "D"[3]. The Debtor's Schedule "D" lists the obligation to me as being secured by a UCC filed in August of 2013 giving me a security interest in the Debtor's stock and two vehicles. As of the date of this statement, the Debtor has not amended its Schedule "D", as confirmed by the Court Docket for this case.

28. On May 19, 2014, I filed a proof of claim in the Debtor's case asserting a secured claim in the sum of $978,000.00 (the "Sanchez Proof of Claim"). The Sanchez Proof of Claim annexed a copy of the Complaint in this Adversary Proceeding as the basis for perfection of the

---

[3] While the Debtor's Schedule "D" lists the secured obligation to Sanchez as "disputed" it is respectfully submitted that the listing as "disputed" referred to something other than secured status (such as amount), as if the Debtor truly believed that Sanchez was an unsecured creditor, the obligation would have been listed on Schedule "F".

8

secured claim. As of the date of this statement, the Debtor has not interposed any objection to the Sanchez Proof of Claim.

29. The Debtor previously filed an Order to Show Cause with this Court dated March 10, 2014 (the "Debtor's Prior Motion"). In further keeping with the terms of the Agreed-Upon Transaction, the Debtor's Prior Motion and the affirmation of Debtor's counsel submitted with the Debtor's Prior Motion repeatedly refer to me as the secured creditor of the Debtor.

30. Subsequent to the hearing on the Debtor's Prior Motion, it appears that B. Sapra has repeatedly been taking actions with regard to the Debtor ("Sapra's Improper Actions") that have been in direct derogation of his fiduciary duty as the operator of a Debtor-In-Possession.

31. Apparently, Sapra's Improper actions began almost immediately after the hearing on the Debtor's Prior Motion.

32. Upon information and belief, of the six known checks B. Sapra has written to Pepsi, three of them have bounced, as follows: (a) March 21, 2014 - $15,976.75; (b) March 26, 2014 - $1,493.50; and (c) March 27, 2014 - $10,519.37, for a total of $27,989.62. The Debtor should have had sufficient monies to cover all of the bounced checks.

33. There are two trucks that are used in the Debtor's operations, Truck 112 and Truck 114. Upon information and belief, the Debtor's cash sales for the two (2) weeks ending March 27, 2014 were $59,102.69, $25,365.29 from the operation of Truck 112 and $33,737.40 from the operation of Truck 114. The majority of sales from the operation of Truck 114 come from one account, Tremont Beverage, the majority of which are paid in the form of checks. The majority of sales from the operation of Truck 112 are paid in cash. At the end of this period, B. Sapra showed Sanchez the Debtor's bank account on-line which, at that time, showed

9

approximately only $33,000.00 in deposits.

34. Brown, the Debtor's primary driver, advised me that at the end of each day he gave all cash proceeds to B. Sapra. Brown further advised that B. Sapra alone had been responsible for collecting from Tremont Beverage. I was advised by Ricky at Tremont Beverage that during the two week period ending March 27, 2014, Tremont had paid B. Sapra cash in the approximate sum of $30,000.00.

35. Upon information and belief, for the two (2) weeks ending March 27, 2014, B. Sapra only deposited checks into the Debtor's bank account and failed to deposit any of the cash collected into the Debtor's bank account.

36. Had B. Sapra deposited all funds, both cash and checks, into the Debtor's bank account for the two (2) weeks ending March 27, 2014, there would have been sufficient funds to cover all of the checks written to Pepsi.

37. On March 27, 2014, I received a call from David Downs ("Downs"), the head of Bronx Sales for Pepsi, who informed me that due to the continued bounced checks, the Debtor was going to be placed on COD.

38. On March 28, 2014, Downs again called me and advised that he had spoken with B. Sapra regarding the Debtor's balance owed to Pepsi, and that B. Sapra told him that he would be coming in to the warehouse with a certified funds in the sum of $20,000.00 by 9:00 a.m. that day. Downs further advised that when B. Sapra didn't arrive by 9:00 a.m., he called him again and was advised by B. Sapra that he had been delayed, and would be coming by with certified funds in the sum of $15,000.00, instead of $20,000.00. When B. Sapra finally appeared at 10:45 a.m., at which time I was with Downs, B. Sapra advised Downs that he had no certified funds,

and only had $4,000.00 in cash which Downs had him turn in to Pepsi s cashier.

39. Pepsi placed the Debtor on COD effective Monday, March 31, 2014.

40. Upon information and belief, B. Sapra has not paid for Pepsi product COD, and as a result, the Debtor ceased operating effective March 31, 2014.

41. Brown, the Debtor s primary driver, tendered his resignation on March 28, 2014, effective immediately, citing an inability to work with B. Sapra.

42. The Debtor has purposefully concealed all of it s financial information since the filing of it s Chapter 11 case by failing to file a single operating report with the Court, despite its requirement to do so.

43. At the Section 341(a) meeting of creditors in this case, I requested that Sapra provide me with an accounting of all of the monies, cash or otherwise, that have been collected by or on behalf of the Debtor, by B. Sapra or any other party, since the Filing Date, but none has ever been provided.

WILLIAM SANCHEZ.

Sworn to before me this 4th
day of September, 2014

_____
Notary Public

MICHAEL G. MC AULIFFE
Notary Public, State of New York
No. 02MC5062957
Qualified in Nassau County
Commission Expires July 15, 2018

11