EXHIBIT "D"

## CONTRACT OF SALE

THIS CONTRACT OF SALE (the "Agreement") is made the 27th day of December, 2012 by and between BUHRE BEVERAGE DIST, INC., a New York corporation having its principal offices at 650 Brush Road, Bronx, New York 10465, hereinafter referred to as the "SELLER", and PBR BEVERAGE INC., doing business at 22 Stony Hollow, Chappaqua, New York 10514, hereinafter referred to as the "PURCHASER".

WHEREAS, in accordance with the terms and conditions of the Distributor Agreement (a copy of which is annexed hereto as Exhibit A) between SELLER and PEPSI-COLA BOTTLING COMPANY OF N.Y., INC. ("COMPANY"), SELLER distributes beverages supplied by the COMPANY in accordance with the Distributor Agreement ("PRODUCTS"); and

WHEREAS, COMPANY has agreed to allow SELLER to transfer the distribution rights to a replacement distributor, in accordance with the provisions of the Distributor Agreement; and

WHEREAS, upon the COMPANY's written approval of the PURCHASER, the Distributor Agreement provides that the COMPANY will enter into a new Distributor Agreement using the form then in use by the COMPANY, designating PURCHASER as "the distributor" for the territory presently served by SELLER, as more particularly described in Exhibit B annexed hereto and made a part hereof (the "Territory"); and

WHEREAS, SELLER has reviewed this Contract with its attorney, Allan M. Stern, Esq.; and

WHEREAS, PURCHASER has reviewed this Contract with his attorneys, Cuddy & Feder LLP.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the SELLER and the PURCHASER covenant and agree:

## 1.00 ASSETS BEING CONVEYED

1.01 Subject to the COMPANY's approval, the SELLER agrees to release SELLER's rights pursuant to the Distributor Agreement. PURCHASER agrees to enter into a Distributor Agreement with the COMPANY to distribute PRODUCTS within the Territory. The closing of the sale transaction contemplated herein (the "Sale Closing") shall take place on or about December 27, 2012 at the offices of PURCHASER's counsel, or such other location as may be agreed to by the parties. The parties acknowledge and agree that BHAVEEN SAPRA has filed a COMPANY form application seeking to obtain COMPANY approval to operate a COMPANY distribution route. PURCHASER is aware that upon receipt of such approval (the "COMPANY Closing"), both the PURCHASER and BHAVEEN SAPRA, individually, will be required by the COMPANY to execute certain documents, and that BHAVEEN SAPRA will likely be required to sign a document stating that he is and shall remain the sole shareholder of the PURCHASER.

1.02 The distribution rights are to be conveyed free and clear of any debts or encumbrances, except as provided in paragraphs 1.03, 1.04 and 8.

1.03 At the COMPANY closing, PURCHASER will assume the loans and leases for the marketeers and vending machines appearing upon a schedule to be provided by the COMPANY for Territory at the COMPANY Closing, substantially in

C&F: 2058844.1

accordance with <u>Exhibit C</u> annexed hereto. Payments upon all such vending equipment shall be current through the date of the COMPANY Closing, and except as provided pursuant to the lease provisions, the vending equipment shall be conveyed free and clear of any debts or encumbrances.

1.04    The sale includes two (2) vehicles and related equipment: a 2004 International Harvester truck bearing V.I.N. 1HTMMAAN74H607626 (approximate finance balance $15,000.00), and a 2005 Kenilworth van V.I.N. 2NKMLZ9X95M100779 (no outstanding financing). PURCHASER further agrees to execute required assumption documents and pay all required transfer fees, re-registration fees, and related expenses pro-rated to the date of the COMPANY closing. SELLER represents that as of the date of the COMPANY Closing, the vehicles will pass New York re-registration inspection. The parties have been advised that the truck financing company will not provide the assumption agreement(s) as of the date of the Sale Closing or the COMPANY Closing, and the parties agree that after the date of the COMPANY Closing, each will execute any documents required for PURCHASER to be designated, as appropriate, as the owner or registrant. If PURCHASER is unable to obtain insurance for said vehicle pending the assumption, SELLER will maintain the insurance and registration upon said vehicle until such time as PURCHASER obtains the transfer of said truck. PURCHASER will reimburse SELLER for all expenses incurred by SELLER relating to said truck after the date of COMPANY Closing. During the Management Period described below at 1.05, SELLER shall continue maintaining and making all payments due upon said vehicles. Upon execution of the assumption agreement, PURCHASER shall be solely responsible for re-registering the vehicle.

1.05    In order for BHAVEEN SAPRA to obtain the experience necessary to fulfill the approval procedures established by the COMPANY, SELLER has agreed to manage the route for PURCHASER and provide training to PURCHASER during the period beginning on the day after the Sale Closing and terminating on (and including) the day of the COMPANY Closing ("Management Period"). As part of the training, PURCHASER shall have access to the SELLER's books and records identifying the route sales from the date of this Agreement. Notwithstanding SELLER's agreement to provide training to PURCHASER, PURCHASER shall be solely responsible for obtaining training and information sufficient to obtain COMPANY approval. On the date of the COMPANY Closing, the parties will agree upon the number of cases sold during the Management Period ("Case Adjustment"). The books and records of the SELLER shall be used to determine the number of cases used to calculate the Case Adjustment. At the COMPANY Closing, SELLER will pay to the PURCHASER an amount equal to the Case Adjustment multiplied by $.45 (the "Case Adjustment Fee"). SELLER agrees to manage the route for a reasonable period not to exceed ninety-five (95) days from the Sale Closing. If BHAVEEN SAPRA has not obtained the COMPANY approval on or before ninety-five (95) days from the Sale Closing, then SELLER, upon SELLER's sole and exclusive discretion, shall be entitled to discontinue managing the route upon five (5) days written notice ("Management Termination Notice").

2.00  TERMS

2.01  The purchase price for the assets being transferred hereunder is ONE MILLION ONE HUNDRED AND SEVENTY-FIVE THOUSAND ($1,175,000.00) DOLLARS ("PRICE") to be paid as follows:

4

a) The initial down payment sum of ONE HUNDRED AND SEVENTY-FIVE THOUSAND ($175,000.00) DOLLARS was paid simultaneously with the execution of this agreement. The down payment is to be deposited into a non-interest bearing escrow account of ALLAN M. STERN, Esq., located and JPMorgan Chase Bank, 215 Old County Road, Mineola, New York 11501;

b) The second down payment sum of ONE HUNDRED THOUSAND ($100,000.00) DOLLARS is to be paid on or before January 28, 2012, and if the COMPANY Closing has not taken place as of said date, the funds will be deposited in the escrow account as set forth in 2.01(a);

c) The principal balance of NINE HUNDRED THOUSAND ($900,000.00) DOLLARS is to be paid in accordance with the provisions of a self-amortizing Promissory Note to be executed at closing. The Promissory Note shall be in the form annexed as Exhibit D, and shall include interest at SIX AND ONE-HALF (6.5%) PERCENT per annum, for TWELVE (12) years, payable NINE THOUSAND SEVENTEEN DOLLARS AND TWENTY-NINE ($9017.29) CENTS per month ("Promissory Note"). Monthly payments shall commence on the date that is ninety (90) days after the COMPANY Closing, and shall continue to be paid monthly for ONE HUNDRED and FORTY-FOUR months on the 1st day of each month hereinafter until paid in full. Each installment payment shall be first applied to the payment of interest on the outstanding principal remaining unpaid, and then in reduction of the outstanding principal balance; and

d) The down payments paid pursuant to 2.01 (a) and (b) shall be paid to SELLER at the COMPANY Closing. The contract down payments shall be held in escrow by Sellers' attorney as escrow agent until the COMPANY Closing.

(1) In the event that PURCHASER makes a timely and good faith application to the COMPANY and BHAVEEN SAPRA is not approved by the COMPANY on or before April 1, 2013, or upon such earlier date that the COMPANY notifies PURCHASER that the COMPANY has disapproved BHAVEEN SAPRA's route transfer application, then either party to this agreement shall be entitled to send a written "Termination Notice" to the other indicating that this agreement is terminated. Within five (5) business days of the receipt of the Termination Notice, the Escrow Agent shall refund to the PURCHASER the down payments. Upon the return of the escrow, all rights, duties and obligations arising under this agreement and the related promissory note and security agreement shall be deemed null and void. The original promissory note will be marked "Terminated" and will be forwarded to PURCHASER's counsel.

2) Except as provided above, the down payments shall be held in escrow until the COMPANY closing. At the COMPANY Closing the Escrow Agent shall disburse the down payments to the Seller. In the event that the COMPANY Closing does not take place due to the default of the PURCHASER, the Escrow Agent is authorized to release the down payment to the SELLER as liquidated damages. Upon the default by the PURCHASER, the Escrow Agent shall provide PURCHASER with ten

6

(10) day written notice that the Escrow Agent intends to release the down payment to the SELLER. If the Escrow Agent fails to receive written notice from the PURCHASER disputing said down payment release prior to the expiration of the notice period, PURCHASER will be deemed to have consented to said release. If the PURCHASER gives timely notice disputing the release of the down payments from escrow, the Escrow Agent shall not release the down payments to SELLER, but shall be entitled to either retain the escrow in the escrow account, or deposit the escrow with the Clerk of a Court of competent jurisdiction. Upon deposit by the Escrow Agent with the Court, the duties of the Escrow Agent will terminate upon said deposit. Except as to the Escrow Agent's acts of willful deceit or gross negligence, if litigation is commenced by any party regarding any money held in escrow by the Escrow Agent, or deposited with the Court, the parties agree that the Escrow Agent shall not be made a party to any lawsuit regarding said escrow. Nothing herein shall prevent the attorney for the SELLER from representing the SELLER, as attorney.

