UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:

BUHRE BEVERAGE DISTRIBUTION, INC.,          Chapter 11

                                                                       Case No. 14-22048-rdd

                                           Debtor.
------------------------------------------------------------------X

WILLIAM SANCHEZ,

                                 Plaintiff,

-against-

                                                        Adv. Pro. No.: 14-08218-rdd

BUHRE BEVERAGE DISTRIBUTION, INC.,
BHAVEEN SAPRA and BRUCKNER BEVERAGE, INC.

                                 Defendants.

------------------------------------------------------------------X

## AFFIRMATION OF BHAVEEN SAPRA IN OPPOSITION
## TO MOTION FOR SUMMARY JUDGMENT

**BHAVEEN SAPRA**, in opposition to the motion of William Sanchez for summary judgment, hereby affirms as follows:

1. I am presently 25 years old.

2. I have a high school diploma. I attended Manhattanville College for approximately 2 years but did not obtain a degree.

3. For the past few years, I have worked with my father, Pratap Sapra, who operates a company engaged in the distribution of household items including Pepsi products. I have assisted him in the warehouse which is located in the Bronx, New York.

1

4. William Sanchez, the Plaintiff herein ("Sanchez"), was the Pepsi representative from whom my father purchased product.

5. My father introduced me to Sanchez in or about the summer of 2011.

6. I considered Sanchez a friend as well as someone that we conducted business with. Sanchez would visit the warehouse where I worked approximately 4 times a week. He typically stayed quite a while, chatting with my father and me.

7. In or about the summer of 2012, Sanchez advised my father and me that he had decided to sell the Pepsi route (the "Route") which he had operated for approximately 25 years. My father expressed an interest in purchasing the Route for me to operate.

8. For the next 4 months or so, Sanchez, my father and I discussed a potential acquisition of the Route.

9. My father wanted to acquire a business that I could operate. The Route, as described by Sanchez, appeared to be the right business for me. My father and I believed that owning a Route, as described by Sanchez, would give me financial security.

10. Finally, after months of discussions, in or about December 2012, Sanchez and I agreed to terms and signed a contract (The "December 2012 Contract"). Under the Contract, a copy of which is annexed hereto as Exhibit A, the Route would be transferred to PBR Beverage Distribution ("PBR"), a company that I owned which was formed expressly for the acquisition. The balance of the purchase price was to be paid to Sanchez under a note in the amount of $900,000.00 (the "Note").

11. Sanchez advised my father and I that it was imperative that I sign the agreement prior to the close of 2012 for tax reasons. He explained that absent an agreement, he would face adverse tax consequences.

12. In connection with the December 2012 Contract, I paid Sanchez a total of $275,000.00 which was comprised of (i) a check for $175,000.00 paid to Sanchez's attorney by my attorney to be held in escrow and (ii) cash in the amount of $100,000.00. The cash was withdrawn from a bank account held by my mother. Sanchez was paid the cash in two increments. The first increment was paid to Sanchez on December 28, 2012 in the amount of $65,000.00 at a Bank of America Branch Office in the Bronx, NY. The second increment in the amount of $35,000.00 was paid on December 31, 2012 at the Bank of America Branch in Greenwich, Connecticut. Excerpts from a statement reflecting the withdrawals is annexed hereto as Exhibit B. The initial transfer of $105,000.00 and subsequent withdrawals of $65,000.00 and $35,000.00 are noted with a circle. Obviously, I would not have paid Sanchez in cash had I not known and trusted him.

13. Payments would begin under the Note as soon as I was approved by Pepsi. It was my understanding that the Note would be secured in the tangible assets of the business (i.e. the trucks and receivables) and not the Route itself.

14. I understood that the December 2012 Contract was expressly contingent upon the approval of Pepsi Bottling Company of New York ("Pepsi"). I applied for approval in or about January 2013.

15. In February 2013, I went to work on the Route with the hope that working on the Route would enhance my chances of being approved.

16. In or about March 2013, I was notified that Pepsi declined to approve me as an owner basically because I lacked experience.