2.02 The Security Agreement in the form annexed at Exhibit E, and the UCC-1 financing statement(s) executed at closing shall each contain language creating a lien upon these Assets.

2.03 PURCHASER shall also pay as an additional Promissory Note payment all reasonable attorneys' fees or other expenses incurred by SELLER in enforcing any of PURCHASER's obligations under this Contract. As used in this paragraph, the phrase

C&F: 2058844.1

"all reasonable attorneys' fees" or other expenses incurred by SELLER in enforcing any of PURCHASER's obligations under this Contract", shall mean the following:

(a) PURCHASER hereby agrees to pay to SELLER's attorney, by bank, certified, or attorney's check, SEVEN HUNDRED AND FIFTY ($750.00) DOLLARS, for preparation of the Promissory Note, Security Agreement, and TWENTY ($20.00) DOLLARS for each UCC-1 or UCC-3 form to be filed.

(b) For every notice of default SELLER's attorney sends to the PURCHASER, PURCHASER shall be obligated to pay a legal fee of $150.00.

(c) Legal fees of the victorious party incurred in the course of litigation shall be paid by the unsuccessful party.

(d) Any payments made or expenses incurred in connection with these rights shall be reimbursed by PURCHASER within ten (10) days after demand thereof.

### 3.00 ASSET ALLOCATION

3.01  The allocation of the sales price shall be subject to the agreement of PURCHASER and SELLER.

3.02  PURCHASER and SELLER each agree to independently obtain the advice of financial advisors concerning the allocation of the PURCHASE PRICE. The failure of the PURCHASER and SELLER to agree to a sale price allocation, will not be deemed a breach of this Agreement, and shall not delay closing.

### 4.00 SALE BY PURCHASER

4.01 Except as provided in the Promissory Note, this route cannot be sold by the PURCHASER prior to the satisfaction of said Promissory Note.

C&P: 2058844.1

### 5.00 OWNERSHIP

5.01 Until the balance due SELLER is paid in full, BHAVEEN SAPRA shall remain the owner of not less than fifty-one (51%) percent of the PURCHASER. BHAVEEN SAPRA shall continue managing the PURCHASER until: the Promissory Note is paid in full; or, a subsequent purchaser assumes the obligations arising pursuant to the Promissory Note.

5.02 Failure to comply with the provisions of 5.01 shall be deemed a default pursuant to the Promissory Note.

### 6.00 DISTRIBUTORSHIP APPROVAL PROCEDURES

6.01 This Contract is subject to and conditioned upon the approval of the PURCHASER by the COMPANY. Pursuant to SELLER's Distributor Agreement, the COMPANY has agreed to issue to PURCHASER a new Distributor Agreement, using the form Distributor Agreement then in use by the COMPANY. PURCHASER is solely responsible for reviewing the Distributor Agreement in use by the COMPANY as of the date of closing, and PURCHASER agrees to enter into the Distributor Agreement, as long as the form is substantially similar to the existing Distributor Agreement.

### 7.00 BUYOUT

7.01 The parties hereto recognize the need to agree upon a settlement procedure to be utilized in the event that prior to the satisfaction of the SELLER's Promissory Note, the Distributor Agreement expires, and PURCHASER is not permitted by the COMPANY to operate the route. For the purpose of this paragraph, payments made by the COMPANY to purchase PURCHASER's rights to the route, for a restrictive covenant pertaining to PURCHASER, or any other payments directly or indirectly to BHAVEEN

C&F: 2058844.1

SAPRA, PURCHASER or PURCHASER's successors or assigns for the extinguishment or release of rights originally held by PURCHASER relating to the Distributor Agreement then in effect, shall be considered to be part of the BUYOUT PAYMENT as used herein. Payments to PURCHASER for vending equipment, vehicles, or other equipment shall be included in the calculation of the BUYOUT PAYMENT to the extent that such payments exceed the fair market value of such equipment. In the event that the COMPANY purchases from PURCHASER the rights which PURCHASER possesses to distribute PRODUCTS pursuant to the Distributor Agreement then in effect, PURCHASER agrees to pay to SELLER the principal balance of the SELLER's Promissory Note with interest, fees, and expenses ("TOTAL BALANCE") then due SELLER subject to the following terms:

(a) In the event that the BUYOUT PAYMENT by the COMPANY is less than TOTAL BALANCE, then the payment to be made to SELLER will be reduced by the fraction which has a numerator in the amount to be paid by the COMPANY, and a denominator which is the TOTAL BALANCE.

(b) In the event that the payment by the COMPANY is to be pursuant to certain terms (i.e. payment of x years, principal payment without interest, etc.), the SELLER agrees to accept further payments based upon the BUYOUT terms to be paid to the COMPANY.

(c) If permitted by the COMPANY, PURCHASER shall direct that the COMPANY pay directly to the SELLER, the payments due SELLER.

(d) PURCHASER and SELLER hereby agree to execute the documents and/or authorizations required by the COMPANY, and to close in a timely

C&F: 2058844.1

manner with the COMPANY in the event of a COMPANY buyout. As part of
SELLER's rights pursuant to this paragraph, PURCHASER agrees to provide
SELLER with a copy of the final COMPANY proposal within not later than
forty-five (45) days prior to the BUYOUT closing scheduled by the COMPANY.

7.02 The parties recognize that notwithstanding the provisions of this paragraph,
SELLER has made no representations that the COMPANY will make an offer to
purchase the distributorship. It is further acknowledged that the COMPANY may not
extend the term of the current Distributor Agreement and, accordingly, the rights to
operate the distributorship being conveyed may expire without a BUYOUT prior to the
satisfaction of the Promissory Note. In the event that the distribution rights expire, the
PURCHASER is not permitted to operate the distributorship, and PURCHASER receives
no BUYOUT PAYMENT, subject to paragraph 7.03, PURCHASER shall only be
obligated to pay SELLER the principal, interest, and fees due through the last day that
PURCHASER operates the route. As used in this paragraph, the term "PURCHASER"
shall include any agent or successor in interest to the PURCHASER.

7.03 If the PURCHASER, PURCHASER's principal officers, or PURCHASER's
successor or assigns (jointly referred to as "Plaintiff") files a claim or commences
litigation against the COMPANY relating to the termination of the Distributor Agreement
by the Company, and Plaintiff obtains a settlement or judgment, then subject to the
provisions of paragraph 8.00 et. seq., Plaintiff shall be obligated to pay SELLER the
Total Balance then due and owing, in addition to fees and expenses reasonably incurred
by SELLER prior to, or in the course of such claim or litigation and/or settlement. The
provisions of paragraph 7.00 et. seq. shall be applied based upon the proceeds derived by

C&F: 2058844.1

the PURCHASER after the payment and/or reimbursement to the PURCHASER of its reasonable litigation costs. Pending judgment award or settlement, if PURCHASER is prevented from operating the route as set forth in paragraph 7.02, PURCHASER will be required to make the Note payments due for the month in which PURCHASER's operation was terminated. Thereafter, PURCHASER will not make further note payments until the successful execution upon such a judgment, award, or settlement.

7.04 Notwithstanding the expiration of the Distributor Agreement, should the PURCHASER continue as a Pepsi-Cola distributor in the Territory, then PURCHASER shall continue making the payments due pursuant to the Promissory Note.

7.05 The provisions in this paragraph "7" shall survive closing.

## 8.00 PENSION PLAN OBLIGATIONS

8.01. SELLER is a participant in the SOFT DRINK AND BREWERY LOCAL 812 I.B.T. RETIREMENT FUND ("Pension Plan"). Both the PURCHASER and SELLER have been advised by their respective counsel that the transaction herein may constitute or result in a "withdrawal" or "partial withdrawal" from the Pension Plan by the SELLER. In the event that this sale is hereinafter determined to constitute a withdrawal or partial withdrawal from the Pension Plan, the signatories hereto agree that this transaction shall not be treated as such by the Pension Plan, and that §4204 of the Employee Retirement Security Act of 1974 as amended ("ERISA") shall apply to the transaction. The SELLER and PURCHASER agree that:

(a)    The PURCHASER shall be obligated to make Pension Plan contributions in substantially the same number of contribution base units as the SELLER has been making in connection with the transferred assets;

C&F: 2058844.1

(b) The PURCHASER shall provide to the Pension Plan a bond or other acceptable security as required by ERISA §4204(a)(1)(C), and as hereinafter required by ERISA §§4204(a)(1)(B) and (C).

8.02. Intentionally Omitted.

8.03. The PURCHASER shall defend, indemnify, and hold harmless the SELLER, its agents, officers, and employees from and against all claims, damages, losses, judgments, expenses and other costs, including but not limited to litigation expenses and reasonable attorney's fees, arising out of or resulting from PURCHASER's acts or omissions relating to compliance/noncompliance with the Pension Plan, or, attributable to the PURCHASER's withdrawal or partial withdrawal from the Pension Plan during the five years immediately following the closing of this transaction. These obligations will be hereinafter jointly referred to as "Purchaser's Indemnification Obligations". The Purchaser's Indemnification Obligations extend to any withdrawal liability incurred by the SELLER to the Pension Plan as a result of this Agreement and ERISA §4204.

8.04. Purchaser's Indemnification Obligations shall include but not be limited to:

(a) The SELLER's withdrawal liability attributable to PURCHASER's withdrawal or partial withdrawal from the Pension Plan, including the interest attributable thereto;

(b) The arbitration or litigation fees, including reasonable attorney's or consultants' fees incurred by the SELLER with respect to Purchaser's Indemnification Obligations.