17. After I learned of the rejection by Pepsi, I asked Sanchez for my deposit back immediately as the transaction was contingent upon Pepsi's approval. Sanchez refused indicating

3

that he was "working on getting approval" despite the rejection by Pepsi. Several days later, Sanchez advised my father and I that he had "a new way" of procuring Pepsi's approval. He assured my father and me that I would be approved if I engaged John Brown, a driver, as an employee. I was uncomfortable with this arrangement and again requested return of the down payment. Sanchez refused. I recall Sanchez explaining that, in his 25 years as a Pepsi distributor, similar routes were transferred to people that lacked experience for example, as a result of divorce and death. Sanchez assured me that Pepsi would approve the transfer as a "stock" sale rather than an "asset" sale. I trusted Sanchez both as a friend and a seasoned businessman familiar with Pepsi's policies. Copies of various requests for return of my deposit are collectively annexed hereto as <u>Exhibit C</u>.

18. At Sanchez's insistence, we restructured the transaction as a "stock" sale. I would be the shareholder of Buhre Beverage Distribution, Inc. (the "Debtor"). I was uncomfortable with the new structure. However, I was assured by Sanchez that it was consistent with Pepsi's policies.

19. It is my understanding that the agreement was still subject to Pepsi's approval. It was also my understanding that I would pay Sanchez amounts due under our agreement following Pepsi's approval. I understood that I would own the Debtor, either directly or through a corporation, and that the Debtor would pay Sanchez the balance of the purchase price in installments upon approval by Pepsi of the transaction. I also understood that Sanchez would be able to seize the Debtor's tangible assets if the Debtor defaulted in payments.

20. I do not at all recall any discussions regarding lack of availability of cash which is highlighted in Sanchez's affirmation in support of Summary Judgment. Cash was not a significant issue (particularly since I had already paid Sanchez $275,000.00).

21. I continued to be concerned about Pepsi's approval. I was also apprehensive about John Brown's role particularly since I did not really know him. We did not have a relationship and I was not comfortable entering into a transaction based upon his involvement.

22. Sanchez made it clear that he had no intentions of returning my deposit. Indeed, at one point, his attorney indicated that a Court would have to resolve the disputes. See Exhibit C. As such, I felt compelled to proceed with the alternate arrangement. While I was hesitant, wanting to make sure that Pepsi approved the transaction, it was Sanchez who was anxious to close.

23. Sanchez's statement that I was eager to close before the summer is false. I was unfamiliar with the nuances of the business and seasonal revenues. It was Sanchez who insisted upon closing.

24. Sanchez advised me that his attorney, Allan Stern ("Stern"), would be preparing the documents.

25. On or about July 31, 2013, I met with Sanchez, Stern and my counsel, John Lettera, Esq. to discuss moving forward. At the meeting, we entered into a new contract (a copy of which is annexed hereto as Exhibit D. It was my understanding that the sum and substance of the agreement was that I would be the sole owner of the Debtor through a company, Bruckner Beverage, Inc. ("Bruckner") and the balance of the purchase price of $900,000.00 would be paid by the Debtor to Sanchez pursuant to the terms of a note.

26. The following reflects the terms of the agreement as I understood them: (a) Sanchez would transfer 100% of the shares in the Debtor to Bruckner for the sum of $1,175,000.00, payable by way of $275,000.00 which was paid in December 2012, and a promissory note for the balance of $900,000.00; (b) Sanchez would receive a note from the

5

Debtor for the balance ($900,000.00); (c) Sanchez would receive a security interest in the tangible assets of the Debtor which included the trucks and cash but not intangibles or the Route; (d) The Debtor agreed to pay an additional $78,000.00 to Sanchez conditioned upon approval by Pepsi; (e) Sanchez was to assist me with operations for approximately 6 months; and (f) the transaction was subject to Pepsi's approval.

27. It appeared that Stern drafted documents that did not accurately reflect the parties intentions. There were numerous mistakes. The mistakes contained therein, included the following:

a. A promissory note with Bruckner as "maker" and Debtor as "payee", pursuant to which Bruckner promised to pay Debtor the sum of $900,000.00 over one-hundred and forty-four months at 6 % percent interest (the "900K Promissory Note"). Exhibit E.