C&F: 2058844.1

8.05. SELLER's delay or failure to enforce any provision of this paragraph will not waive SELLER's right to subsequently enforce such provision, unless so indicated by the SELLER in writing.

8.06 The parties hereto recognize that hereinafter the PURCHASER may sell the Pepsi-Cola distribution rights and Territory referred to herein to a subsequent purchaser ("Subsequent Purchaser"). If the PURCHASER seeks to sell all or a portion of the distribution rights and Territory being conveyed herein to a Subsequent Purchaser prior to five years from the date of closing, or until such time as PURCHASER is relieved of Purchaser's Indemnification Obligations by law or the action of the Pension Plan, said sale will be conditioned upon the Subsequent Purchaser executing an agreement identical to this paragraph 8. Although the Subsequent Purchaser will thereafter become the primary obligor with respect to Purchaser's Indemnification Obligations, in the event that the Subsequent Purchaser is in default of such Purchaser's Indemnification Obligations, then the Pension Plan and the SELLER will continue to require the PURCHASER to pay the amount(s) due pursuant to Purchaser's Indemnification Obligations.

8.07 The parties hereto agree to timely execute and deliver to ALLAN M. STERN, Esq., any documents required in writing by the Pension Plan.

9.00 CLOSING

9.01 The SELLER and its principal officer shall execute and deliver to the PURCHASER a Bill of Sale containing warranties that it is not indebted to any trade creditors, any other creditors, any governmental agency, taxing authority, etc., except as provided in this Agreement. The SELLER further warrants and covenants that, except as provided herein, it will indemnify and hold the PURCHASER harmless from any and all

14

damages suffered by the PURCHASER as a result of suits, claims or other indebtedness including, but not limited to, taxes, labor claims, wage claims, personal injury suits, and any and all other claims of indebtedness arising out of, or pertaining to in any manner of occurrence in the course of the conduct of the distribution route and/or operations pursuant to the Distributor Agreement prior to the date the Bill of Sale is delivered to the PURCHASER. Said indemnification shall include, but not be limited to, the PURCHASER's reasonable counsel fees and expenses of litigation.

9.02 The Bill of Sale to be executed at the SALE Closing shall contain a statement to the effect that the SELLER and its aforesaid principal officer, shall not solicit or sell any beverages of the type sold by SELLER in connection with the business being herein sold, to any of its customers located in the Territory, for a period of two(2) years from the Sale Closing. The continuing existence of the restrictive covenant stated herein is conditioned upon PURCHASER's payment and compliance with the terms of the Promissory Note and Security Agreement referred to in paragraph 2.00 et. seq. In the event that the PURCHASER: (i) fails to cure a default of the Promissory Note or Security Agreement; (ii)is terminated by the COMPANY for cause; (iii) is terminated by the COMPANY without cause and fails or refuses to challenge such termination, then, the balance of the restrictive covenant shall be deemed null and void.

9.03 SELLER also agrees that prior to closing, PURCHASER shall have access to sales records of the distributorship including, but not limited to, the existing route books.

9.04 The provisions of this Contract shall survive closing.

9.05 The COMPANY Closing shall take place at the closing office of the COMPANY within twenty-one (21) days after PURCHASER receives approval by the COMPANY.

## 10.00 SELLER'S REPRESENTATIONS

. 10.01 SELLER warrants that the selling corporation is duly organized, validly existing, and in good standing under the laws of the State of New York.

.10.02 The execution and delivery of this Agreement and the consummation of the transaction have been duly authorized by the Board of Directors and the SELLER has the right, power, and the legal capacity to enter into and perform the obligations under this Contract, and that further corporate or shareholder authorization is not necessary in connection herewith.

10.03 SELLER is the owner, beneficially and of record and has good and marketable title to all assets being sold herein, free and clear of any liens, encumbrances, security agreements, equities, options, claims, charges or restrictions except as otherwise specifically set forth in the schedule annexed, and that there is no suit, litigation, action, administrative or other proceeding, governmental investigation, wage or labor problems pending or, to SELLER's knowledge, threatened.

10.04 SELLER is not in violation of any law, statute, regulation or ordinance.

10.05 The Distributor Agreement is in full force and effect.

10.06 Except as otherwise provided, SELLER hereby agrees to defend, indemnify and hold harmless the PURCHASER for losses, obligations, costs, or expenses (including, but not limited to, reasonable attorney's fees and litigation expenses) relating

C&F: 2058844.1

to or arising out of SELLER's operation of the route prior to the date of COMPANY Closing (each, an "INDEMNIFYING EVENT").

10.07 The SELLER represents that no broker was responsible for this sale, and the SELLER shall indemnify the PURCHASER against any claim for brokerage, provided the SELLER is given the opportunity, through his own counsel, to defend any such claim.

## 11.00 PURCHASER'S REPRESENTATIONS

11.01 The PURCHASER represents that no broker was responsible for this sale, and the PURCHASER shall indemnify the SELLER against any claim for brokerage, provided the PURCHASER is given the opportunity, through his own counsel, to defend any such claim.

11.02 The PURCHASER warrants and represents to the SELLER that:

(a) PURCHASER is duly organized, validly existing in good standing under the laws of the State of New York.

(b) The execution and delivery of this Agreement and the consummation of the transaction have been duly authorized by the Board of Directors and the PURCHASER has the right, power, and the legal capacity to enter into and perform the obligations under this Contract, and that further corporate or shareholder authorization is not necessary in connection herewith.

(c) Has available sufficient funds to pay the sums due hereunder.

(d) The principal shareholder(s), officer(s) or director(s) of PURCHASER do not have any prior felony convictions or pending criminal charges, have not

C&F: 2058844.1

been charged with Driving Under the Influence of Drugs or Alcohol, and have not had their driving privileges suspended or revoked.

(e) PURCHASER, its shareholders, officers and directors, have fully and truthfully disclosed their work history and the financial resource sources to SELLER, and consistent with the information they have supplied SELLER, will truthfully answer employment, criminal, licensing and financial questions submitted by the COMPANY.

(f) PURCHASER, its shareholders, officers and directors, are not aware of any reason that is reasonably likely to cause the COMPANY to terminate the distributorship.

(g) Except as provided, PURCHASER indemnify and hold the SELLER harmless for losses, obligations, costs, or expenses relating thereto (including reasonable attorney's fees) and arising out of SELLER's good faith operation of the route subsequent to the closing and prior to the COMPANY closing.

("INDEMNIFYING EVENT")

## 12.00 JOINT REPRESENTATIONS

12.01 The SELLER and the PURCHASER agree that there are no representations or warranties except as herein provided and that this Agreement contains all of the terms and conditions relating to the transfer of the distribution rights set forth herein, and the parties further agree that any change or modification of the terms of the within Contract must be in writing and signed by the party against whom enforcement or the change or modification or discharge is being sought.

12.02  This Agreement shall bind and benefit all of the parties hereto, their respective heirs, executors, administrators, legal representatives, successors and assigns.

12.03  The indemnified party shall cooperate with the indemnifying party, and will not settle or compromise an INDEMNIFYING EVENT without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld.  If the INDEMNIFYING EVENT shall have been instituted against the indemnified party and the indemnifying party fails after reasonable notice of the INDEMNIFYING EVENT to take action to defend it, the indemnified party shall be entitled to settle or compromise the INDEMNIFYING EVENT.  If the indemnifying party admits in writing its liability to the indemnified party with respect to all material elements of the claim of a third party indemnified against hereunder and provides the indemnified party with adequate proof of its financial responsibility, the indemnifying party shall have the right to assume full control of the defense of such claims.

12.04  The indemnifying party shall promptly pay the amounts due and pertaining to the INDEMNIFYING EVENT.

13.00 MISCELLANEOUS

13.01  Any and all disputes or disagreements between the parties hereto arising out of, under and/or by virtue of this Agreement and/or concerning the interpretation or application of the provisions of this Agreement shall be determined in arbitration before the office of the American Arbitration Association located in Bronx County, New York. The resulting award shall be rendered in accordance with the rules of the civil law and

C&F: 2058844.1

rules then applicable, and judgment upon the award may be entered in any court having jurisdiction thereof.

13.02  This Agreement may be executed in one or more counterparts, any of which may be transmitted by facsimile or other electronic method, each of which shall be deemed an original, but which together will constitute one and the same instrument.

13.03  All notices, requests, demands, and other communications, under this Agreement, shall be in writing, and shall be deemed to have been duly given on the date of service, if served personally, on the party against whom notice is to be given, or mailed by certified mail to a party at the address hereinabove set forth, or to such other address as shall be advised, by certified mail, return receipt requested.

13.04  This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

## 14.00  NON-COMPETITION

SELLER AND ITS PRINCIPALS, jointly and severally, hereby agree that they shall not re-establish, re-open, be engaged in, or in any manner whatsoever become interested, directly or indirectly, either as employee, as owner, as partner, as agent, or as stockholder, director or officer of a corporation, or otherwise, whether or not for consideration, in any business competitive to the one hereby sold, within the Territory for a term of two (2) years from the date of SALE Closing, unless the SELLER forecloses upon the Security Agreement being executed and delivered simultaneously with the SALE Closing.  The provisions of this Paragraph 14 shall survive the COMPANY Closing.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, the day and year first above written.

Dated: December 27, 2012

PBR BEVERAGE INC.

BUHRE BEVERAGE DIST., INC.

By: BHAVEEN SAPRA, President

By: WILLIAM SANCHEZ, President

Paragraphs 1.01, 1.05, 5.01 and 7.01
Agreed to:

BHAVEEN SAPRA, Individually

Paragraph 14
agreed to:

WILLIAM SANCHEZ, Individually

Paragraphs 2.01(a)(b) & (d)
agreed to:

Allan M. Stern, Esq., Escrow Agent

[Signature page to Contract of Sale]

C&F: 2058844.1

# EXHIBIT A

## DISTRIBUTOR AGREEMENT

C&P: 2058844.1

Effective as of the ███████████ the following attached documents shall constitute the Distributor Agreement between Pepsi-Cola Bottling Company of New York, Inc. ("Company") and ███████████████, an individual, ██████████████ a New York corporation ("Distributor").