The "payee" on the 900K Promissory Note should have been Sanchez, not Debtor;

b. A promissory note with Bruckner as "maker" and Sanchez as "payee", pursuant to which Bruckner promised to pay Debtor the sum of $78,000.00 on or before November 1, 2013, with interest to accrue at 12% only if the full balance was not paid in full by November 1, 2013. Exhibit F.

The Payment obligation for this note was contingent upon Pepsi's approval of the transaction.

c. A security agreement with Bruckner as "debtor" and Debtor as "secured party", pursuant to which Bruckner granted Debtor a security interest in the shares of Debtor and the Pepsi Cola Distributor territory, together with all accounts receivable and equipment related thereto. Exhibit G.

This entire agreement is incorrect and does not reflect my understanding of the arrangement.

d. A stock power pursuant to which Sanchez transferred one share of Debtor stock to Bruckner.

I believe that this document in and of itself is incorrect. I understood that I was the sole owner of Debtor through Bruckner.

e. A UCC-1 financing statement listing the "debtors" as Debtor and Bruckner and asserting a lien against the following collateral: (a) shares of stock of Bruckner; and (b) assets of Debtor (the "UCC-1 "). Exhibit H. This document was amended by the UCC- 3 Amendment described below.

28. Apparently, on or about November 4, 2013, a UCC-3 amendment (the "UCC-3 Amendment") was filed to amend the UCC-1, which restated the collateral as being:

"[t]he Distributor Agreement by and between Bruckner Beverage, Inc. and the Pepsi-Cola Bottling Company of New York, Inc. and pertaining to a certain Pepsi-Cola distribution territory conveyed July 31, 2013, beverage trucks with vehicle identification numbers1HTMAAN74H607626 and 2NKMLZ9X95M100779, and pertaining to that said territory, all of the Debtor's equipment, parts, inventory, accounts receivable and the proceeds derived therefrom, now or hereinafter owned by or due the Debtor."

Exhibit I.

The description on the UCC is correct. It reflects the parties' intentions. It should be noted that I do not recall seeing the Amendment until shortly before the bankruptcy petition date when I served with a notice the Sanchez intended to seize the Debtor's vehicles. A copy of the notice is annexed hereto as Exhibit J.

29. I never assumed control of the Debtor's operations. Sanchez continued to hold himself out as the "owner" and continued to interact with customers. Sanchez controlled the Debtor's check book and attended to payables. Customers, who had been used to dealing with Sanchez for many years, would not deal with me.

30. The Debtor filed for bankruptcy protection on an emergency to avoid imminent seizure of its assets by Sanchez. I listed Sanchez as a disputed creditor on the Debtor's schedules. I dispute the validity, classification as well as extent of the amounts alleged to be due. See Exhibit K.

31. From early on the case, Pepsi has been operating the Route in accordance with its policy.

32. I have worked with Pepsi to sell the Route in the correct way to an approved buyer. The Debtor has entered into a contract to sell the Route to an entity approved by Pepsi (the

"Buyer"). The Debtor actively marketed the Route. Notwithstanding, no other bidders but the Buyer have made a valid offer.

33. I intend to object to the proof of claim Sanchez filed against the Debtor. I have not done so because I am waiting for the outcome of the sale motion. It is possible that a sale will not be consummated. As such, I believe that it makes more sense to wait until the sale is approved. Once a sale is approved, we can resolve the claims.

34. At no time did I breach my fiduciary obligation to the Debtor or anyone else. I tried to operate the Route to the best of my ability. It should be noted that I did not receive any assistance from Sanchez (as required under the agreements) and was subjected to Sanchez's obstruction and control over finances.

35. I have not filed operating reports because I am not operating the Route. Pending the sale to the Buyer, Pepsi is operating the Route pursuant to its policy. I have not attempted to conceal anything from the Court.

36. I dispute Sanchez's assertions that I have acted improperly. At all times, I endeavored to cooperate with Pepsi and maximize the value of the Debtor. On the contrary, it was Sanchez who attempted to evade rules and circumvent policies.

WHEREFORE, it is respectfully requested that the Court deny Sanchez's motion.

Dated: October 28, 2014
White Plains, NY 10601

Bhaveen Sapra