1. Pepsi-Cola Bottling Group, New York City Operations form of Distributor Agreement (Exhibit A hereto) as amended by an Agreement entered into on July 28, 1984 between New York Pepsi-Cola Distributor Association, Inc. and New York Beverage Acquisition Corporation (now Pepsi-Cola Bottling Company of New York, Inc.).

2. Agreement entered into on July 28, 1984 between New York Pepsi-Cola Distributor Association, Inc. and New York Beverage Acquisition Corporation (now Pepsi-Cola Bottling Company of New York, Inc.) (Exhibit B hereto). Exhibit A thereto is also Exhibit A hereto.

3. Agreement and Addendum entered into on May 5, 1989 between New York Pepsi-Cola Distributors Association, Inc. and Pepsi-Cola Bottling Company of New York, Inc. (Exhibit C hereto)

4. Agreement entered into on March 19, 2002 between New York Pepsi-Cola Distributors Association, Inc. and Pepsi-Cola Bottling Company of New York, Inc. (Exhibit D hereto)

DATED: New York, New York
████████████

Company: Pepsi-Cola Bottling Company of New York, Inc.

By: _____

By: _____, President

_____, Individual

# PEPSI-COLA BOTTLING GROUP

## NEW YORK CITY OPERATIONS

### DISTRIBUTOR AGREEMENT

AGREEMENT, made the date hereinbelow specified between Pepsi-Cola Bottling Group (hereinafter called the "Company"), a/k/a Pepsi-Cola Metropolitan Bottling Company, Inc., a New Jersey corporation, or its successors, with offices at 700 Anderson Hill Road, Purchase, New York 10577, and                  , an individual, and                  , a New York corporation (hereinafter called the "Distributor"), of the address specified below.

The Company is engaged in the business of bottling and canning the carbonated beverages known as and sold under the trademarks Pepsi-Cola, Pepsi, Pepsi Light, Patio, Teem, Mountain Dew, Schweppes and NuGrape Grape Soda, including the dietetic soft drinks sold as Diet Pepsi-Cola or Diet Pepsi (all said soft drinks being hereinafter collectively referred to as the "Beverages"), and processing beverage concentrate into Beverage Syrup, and also in the business of distributing the Beverages and Beverage Syrup, all in accordance with the provisions and limitations of the respective Bottling and Syrup Appointments, through employees and Distributors in and about New York City.

In order to promote a more orderly and efficient distribution of the Beverages and Beverage Syrup in the area above specified and to increase sales, the Company has established restricted territories in which its sales of the Beverages intended for consumption within each restricted territory, with certain exceptions, are sold and distributed to outlets in the territory only by the Company through its employees or the Distributor designated for the territory.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Company and the Distributor hereby covenant and agree as follows:

1. APPOINTMENT-TERRITORY-EXCLUSIONS

Subject to the provisions of this agreement, the Distributor shall act as exclusive agent for delivery of the Beverages and Beverage Syrup to outlets in the territory specified in the attached Schedule (hereinafter referred to as the "Territory"). The following classes of sales and distribution of the Beverages are excluded from coverage under this agreement: (a) sales of private label brands or other beverages not included in this agreement, to stores of any chain store organizations with which the Company shall from time to time have warehouse delivery agreements; (b) sales in the Distributor's Territory intended for distribution or

the Distributor's Territory intended for distribution or resale outside thereof; (c) sales to special accounts, which for reasons that the Company may deem sufficient, are to be directly serviced by the Company provided, however, that the Distributor shall have the right of first refusal to service the same special account in accordance with the required terms; (d) sales or distribution intended for retail sale through cup vending machines, it being specifically understood that the Distributor shall have the right to act as distributor for the delivery of Beverages intended for sale through bottle or can vending machines, except that the Company reserves the right to sell and distribute to industrial and other accounts where bottle or can vending machines are located which may require full service, special service, or the type of service which the Distributor cannot give to such accounts and which the Company may desire to give; and (e) sales and distribution of Beverage Syrup which are reserved to PepsiCo, Inc., under the terms of the Company's Syrup Appointment from PepsiCo, Inc.

## 2. SALES OF COMPETITIVE BEVERAGES

The Distributor shall not bottle, sell or distribute directly or indirectly, in the Distributor's Territory any beverage known or sold as a cola beverage or in the name of which "cola" or "kola" occurs or any beverage which could be confused with Pepsi-Cola, or any other soft drink having the flavor of any of the Beverages, nor will the Distributor distribute or sell in any capacity whatsoever, directly or indirectly, any other soft drink with a name the same as any such soft drink or with a name or trademark which could be confused with the name of any such soft drink.

## 3. OUTLET COVERAGE - NEW ACCOUNTS

(a) The Distributor shall secure full distribution of the Beverages in the Territory and to that end shall individually (or by his or its own employees directly supervised by the Distributor) at all times diligently promote the sale and distribution of the Beverages in the Territory, and shall actively solicit the sale of the Beverages to every appropriate outlet therein. All outlets are to be serviced at least once a week unless the outlet requests less frequent service and such request is verified by the Company, and the Distributor's service of accounts and operation of delivery trucks are to be in effect at least five days a week except that such service shall not be required on a holiday observed by the Company provided all accounts are serviced during such week (in other words, the sole intent of this sentence is to require a minimum of a once a week service per outlet regardless of whether or not the week includes a holiday). The Company waives strict performance by any Distributor with respect to service on those religious holidays not observed generally by the Company, especially Rosh Hashonah, provided

that all accounts are serviced during the weeks in which such holidays fall and provided that the Distributor is aware of and will reasonably cooperate with the Company in the resolution of the problems created for the Company by the operation of the Company's bottling plants on those holidays and the lack of adequate storage facilities in those plants. Distributor will push vigorously the sale of the Beverages and Beverage Syrup throughout the entire Territory in any size or type bottle prescribed by the Company. Without in any way limiting the Distributor's obligation under this Paragraph 3, the Distributor must fully meet and increase the demand for the Beverages throughout the Territory and secure full distribution up to the maximum sales potential therein through all channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must service all accounts with frequency adequate to keep them at all times fully supplied with the Beverages, except that the Distributor reserves the right to organize and schedule its own route books; must employ and train his own qualified personnel; must use his own personnel and trucks in numbers adequate for all seasons and must increase the number of his personnel and the number of his trucks whenever reasonably requested to do so by the Company to better assure Distributor's compliance with this agreement; and must fully cooperate in and vigorously push the Company's advertising and sales promotion programs and campaigns for the Territory; (b) the Company shall exercise diligence in maintaining supplies of Beverages to the Distributor.

4.   SALES OF COLLATERAL ITEMS

In order to increase sales of the Beverages, the Company has developed plans and programs for the placement of collateral items. In accordance with the plans from time to time in effect, the Distributor will use his or its best efforts to secure placement in all outlets in the Territory bottle and can coolers of all types, bottle and can vending machines of all types, glasses, straws, advertising novelties and similar items supplied by the Company. The Company will provide all such items to the Distributor on a non-discriminatory basis without reference to the identity of the Distributor. Nothing herein contained, however, shall prevent the Company itself from placing such items at outlets in the Territory.

5.   ADVERTISING COOPERATION

The Distributor must fully cooperate in and vigorously promote the Company's advertising and sales promotion programs and campaigns for the Territory, and shall follow the Company's instructions in placing advertising material and carton racks and arranging floor displays.

## 6. DISTRIBUTOR'S WAREHOUSE

Any Distributor who is not garaged or warehoused in a Company plant or warehouse shall provide adequate and clean warehouse space readily accessible to the Company and capable of receiving deliveries of the Beverages and Beverage Syrup by the Company in accordance with the customary delivery practices of the Company with trucks and trailers of the size and type customarily used by the Company. Representatives of the Company shall be allowed access to the Distributor's warehouse during business hours to check on sanitary conditions.

## 7. DISTRIBUTOR'S TRUCKS

The Distributor shall at all times furnish and operate sufficient delivery trucks to supply the Territory adequately with the Beverages in all sizes and types of bottles and cans and shall also comply with such additional requirements set forth in Paragraph 3 of this agreement. All such trucks used by the Distributor in the distribution of the Company's products, except trucks rented in the busy season on a strictly temporary basis, shall be painted and inscribed in compliance with the Company's requirements and shall be maintained at all times in a clean and neat condition. The Distributor shall, at his or its expense, cause his or its trucks to be painted with the basic white or other color prescribed by the Company and with such inscriptions or lettering as may be prescribed by the Company. The Company shall cause any inscription, lettering or change of color prescribed by it to be painted or placed on the Distributor's truck at the Company's own cost and expense. The Company shall have the right to designate and to redesignate from time to time reasonable loading and unloading points for the Distributor's trucks and other vehicles.

## 8. UNIFORMS

The Distributor and all drivers and helpers who are employed by him or it shall at all times when contacting customers or delivering merchandise wear uniforms furnished by the Distributor and approved by the Company.

## 9. USE OF COMPANY TRADEMARK, SYMBOLS, ETC.

The Distributor will use the Company trademarks, symbols, slogans and advertising material only upon such terms and conditions as the Company may from time to time prescribe. In the event that this agreement is terminated for any reason whatsoever, the Distributor shall forthwith discontinue the use of the trademark and all symbols, slogans and advertising material of the Company and forthwith return to the Company all advertising signs, novelties, coolers, glasses, straws and other material in the possession of the Distributor on which

any such trademarks appear, it being understood that if the Distributor has paid the Company for any such material, the Company shall have the right to purchase the same from the Distributor by paying the cost price thereof to the Distributor.

## 10. SALES RECORDS AND RIGHT OF INSPECTION

The Distributor shall at all times maintain full and complete records and route books in a form approved by the Company and shall during ordinary business hours permit authorized representatives of the Company to inspect and make copies thereof. In order to assist the Distributor in marketing and advertising during advertising and promotional periods, the Company shall compile a list of all accounts being serviced by the Distributor from the route books, and the Distributor shall notify the Company every six months of any additions or deletions to that list of accounts.

## 11. COMPANY PRICES AND PAYMENT

Subject to the provisions of Paragraph 19 of this agreement, the Company shall pr██████he Distributor with sufficient quantities of all Bev█████nd Beverage Syrup to supply all accounts in the Terri██████required in Paragraph 3. The Distributor shall del█████Beverages and Beverage Syrup to accounts at the price███████ated in the Schedule of Prices set forth in Exhibit "██████rom time to time amended in the manner hereinafter pr████. As compensation therefore, the Distributor will rece███████commissions specified in, or computed in accordance█████aid Schedule of Prices set forth in Exhibit "B". The Distributor shall remit for all merchandise received from the Company, including, where applicable, bottles and cases, cash or Company-approved credits equal to the Company's stipulated prices. Approved credits shall consist of signed delivery tickets to Company-approved credit accounts plus commission statements setting forth commissions earned by the Distributor by type and size of Beverage and quality delivered.

## 12. REVISION OF PRICES AND DEPOSIT REQUIREMENTS

Any or all of the prices for the Beverages and Beverage Syrup stipulated in the aforesaid Schedule of Prices, as well as deposit requirements, may from time to time be revised to other or different prices or deposits by written notice by the Company to the Distributor. Any such notice shall stipulate the new prices or deposit requirements, and the new commission rate, as the case may be, and the effective date thereof, which shall be at least one day after the giving of such notice.

In the event of any increase or decrease in the stipulated price of package size, the commission payable to the Distributor for that package shall be increased or decreased,

as the case may be, by an amount equal to 15% of the stipulated price increase or decrease, all as provided in Exhibit "B".

13. PACKAGE AND UNIT CHANGES

The Company reserves the right to modify the size and/or type of bottles or containers used in packaging the Beverages, and the manner of packaging the Beverages, including the number of bottles or containers which shall constitute a unit of sale. In the event of modification as herein provided, the commission to be paid the Distributor shall be mutually agreed upon by the parties. Upon refusal or failure to enter into such agreement, the matter shall be subject to arbitration as provided in Paragraph 22 hereof -- Settlement of Disputes.

14. BEVERAGES, BOTTLES AND CASES -- TITLE-RETURN

Notwithstanding the remittance of cash or approved credits to the Company for any bottles or cases, all such bottles or cases collected from outlets shall remain solely the property of the Company and shall be disposed of solely in accordance with the Company's instructions. The Distributor shall not acquire title to or any interest in any Beverages, bottles or cases. The Company may, on a daily basis, inspect or take inventory of the Beverages in the Distributor's possession. The Distributor shall be responsible for any shrinkage in the Beverage or Beverage Syrup held by it for the Company. Payment for shrinkage shall be based upon the Company's stipulated prices less the commission allowance and shall be made daily. The Distributor shall at all times diligently cooperate with the Company to bring about the prompt collection of all empty returnable bottles and cases from outlets and to return such bottles and cases promptly to the Company, pre-sorted by the Distributor by sizes and by types of bottles.

15. SPECIAL SALES PROMOTION

In the event of a special Company promotion which includes "free" goods for outlets in the Distributor's Territory, the Company agrees to pay a sum equivalent to the Distributor's regular commission.

16. TRANSFERS

So long as this agreement is in effect, the Company shall accept any substitute agent produced by the Distributor to take over and service the Territory in place of the Distributor and shall approve the assignment of this agreement to enter into a new agreement for the balance of the term hereof in the form then in use by the Company, with such proposed party provided, he or it shall, to the satisfaction of the Company, meet the requirements of the Company as to

character, ability, financial responsibility, and adequacy of equipment to discharge the obligations assumed by the Distributor hereunder. No approval of the transfer of the Territory shall be effective unless such approval, which approval shall not be unreasonably withheld, is in writing and is executed on behalf of the Company by an officer thereof. This agreement is a personal one on the part of the Distributor, and except as hereinabove provided, the agreement may not be assigned in whole or in part and none of the obligations herein provided to be performed by the Distributor may be delegated to any other person. No sale or transfer of stock of Distributor shall be made without the written consent of the Company. Upon the termination of this agreement, the mutual rights and obligations of the parties hereto shall cease and terminate and the Company shall be under no obligation to the Distributor and the Distributor shall have no right or interest in respect of the Territory or in any other respect whatsoever, except as herein expressly provided.

17. COMPANY-DISTRIBUTOR RELATIONSHIP

The Distributor in his or its relation to the Company shall at all times be an independent agent and neither the Distributor nor any of his or its employees shall under any circumstances be deemed to be an employee of the Company. Neither the Distributor nor his or its employees shall make any representation in respect of the Company or its products not previously authorized by the Company in writing. The Company shall use its best efforts to procure discontinuance of unauthorized sales of the Beverages in the Territory, but the Company shall not be liable to the Distributor with respect to any such unauthorized sales.

18. DISTRIBUTOR'S COVENANTS

The Distributor shall not sell or distribute the Beverages or Beverage Syrup to outlets not included in the Territory unless specifically authorized so to do by the Company. The Distributor shall not join in any slowdown or cessation of distribution of the Company's products, or directly or indirectly give aid or assistance in any such action.

19. ALLOCATION OF PRODUCTS

In the event that the Company, by reason of any governmental regulations, strikes, fires, lack of materials, or any other reason whatsoever not limited to the foregoing enumeration other than its own willful fault, shall be unable to supply customers with the quantity of the Company's products which the respective customers shall require, the Company shall equitably allocate the available quantity of its products among the respective customers.

20. TERMINATION BY THE COMPANY

If the Company shall determine that the Distributor's failure or refusal to comply with one or more of the terms of this agreement, including without limitation, the failure to serve outlets in the Territory in the manner set forth in Paragraph 3 and other paragraphs of this agreement, is serious enough to warrant the action or if the Distributor is convicted of a felony, or if the Distributor becomes insolvent, makes an assignment for benefit of creditors, or if a trustee or receiver of the property or business of the Distributor is appointed, files or has filed against it a petition in Bankruptcy Act, suffers entry of any judgment against it which is not discharged, stayed or bonded of record within thirty (30) days, then, and in any such event, the Company may terminate this agreement by mailing to the Distributor by registered mail addressed to his or its last known address, a written notice terminating this agreement effective not less than thirty (30) days after the date of mailing the notice. Before issuing any such termination notice, as hereinabove provided in Paragraph 20, the Company shall give the Distributor reasonable opportunity to explain and excuse such failure or refusal. The failure of the Company to exercise any right or to act in respect of any breach hereunder by the Distributor shall not constitute a waiver of such right or breach, as the case may be. Nothing herein contained shall amount to a waiver of any right or remedy which the Company shall have at law or in equity in respect of any of the terms of this agreement or the performance of the Distributor hereunder.

21. AGREEMENT COMPLETE - MODIFICATIONS

It is expressly reaffirmed that, notwithstanding any contractual or non-contractual practices to the contrary under prior agreements, this agreement is intended to and shall supersede any and all existing agreements between the Company and the Distributor and expresses fully the agreement between the Company and the Distributor, and both parties agree that there are no promises, terms, conditions, understandings, commitments or obligations in respect of the subject matter of this agreement, except as set forth herein. This agreement shall not be modified except by written instrument executed by both of the parties.

22. SETTLEMENT OF DISPUTES

Any and all disputes between the parties, except for (a) the Distributor's obligations as provided for in the first two sentences of Paragraph 3, and (b) any matters covered by Paragraphs 20, 21, 23 and 24, shall be settled by the Vice President/Area Manager of PBG and the President of the Association.

Any and all disputes between the parties with regard to the first two sentences of Paragraph 3 and matters covered by Paragraphs 20, 21, 23 and 24 shall be settled by the President of PBG and the President of the Association.

In the event that these parties cannot agree, they shall appoint a third neutral arbitrator.

The decision of the majority of the arbitrators shall be final and binding upon the parties.

23.  DISCONTINUANCE OF BEVERAGES – TERMINATION

Anything contained in this agreement to the contrary notwithstanding, the Distributor agrees that in the event the Company, for any reason whatsoever, discontinues the sale or distribution of any of the Beverages or Beverage Syrup in and about New York City during the term of this agreement, the Distributor's right to distribute any such product shall immediately cease and be deemed terminated, released and extinguished without any liability by either party to the other.

24.  TERM OF AGREEMENT

This agreement expires on May 31, 1986 unless sooner terminated pursuant to the provisions hereof.

IN WITNESS WHEREOF, the Company and the Distributor have executed this Agreement the day and year below written.

Distributor:

Joseph M. DiStasi

_____
Individual

Colonial Distributor

_____
Corporation

Byx _____
President

Dated: _____, 1979

PEPSI-COLA BOTTLING GROUP

By _____
President

Business Address:

_____

_____

Home Address:

_____

## PEPSI-COLA BOTTLING GROUP
## NEW YORK CITY OPERATIONS

### SCHEDULE OF PRICES AND COMMISSIONS
### All Prices "Per Case"

| Pepsi Products | Distributor Commission | | | | Index Pric Retail Out as of June 1 |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| 7 N.R. | .8650 | .8950 | .9175 | .9400 | 4.50 |
| 10 N.R. | .9750 | 1.0050 | 1.0275 | 1.0500 | 5.70 |
| 16 N.R. | 1.0100 | 1.0400 | 1.0625 | 1.0850 | 6.25 |
| 32 N.R. | 1.0050 | 1.0350 | 1.0575 | 1.0800 | 6.00 |
| 48 N.R. | 1.0825 | 1.1125 | 1.1350 | 1.1575 | 6.00 |
| 2 Liter/64 oz. Pepsi Diet Light | 1.0400 | 1.0700 | 1.0925 | 1.1150 | 5.25 |
| 2 Liter/64 oz. Mt. Dew/Nu Grape | 1.0400 | 1.0700 | 1.0925 | 1.1150 | 4.80 |
| Cans | .9550 | .9850 | 1.0075 | 1.0300 | 5.75 |

| Schweppes Products | A | B | C | D | E |
|---|---|---|---|---|---|
| 7 N.R. OW/BL | .8650 | .8950 | .9175 | .9400 | 4.75 |
| 10 N.R. OW/BL | .9750 | 1.0050 | 1.0275 | 1.0500 | 5.75 |
| 32 N.R. OW/BL | 1.0050 | 1.0350 | 1.0575 | 1.0800 | 6.65 |
| 7 N.R. CS/CA | .8800 | .9100 | .9325 | .9550 | 4.50 |
| 10 N.R. CS/CA | .8750 | 1.0050 | 1.0275 | 1.0500 | 4.80 |
| 32 N.R. CS/CA | .9500 | .9300 | 1.0025 | 1.0250 | 5.25 |
| Cans C/A | .9550 | .9850 | 1.0075 | 1.0300 | 5.75 |

For each product, the Distributor Commission per case shall be the greater of:

(1) the commission stated in Column A plus or minus 15% of any change in the index price to retail outlets per case stated in Column E; OR

(2) the amount shown in the following columns for the time period set forth thereafter:

    B - from June 1, 1978 to May 31, 1979;
    C - from June 1, 1979 to May 31, 1980;
    D - from June 1, 1980 to May 31, 1981.

Returnable Products: the returnable product commission shall be the same as the N.R. commission, less 2 cents per case. Furthermore, there shall be a commission of 2 cents per case of empties which is returned.

## MEMORANDUM OF AGREEMENT

MEMORANDUM OF AGREEMENT entered into as of this 1st day of June, 1978 by and between PEPSI-COLA BOTTLING GROUP, hereinafter referred to as "PBG", a/k/a PEPSI-COLA METROPOLITAN BOTTLING COMPANY, INC., a New Jersey corporation, or its successors, and NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC., hereinafter referred to as "the Association", or its successors, on its behalf and on behalf of each of its members.

This Memorandum of Agreement, hereinafter referred to as the "Agreement" shall be binding upon the parties hereto, their successors, administrators, executors and assigns.

PBG and certain members of the Association are signatories to a certain form of individual Distributor Agreement which, as amended, is to expire on May 31, 1978 and which agreement states the terms and conditions under which PBG will sell in New York City soft drink products manufactured by PBG, primarily Pepsi-Cola, through such individual members of the Association.

The Association declares that it has been and is authorized on behalf of each of the existing distributor signatories to negotiate an agreement with PBG. Pursuant to and in accordance with that authority, the Association and PBG have negotiated with each other with regard to the preparation of a renewal Distributor Agreement to be executed by each of the distributors and to take effect as of June 1, 1978 and to remain in effect for a fixed term thereafter as hereinafter provided.

NOW, THEREFORE, in consideration of the fore-going and the agreement herein contained, the parties agree as follows:

FIRST. (a) PBG currently owns several routes which it operates to its account. In addition, PBG may from time to time as it sees fit and as it may lawfully do so acquire other routes, including routes acquired upon termination for cause as provided in the Distributor Agreement. It is agreed that PBG may directly operate all of the routes which it owns with its own employees and supervision. PBG agrees that it shall offer promotion programs within the City of New York on a nondiscriminatory basis without reference to route ownership. Similarly, as to truck loading, vending service and vis-a-coolers, and any other service and equipment which PBG provides, such service and equipment shall be provided on a nondiscrimina-tory basis to all such routes, irrespective of their ownership. With respect to PBG's operations of the routes, PBG shall maintain such books which, as well as promotions and services provided such routes, shall, upon Association request, be subject to audit by the Association designees at the Association's expense. In the event of such an audit, PBG shall, upon request, produce tickets, memoranda, books and records relating to the operations of such PBG operated routes.

(b) Records of routes of individual owners shall, upon Association request in writing and upon the individual route owner's written authorization, be made available to a designee of the Association for examination provided that the request for such examination allows

sufficient time for the compilation of the records and provided further that such examination is carried out on FBG's premises at Association expense.

SECOND, the distributor agreement between FBG and each of the individual distributors shall be in the form hereinafter annexed as "Appendix A" and designated Distributor Agreement. The terms of the aforesaid Distributor Agreement shall upon acceptance and execution by an individual distributor continue in full force and effect as to such distributor until May 31, 1986 provided such acceptance and execution takes place before July 1, 1979. In the event that an individual distributor does not accept and execute such Distributor Agreement by July 1, 1979, his option to execute such an agreement shall terminate as of that date, and any and all distributor rights that he may have had as a distributor shall be determined in accordance with the agreement to which he is presently a signatory.

THIRD, it is agreed that syrup is to be included as one of the Pepsi products in Exhibit "B", the Schedule of Prices and Commissions, and the appropriate commission in existence as of June 1, 1978, as well as the appropriate pass throughs of increased commissions, to wit, 1 3/4 cents the first year, 1 1/2 cents the second year, and 1 1/2 cents the third year, are to be provided in the aforesaid schedule.

PEPSI-COLA BOTTLING GROUP

By _____
    Darrell Agem, President

By _____
    Richard H. Alven, Vice
    President - Sales
    Eastern Division

By _____
    Edward A. Keighley, III
    Division Employee
    Relations Manager,
    Pepsi-Cola Company


NEW YORK PEPSI-COLA DISTRIBUTORS
ASSOCIATION, INC.

By _____
    Joseph DiStasi, President

By _____
    Michael SevBlacqua
    Vice President


By _____
    William Ross
    Secretary-Treasurer


Each of the undersigned, having read in its
entirety the foregoing Memorandum of Agreement between
PBG and the Association dated June 3, 1975, does hereby
subscribe thereto and agrees to be bound by each and every
term therein for the full term of said Memorandum of
Agreement.

SIGNATURE, INDIVIDUAL          SIGNATURE, AS OFFICER OF
                               THE DISTRIBUTOR

- 6 -

AGREEMENT, made and entered into this 28th day of July, 1984, by and between NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC., ("Association") on its behalf and on behalf of each of its members, and NEW YORK BEVERAGE ACQUISITION CORPORATION ("Company").

WHEREAS, PEPSI-COLA BOTTLING GROUP ("PBG") and each member of the Association ("Distributor") are signatories to a certain form of individual Distributor's Agreement ("Agreement"), which agreement (Exhibit A) states the terms and conditions under which PBG will sell in New York City soft drink products manufactured and distributed by PBG through each Distributor, and

WHEREAS, the Association declares that it has been and is authorized on behalf of each Distributor as listed on Schedule A to negotiate and execute this Agreement, and

WHEREAS, PBG is about to assign and transfer certain of its assets in and about New York City to Company, and

WHEREAS, "Agreement" is one of the assets to be assigned and transferred, and

WHEREAS, each Distributor is desirous of continuing to operate as the exclusive agent for delivery of the Beverages and Beverage Syrup to the outlets in the territory specified in its Agreement as modified herein, but for and on behalf of the Company.

EXHIBIT B

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

FIRST: Company assumes the obligations of PBG as set forth in Agreement (as modified herein) but only on and after July 23, 1984, or at such other times as the acquisition from PBG is closed ("Closing Date") and then only as to post-closing date matters. It is specifically understood that Company assumes no obligation whatsoever for any matter or liability occurring or incurred prior to closing date, no matter when asserted.

SECOND: Agreement is extended up to an including May 31, 2005.

THIRD: Effective with the closing date, Distributor shall be paid a commission of $.05 per case (or such other amount as may be awarded in a pending arbitration proceeding involving distributors of the Coca Cola Bottling Company of New York, Inc.) for each case of empty non-refillable product actually returned by Distributor to Company, as mandated by the New York State Bottle Bill (Section 27-1001 et seq. E.C.L.).

FOURTH: (a) The term "Beverages" as used in the preamble to Agreement shall be deemed to include all carbonated and non-carbonated soft drinks, hereinafter, sold by Company in the New York City area.

(b) The provisions of Paragraph 2 of Agreement shall be deemed enlarged so as to afford the maximum legal protection as to those products hereinafter handled by Distributors pursuant to the expanded definition of Beverage as set forth in this Paragraph Fourth.

(c)  The term Beverages shall also be deemed to include aseptic juices, but only those which Company because of parent company requirement or competitive factors delivers "store door".

(d)  The commission payable to Distributor for the store door delivery by it of any aseptic juices, shall be as mutually agreed upon by the parties, giving principal consideration to competitive factors. In the event of a failure to so agree, the matter shall be subject to arbitration as provided in Paragraph 22 of Agreement.

FIFTH:  (a) All references to Exhibit B in Paragraphs 11 and 12 of Agreement, as well as Exhibit B itself, are deemed deleted; it being understood that Distributor shall deliver the Beverages and Beverage Syrup to accounts at the prices stipulated by Company as from time to time amended in the manner provided in Agreement. As compensation therefore, Distributor shall receive its present rate of commissions, as modified herein and as subject to the provisions of Paragraph 12 of Agreement.

(b) Distributor waives any rights it may have at any time to any further "labor pass through" (See litigation between PBG and Columbia-Oxford Beverages, Inc., for a definition of the term) and neither the right of Distributor to receive the same nor the amount of the same shall be an arbitrable issue under Agreement.

SIXTH: (a) The commissions payable to Distributor shall be reduced by the following amounts to the following new commissions, effective as of the closing date:

| Package | Wholesale Price | Commission Reduction | New Commission |
|---|---|---|---|
| 7 Oz. Pepsi Packages | $7.35 | $.096 | $1.1965 |
| 10 Oz. Pepsi Packages | 7.95 | .049 | 1.2635 |
| 16 Oz. Pepsi Packages | 9.25 | .08 | 1.38 |
| 1 Liter Pepsi Packages | 9.50 | .076 | 1.454 |
| Cans Pepsi Packages | 7.98 | .045 | 1.2445 |
| 2 Liter Pepsi Packages* | 8.08 | .105 | 1.3595 |

\* With respect to the 2 Liter Package, Company has announced that the stipulated price of the package shall forthwith be reduced to $7.60 per case and it is agreed that the commission shall further be reduced by 3.6 cents on January 1, 1985.

| Package | Wholesale Price | Commission Reduction | New Commission |
|---|---|---|---|
| 7 Oz. Schweppes Pkgs. | $7.00 | $.048 | $1.0975 |
| 10 Oz. Schweppes G/A and C/S | 7.70 | .112 | 1.298 |
| 10 Oz. Schweppes Tonic | 8.00 | .041 | 1.2715 |
| 1 Liter Schweppes G/A and C/S | 8.55 | .062 | 1.383 |
| 1 Liter Schweppes Tonic | 9.50 | No Reduction | 1.4325 |
| 1 Liter Schweppes Seltzer | 7.58 | No Reduction | 1.2995 |
| 2 Liter Schweppes Package | 8.08 | .14 | 1.395 |
| Cans Schweppes Packages | 7.65 | .045 | 1.195 |

(b) Thereafter and notwithstanding the provisions of Paragraph 12 of Agreement, Distributor shall receive 10% as opposed to 15% of any increase in the stipulated price of a package (except for an increase in the stipulated price of the 2 Liter Pepsi package from $7.60 up to $8.08, in which event Distributor shall receive a commission increase equal in amount to the commission decrease theretofore received as a result of the stipulated price decrease from $8.08 down to $7.60) until such time as the commission for such package is no more than $.02 above the contractual markup which would be paid to a distributor

of the Coca Cola Bottling Company of New York, Inc., under its
present Distributors Agreement for an identical package at the
same suggested wholesale price in New York City. At no time,
however, shall te difference between the 15% and the 10% be
allowed to result in a reduction fo the commission increase in
any June 1 to May 31 period, in excess of $.05 for such package.
In no event shall there be less than 1-1/2 cent decrease in
commissions or less than a 1-1/2 cent reduction in the commission
increase for the 2 Liter Packagein the following periods but in
no event beyond such time as the commission for such package is
no more that $.02 above such comparable contractual markup for a
distributor of The Coca Cola Bottling Company of New York, Inc.:

         June 1, 1986    -    May 31, 1987
         June 1, 1987    -    May 31, 1988
         June 1, 1988    -    May 31, 1989

The commission for any package which on June 1, 1989,
is still more the $.02 above the contractual markup which would
at that time be paid to a distributor of the Coca Cola Bottling
Company of New York, Inc., under its present distributors
agreement for an identical package at the same suggested
wholesale price in New York City, shall be reduced on June 1,
1989 to a commission equal to the said markup plus $.02.

For the purposes of this sub-paragraph, Pepsi Cola and
other franchised package commissions shall be compared to Coca
Cola and franchised package commissions, while Schweppes package
commissions shall be compared to Seagrams package commissions.

(c) Anything herein or in Paragraphs 11 and 12 of
Agreement to the contrary notwithstanding, at no time (except as

hereinafter provided) shall the commissions payable to Distributor be less than the following:

| | |
|---|---|
| 7 oz. Pepsi Packages | $1.12 |
| 10 oz. Pepsi Packages | 1.234 |
| 16 oz. Pepsi Packages | 1.32 |
| 1 Liter Pepsi Packages | 1.397 |
| Cans Pepsi Packages | 1.219 |
| 2 Liter Pepsi Packages | 1.202 |
| 7 oz. Schweppes Packages | 1.0245 |
| 10 oz. Schweppes G/A and C/S | 1.205 |
| 10 oz. Schweppes Tonic | 1.2055 |
| 1 Liter Schweppes G/A and C/S | 1:1985 |
| 1 Liter Schweppes Tonic | 1.197 |
| 1 Liter Schweppes Seltzer | 1.02 |
| 2 Liter Schweppes Packages | 1.202 |
| 2 Liter Schweppes Seltzer | 1.02 |
| Cans Schweppes Packages | 1.17 |

Notwithstanding the provisions of this sub-paragraph, the commissions for any package which on any or all of the below dates is more than $.02 above the contractual markup which would at that time be paid to a distributor of the Coca Cola Bottling Company of New York, Inc., under its then Distributor's Agreement for an identical package at the same suggested wholesale price, shall on such date or dates be reduced to a commission equal to the said markup plus $.02:

June 1, 1994
June 1, 1999
June 1, 2004

SEVENTH: Association shall be given the right of first refusal on all aseptic package trucking out of any manufacturing plant of Company to any warehouses in New York City, provided Association shall have obtained all necessary licenses, permits, approvals, etc., shall have the necessary manpower and equipment to adequately perform the trucking, shall match both the lowest price and best terms received from any other party and shall be

able to render the services to reasonable satisfaction of Company. Reasonable advance notice shall be given to Association of any such trucking opportunity, commencing with such time and only so long as Association furnishes written documentation that it has obtained the necessary licenses, permits, approvals, etc. Absent reasonably timed advance written acceptance of any such opportunity, Association shall be deemed to have rejected such trucking opportunity. If the Association shall successively reject of be deemed to have rejected five (5) such opportunities, the provisions of this Paragraph shall be deemed cancelled and of no further force and effect.

EIGHTH: Paragraph 22 of the Agreement is amended to read as follows:

"Any and all disputes or disagreements between the Company and the Distributor concerning the interpretation of application of the provisions of this Agreement, shall be determined in arbitration before Mr. William J. Glinsman, and judgment upon the award rendered by the said Arbitrator may be entered in any Court having jurisdiction. In the event of the failure of Mr. Glinsman to act as Arbitrator for whatever reason, the person then acting as Arbitrator under the then collective bargaining agreement between the Company and the Soft Drink Workers Union, Local 812 I.B.T., shall act as his replacement until such time as the parties hereto shall designate in writing a substitute Arbitrator for Mr. Glinsman. In no event shall the Arbitrator have the power to alter or amend the terms of this Agreement."

NINTH: It is a condition of this Agreement that Company close its transaction with PBG, and failing such closing this Agreement shall be deemed immediately cancelled and of no force and effect (unless such condition shall be waived in writing by Company.)

IN WITNESS WHEREOF, the parties have hereunto caused this Agreement to be signed by their duly authorized officers the day and year first above written.

NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC.

BY: _____
Joseph DiStasi, President

BY: _____
Michael Bevilacqua, Vice-Pres

BY: _____
William Rose, Secy-Pres.

NEW YORK BEVERAGE ACQUISITION CORPORATION

BY: _____
Dennis Berberich, Vice-Pres.

AGREEMENT made and entered into this 5th day of May, 1989, by and between NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC. ("Association") on its behalf and on behalf of each of its members and PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. ("Company").

WHEREAS Company and each member of Association are signatories to a certain form of individual Distributor's Agreement ("Agreement") which Agreement states the terms and conditions under which Company will sell, in New York City, Soft Drinks and Beverage Syrup manufactured by Company and distributed by Company through each Distributor; and

WHEREAS Association warrants that each Distributor listed on Schedule A hereof is a member of Association and Association has been authorized by each such Distributor to negotiate and execute this Agreement; and

WHEREAS the parties hereto have negotiated for and have reached an understanding with respect to the distribution by each Distributor of Beverage Syrup on and after May 8, 1989.

NOW THEREFORE, it is agreed as follows:

FIRST: As soon as is reasonably practicable on and after May 8, 1989, Company shall commence the distribution of Beverage Syrup within its franchised territory pursuant to the Syrup Appointments issued by PepsiCo Inc. as such Appointments may exist from time to time; it being the intention of this Agreement that Company shall ultimately assume complete distribution of Beverage Syrup within its franchised territory (subject to the provisions of paragraph FIFTH hereof). At such time as Company has commenced

such distribution within the territory of a Distributor, such Distributor shall immediately cease the distribution of Beverage Syrup. Commencing with May 8, 1989 and until such time as Company has commenced such distribution within the territory of a Distributor, the Distributor shall continue to distribute Beverage Syrup as heretofore, except that the commission to be paid by Company to the Distributor for each gallon of Beverage Syrup so delivered shall be:

National Accounts — $.45 per gallon
Local Accounts   — $.50 per gallon

At such time as Company shall commence the distribution of Beverage Syrup within the Distributor's territory, Company shall pay to the Distributor a commission of $.06 per gallon for each gallon of Beverage Syrup so delivered by Company in the territory of the Distributor,* whether to a National or a Local Account. Said commission is to be paid quarterly (with monthly accountings); payment is to be made on January 31, April 30, July 31 and October 31 for gallons delivered during the preceding three (3) months ending December 31, March 31, June 30 and September 30 respectively (but for no period prior to May 8, 1989). Company at the time of making such commission payment to the Distributor, shall provide the Distributor with a written statement showing the computation of such commissions and make available for inspection by the Distributor, at reasonable business hours, the records of Company upon which such computation is based.

*(Whether to Fountain Outlet or to Warehouses, even if intended retail sale)

The Distributors Agreement between Company and each Distributor is hereby deemed modified so as to incorporate the provisions of this Article FIRST, and all provisions in the said Distributor's Agreement granting the Distributor the right to deliver Beverage Syrup and providing for a commission therefore, are deemed revoked and of no further force and effect.

SECOND: Association agrees to procure the written consent of each and every Distributor to the terms of this Agreement; said consent to be evidenced by the Distributor affixing his signature to Schedule A hereto.

THIRD: In consideration of the reduction of the commissions as set forth herein for the remaining deliveries of Beverage Syrup by the Distributor, Company, within ten (10) days after the written consent of each and every Distributor shall have been procured (Article SECOND hereof), shall pay to Association, as agent for the Distributors, the sum of Five Hundred Thousand ($500,000) Dollars. Company assumes no responsibility for the allocation amongst the Distributors or the distribution to the said Distributors of the said sum; it being intended that such allocation and distribution be determined solely by Association and the Distributors as they, in their sole discretion, shall determine.

FOURTH: Except as specifically set forth in Article FIRST hereof, the terms and conditions of each Distributor's Agreement, shall continue unchanged and in full force and effect.

FIFTH: In the event Beverage Syrup is at any time in the future delivered by Company "store door" to outlets for resale at retail, the same shall be delivered by the Distributors at such mark-up as the parties hereto shall mutually agree upon and failing such agreement, as determined in arbitration pursuant to the arbitration clause in each Distributor's Agreement.

SIXTH: It is understood and agreed that the $.06 per gallon commission agreed to herein shall not be subject to reduction.

SEVENTH: This agreement shall be binding upon the parties hereto as well as their successors and assigns.

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first above written.

NEW YORK PEPSI COLA DISTRIBUTORS ASSOCIATION, INC.

BY:_____

PEPSI COLA BOTTLING COMPANY OF NEW YORK, INC.

BY:_____

## ADDENDUM

The following paragraph eighth is hereby added to the attached agreement.

EIGHTH: In the event the Company elects to transfer its Beverage Syrup distribution rights to third person other than the Pepsi Cola Company, PepsiCo, other parent company, or any other Pepsi Cola Bottler to whom the Company's entire operation is transferred, the Association shall be given the right of first refusal on such transfer on such terms and conditions as are proposed in good faith to be given to the Association of such proposed transfer and the Association shall have thirty (30) days thereafter to exercise its right of first refusal, by certified mail, return receipt requested.

NEW YORK PEPSI COLA DISTRIBUTORS ASSOCIATION, INC.

BY: _____

PEPSI COLA BOTTLING COMPANY OF NEW YORK, INC.

BY: _____

AGREEMENT made and entered into this 1?? day of March 2002, by and between NEW YORK PEPSI COLA DISTRIBUTORS ASSOCIATION, INC. ("Association") with its principal office at 46-00 Fifth Street, Long Island City, NY 11101, on its behalf and on behalf of each of its members, and PEPSI COLA BOTTLING COMPANY OF NEW YORK, INC. ("Company"), with its principal office at 50-35 56th Road, Maspeth, NY 11378.

## W I T N E S S E T H:

WHEREAS each of the distributor members of Association is a party to a Distributor's Agreement ("Agreement") with Company which expires on May 31, 2005 and which includes or was modified by (i) an Agreement made July 28, 1984 between New York Pepsi Cola Distributors Association, Inc., and New York Beverage Acquisition Corporation, and (ii) an Agreement made May 5, 1989 between New York Pepsi Cola Distributors Association, Inc., and Pepsi Cola Bottling Company of New York, Inc.; and

WHEREAS Association and Company have been engaged in discussions and negotiations with each other, attempting to agree upon terms for the extension and amendment of such Agreements; and

WHEREAS Association and Company desire to continue such discussions and negotiations, free from the pressures and distractions which may arise as a result of the expiration date above set forth.

NOW THEREFORE and in consideration of the covenants and agreements herein set forth, it is agreed as follows:

FIRST:        Each Agreement is extended up to and including April 17, 2007.

SECOND: It is the intention of Association and Company that except as otherwise provided in Article THIRD hereof, each Agreement shall at all times have a remaining unexpired term of five (5) years. It is therefore agreed that at midnight of each successive day commencing with April 18, 2002, the term of each Agreement shall automatically be deemed extended by one (1) additional day.

THIRD (A): Anything contained in either Article SECOND hereof or any agreement to the contrary notwithstanding, each of Association and Company shall have the unequivocal and unconditional right (in its sole and absolute discretion) and upon the giving of ninety (90) days prior notice to the other, to unilaterally void the extension provisions contained in Article SECOND hereof, but only prospectively and only effective as of the ninetieth (90th) day after the giving of such notice. In any such event, the expiration date of each Agreement shall be deemed to be the expiration date as it may exist on such ninetieth (90th) day, and there shall be no further daily one (1) day extensions.

(B): During the period between the giving of such notice and the expiration of ninety (90) days thereafter, the parties shall meet at such time or times as shall be agreeable to each of them (in the absolute discretion of each), for the purpose of attempting to resolve any pending issues between them and for the further purpose of exploring the possibility of a recission of the said notice. It is understood however, that nothing contained in this sub-paragraph (B) shall be deemed either (i) to require either party to rescind such notice once given, or (ii) to create an arbitrable issue under the arbitration provisions of the Agreement, as to the reasonableness of the position of either party in giving such notice and electing not to rescind such notice.

FOURTH: This agreement shall be deemed an amendment to each Agreement and except as otherwise provided herein, (i) each Agreement and the present terms and conditions thereof, shall continue unchanged and in full force and effect, (ii) the rights of each party, as they existed prior to the execution hereof, shall remain unchanged and in full force and effect, except as set forth in subdivision (iii) of this paragraph, and (iii) no prior waiver, prior failure to assert any available right or remedy under the Agreement or otherwise, nor anything herein contained, shall as to either party hereto amount to a continuing waiver of any right or remedy which such party hereto shall have in respect of any of the terms of the Agreement after the date hereof. It is understood however, that (x) no alleged failure of a distributor to meet its marketing and performance obligations under the Agreement, occurring prior to March 1, 2002, shall be cited, in whole or in part, as grounds for termination of the Agreement, and (y) no alleged failure of a distributor to meet its marketing and performance obligations under the Agreement, occurring between March 1, 2002 and April 30, 2002, shall be cited, in whole or in part, as grounds for termination of the Agreement, provided such alleged failure is cured by May 1, 2002. Company agrees to allow a distributor until April 30, 2002 to rectify any current marketing and performance deficiencies under the Agreement. For the purpose of this provision, marketing and performance deficiencies shall not be deemed to include acts of dishonesty or failure to meet monetary obligations of a distributor under the Agreement.

FIFTH: Association agrees to use its best efforts to procure the written consent of each and every of its distributor members to the terms of this agreement; said consent to be evidenced by the distributor affixing his, her and its signature to Schedule

A hereof. In the event, the Association fails to procure and deliver to Company the written consent of at least ninety (90%) percent of distributors who are parties to an Agreement with Company, prior to April 18, 2002, this Agreement shall automatically be deemed cancelled and of no force and effect.

SIXTH: Any notice given hereunder shall be deemed to have been given only when deposited with the United States Postal Service by registered or certified mail, return receipt requested, addressed as above set forth, or to such new address as to which notice may have been given pursuant to this Article SIXTH.

SEVENTH: Any amendment, modification or waiver of any of the provisions of this agreement must be in writing and signed by Association (and the distributor members intended to be bound thereby) and Company, for it to be effective.

EIGHTH: This agreement shall be binding upon the parties hereto, as well as their successors and assigns.

IN WITNESS WHEREOF the parties have executed this agreement as of the date first above written.

NEW YORK PEPSI COLA DISTRIBUTORS ASSOCIATION, INC.

By: _____

By: _____

PEPSI COLA BOTTLING COMPANY OF NEW YORK, INC.

By: _____ Pres/CEO

6503.doc

NOTE: Territory Boundaries - Please note that your Territory covers only the "near" side of the streets bounding your Territory, unless otherwise specifically noted.

Territory No. ███

Starting at ████████, and ████████ along ████

███ to ████████ along ████████ to ███

███, along ████████ to ████ along ████

███ to ████████, along ████ to ████████,

along ████████ to ████████ point of beginning.

Dated: ████

It is intended that the territory included in this description and in the discription contained on the following page, constitutes the identical territory serviced by ████████ up to today's date.

# EXHIBIT B

## MAP AND TERRITORIAL AGREEMENT

NOTE: <u>Territory Boundaries</u>-Please note that your Territory covers <u>only</u> the "near" side of the streets bounding your Territory, unless otherwise specifically noted.

CROSBY Beverage Distributors, Inc.                    Territory No. BX-103

Starting at Eastchester Road and Pelham Parkway South, going east on Pelham Parkway South to Bruckner Boulevard, going south on the west side of Bruckner Boulevard to Westchester Creek, going north on the east side of Westchester Creek to East Tremont Avenue, going west on the north side of East Tremont Avenue to Silver Street, going north on the east side of Silver Street to the east side of Eastchester Road, going north to Pelham Parkway South, the point beginning.

CROSBY DIST

Dated: 8/9/95

