# CONTRACT OF SALE

THIS AGREEMENT is made the 31st day of July, 2013 by and between WILLIAM SANCHEZ, residing at 145 Georgetown Road, Weston, Connecticut 06883, hereinafter referred to as the "SELLER", and BRUCKNER BEVERAGE INC., a New York corporation doing business at 22 Stony Hollow, Chappaqua, New York 10514, hereinafter referred to as the "PURCHASER".

WHEREAS, in accordance with the terms and conditions of the annexed Distributor Agreement between BUHRE BEVERAGE DIST, INC., a New York corporation having its principal offices at 145 Georgetown Road, Weston, Connecticut 06883 ("BUHRE") and PEPSI-COLA BOTTLING COMPANY OF N.Y., INC. ("COMPANY"), BUHRE distributes beverages supplied by the COMPANY in accordance with the Distributor Agreement ("PRODUCTS"); and

WHEREAS, COMPANY has agreed to allow BUHRE to transfer the distribution rights to a replacement distributor, in accordance with the provisions of the Distributor Agreement; and

WHEREAS, Buhre and PBR BEVERAGE INC have entered into a Contract of Sale dated the 27th day of December 2012 ("Contract") providing for the purchase of all of the assets of Buhre.

WHEREAS, the parties seek to incorporate the terms of that Contract of Sale in this Contract of Sale ("New Contract"); and

WHEREAS, the parties intend that Bhaveen Sapra shall be the sole owner of Buhre, and that Bhaveen Sapra shall be approved by the COMPANY as a distributor.

NOW THEREFORE IN CONSIDERATION THEREOF,

1. PURCHASER and SELLER agree that the terms of the Contract dated the 27th day

of December, 2012, as annexed, are incorporated in this New Contract by reference as if restated in whole, except that:

   a. Purchaser shall be substituted for PBR BEVERAGE INC.
   b. Contract paragraph 1.05 shall be excluded and acknowledged to be without force or effect;
   c. Contract paragraph 2.00 is amended as follows:

   2.01. The purchase price is reduced from ONE MILLION ONE HUNDRED and SEVENTY-FIVE THOUSAND ($1,175,000.00) DOLLARS to ONE MILLION ONE HUNDRED and FIFTY-THREE ($1,153,000.00) DOLLARS.

   d. Not later than ONE HUNDRED AND EIGHTY (180) days after the execution of this New Contract, Bhaveen Sapra shall re-submit an application to the COMPANY to become a "distributor" as identified in the form Distributor Agreement between SELLER and the COMPANY. Within a reasonable period of time after the execution of this Contract of Sale, Bhaveen Sapra will obtain a "CDL" license for use in the State of New York. Until Bhaveen Sapra obtains the CDL license and is approved by the COMPANY, SELLER shall, without additional compensation, continue to assist Bhaveen Sapra in managing BUHRE.

2. SELLER represents that he is the sole shareholder of BUHRE and that such Seller is the record and beneficial owner of the Shares, free and clear of any lien and any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such Shares), and will transfer and deliver to Purchaser at the Closing valid title to such Shares free and clear of any Lien and any such limitation or restriction. PURCHASER has examined the

corporate book of BUHRE and is satisfied that SELLER is the sole shareholder of BUHRE. In consideration for the payment of ONE MILLION ONE HUNDRED AND FIFTY THREE THOUSAND ($1,153,000.00) DOLLARS, upon the terms set forth in the Contract, SELLER conveys to PURCHASER ninety-nine (99) shares of stock in BUHRE and agrees to retain one (1) share of non-voting stock until Bhaveen Sapra has a closing with the COMPANY as further referenced below at paragraph "4". At closing SELLER will convey the one (1) share to PURCHASER in consideration for the COMPANY's approval of Bhaveen Sapra. SELLER shall receive no further consideration for the transfer of the one (1) share.

    a. PURCHASER shall open a checking account in the name of BUHRE and the signatories to the account shall be selected by the PURCHASER. SELLER shall not be a signatory for the account

    b. Outstanding account balances due BUHRE amounting to approximately THIRTEEN THOUSAND ($13,000.00) DOLLARS due from Tremont Beverage and Soma Distributor for sales prior to the execution of this Contract of Sale shall be retained by Buhre. All other receivables due prior to July 31, 2013 shall be paid to Seller.

    c. Revenues and expenses resulting from BUHRE sales after the execution of this Contract of Sale shall be the sole responsibility of the PURCHASER.

3. Contemporaneously herewith, SELLER and Purchaser agree to execute documents substantially similar to the documents executed by and between SELLER and PBR Beverage Inc. dated December 27, 2013. ("New Closing Documents") The New Closing Documents shall include, without limitation, a promissory note and security agreement.

4. Within seven days (7) days after SELLER's receipt of the COMPANY's approval of Bhaveen Sapra, SELLER agrees to contact the COMPANY attorney to schedule a closing between BUHRE and the COMPANY. At the closing, SELLER agrees to execute the documents reasonably required by the COMPANY to designate Bhaveen Sapra as distributor.

Dated: July 31, 2013
Purchase, New York

_____
WILLIAM SANCHEZ

BRUCKNER BEVERAGE INC.

_____
By: BHAVEEN SAPRA, President

As to paragraphs 1(b)

_____
BHAVEEN SAPRA

PROMISSORY NOTE

Principal Balance: $900,000.00
Date: July 31, 2013

FOR VALUE RECEIVED, BRUCKNER BEVERAGE INC., doing business at 22 Stony Hollow, Chappaqua, New York 10514, hereinafter referred to as "MAKER", BUHRE BEVERAGE DIST, INC., a New York corporation having its principal offices at 145 Georgetown Road, Weston, Connecticut 06883, hereinafter referred to as "PAYEE", do hereby acknowledge that the MAKER agrees to pay the principal sum of NINE HUNDRED THOUSAND ($900,000.00) DOLLARS with interest as follows:

> In consecutive monthly installments of NINE THOUSAND SEVENTEEN DOLLARS AND TWENTY-NINE ($9017.29) CENTS commencing on 1st day of November, 2013 and thereafter paid on the 1st day of each month for a total of ONE HUNDRED AND FORTY-FOUR (144) consecutive months, to be applied first to interest at a rate of SIX AND ONE-HALF (6.5%) PERCENT per annum, balance in reduction of principal, until fully paid.
>
> Except as otherwise provided herein, the entire sum of $900,000.00 together with fees and interest due thereon shall be paid in full no later than October 1, 2025.

1. MAKER and the PAYEE each hereby waive trial by jury in any action or proceeding arising on, out of, under or by reason of this Note.

2. The MAKER hereby waives notice of presentment for payment, demand for payment, except as provided in paragraph 4, notice of non-payment and dishonor, protest and notice of protest.

3. If this Note is not paid when due and if it is placed with an attorney for collection, the MAKER hereby agrees to pay all costs and expenses of collection incurred by the PAYEE plus a reasonable attorney's fee which shall be applied to the amount due

under this Note and recoverable with the amount due hereunder. For every notice of default PAYEE's attorney sends to the MAKER, MAKER shall be obligated to pay a legal fee of $150.00. If the PAYEE accepts a payment despite knowing that MAKER has breached a provision of this Note, the PAYEE shall not be deemed to have waived the right to obtain a remedy for such breach. Payment by MAKER or receipt by the PAYEE of a lesser amount than the amount(s) then due shall be deemed an "on account" payment of the earliest monthly payment or additional amount then unpaid. No endorsement, statement on any check, or any letter accompanying a check or payment shall be deemed to be an accord and satisfaction. The PAYEE may accept such check or payment without prejudice to the PAYEE's right to recover the balance due, or pursue such other remedy as provided in the Promissory Note or available at law.

4. The MAKER and the PAYEE each hereby expressly and unconditionally agree that if any payment required hereunder is not paid on or before the tenth (10th) day after the due date, MAKER will pay, if charged by PAYEE, a "late charge" of four (4) cents for each dollar so overdue. Upon the occurrence of a default, the arrearages, and costs of collection shall immediately become due and payable in full, if the default is not cured, stayed, or dismissed not later than FIFTEEN (15) days after the PAYEE gives notice of such default by certified mail, return receipt requested. Furthermore, the MAKER shall pay the sum of ONE HUNDRED AND FIFTY ($150.00) DOLLARS to the attorney for the PAYEE as a legal fee in connection with the mailing of each notice of default. Each of the legal fees shall be due and payable not later than the next monthly note due date. Failure to pay a late fee shall be deemed to be a default.

5. In the event of a strike against the COMPANY, which prevents the MAKER from securing beverages for distribution, or in the event of an interruption of the supply of beverage products through no fault and not within the control of the MAKER, the payment of the Promissory Note herein shall be suspended during the pendency of such strike or interruption for the following periods:

    a. In the event such strike, lockout or interruption against the COMPANY lasts no longer than thirty (30) days, all missed payments shall be repaid to the PAYEE within a period of sixty (60) days from the date the strike, lockout or interruption ends, and MAKER's truck is loaded with product.

    b. In the event a strike, lockout or interruption exceeds thirty (30) days, then the term of the note shall be extended by a period equal to the number of monthly payments deferred during the strike or interruption. Deferred installments shall be paid monthly, commencing one (1) month after the last installment payment due pursuant to the Promissory Note executed at closing. The Security Agreement executed at closing shall be extended by a period equal to the number of deferred monthly Promissory Note payments. Interest shall not be charged for the moratorium period.

6. MAKER may only convey all or a portion of the distribution territory ("Route") pursuant to the terms of the Security Agreement and paragraphs "6" and "7" of this Promissory Note:

    a. Due on Sale

        i. If all or any part of the Route or any interest in it is sold or

transferred (or if a beneficial interest in MAKER is sold or transferred) without PAYEE's prior written consent, PAYEE may, at its option, require immediate payment in full of all sums secured by the Security Instrument executed contemporaneously with this Promissory Note.

    ii. If PAYEE exercises this option, PAYEE shall give MAKER notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Maker must pay all sums secured by the Security Agreement. If MAKER fails to pay these sums prior to the expiration of this period, PAYEE may invoke any remedies permitted by the Security Agreement without further notice or demand on MAKER

b. When MAKER intends to sell all or part of the distribution route, and PAYEE notifies MAKER that PAYEE will not exercise the "Due on Sale" provisions set forth in paragraph 6a, then MAKER will advise the PAYEE of the name, address, and Employer Identification Number of the proposed corporate MAKER, and the name, date of birth, social security number and home address of the shareholder(s) of the proposed corporate MAKER (jointly "New MAKER").

c. Not later than five (5) days prior to closing, MAKER shall provide the PAYEE with a copy of the Secretary of State corporate filing receipt for the New MAKER, and a copy of a judgement and lien search upon the New MAKER dated not more than fourteen (14) days prior to the date of service.

d. Not later than thirty (30) days prior to closing upon said Route

Portion, MAKER shall provide to PAYEE the map and territorial description of the Route or portion of the Route. In addition, MAKER shall provide PAYEE with a sworn statement as to the number of cases sold within the Route or Route portion in the prior year, and MAKER shall annex thereto a computer printout prepared by The COMPANY identifying the cases sold during the year prior to closing ("Re-sale Statement").

  e. If the Route sale is for a Route portion, the Promissory Note principal balance to be assumed by the New MAKER shall be determined by a fraction, the numerator of which shall be the cases sold by the MAKER in the Route Portion during the year prior to closing, and the denominator shall be the cases sold in The Route during the hear prior to closing. Said fraction shall then be used to determine the amount of the promissory note principal balance to be assumed by the New MAKER ("New MAKER Principal Balance"). For example, if the MAKER represents in the Re-Sale Statement that the MAKER sold 25,000 cases in the Route Portion during the year prior to closing, and 125,000 cases for The Route, then New MAKER shall assume the principle balance equal to one-fifth (25,000/125,000) of the then existing principle balance due upon the Promissory Note pertaining to The Route between MAKER and PAYEE. If at the closing with the New MAKER, the principal balance due upon the Promissory Note between MAKER and PAYEE is TWO HUNDRED THOUSAND ($200,000.00) DOLLARS, then by multiplying one-fifth by $200,000.00, the New MAKER Principal Balance can be calculated to be FORTY THOUSAND ($40,000.00) DOLLARS (1/5 x $200,000.00). At closing MAKER,

PAYEE, and NEWMAKER will execute an agreement commonly referred to as a "Wraparound Agreement" whereby the NEW MAKER will agree to assume the FORTY THOUSAND ($40,000.00) DOLLAR principal balance, and will simultaneously execute a promissory note to that effect, subject to the same terms as set forth in the original promissory note between MAKER and PAYEE ("Old Note"). As a result, the Wraparound Agreement will reflect that the Old Note shall be amended to reflect the assumption of the NEW MAKER Principal Balance by the New MAKER.

    f. In the event of a buyout by the COMPANY, the provisions of paragraph 7. et. seq. shall supercede the provisions of section 6. et. seq.

    g. As a condition to the assumption of the NEW MAKER PRINCIPAL BALANCE by the NEW MAKER, at or before closing, MAKER shall pay PAYEE any outstanding amounts due and owing (including but not limited to expenses hereinafter referred to as "Outstanding Arrearages": defaults, late fees, bounced check fees, unreimbursed fees incurred by PAYEE, attorneys fees). MAKER must also pay and legal document preparation fees incurred by PAYEE not to exceed SEVEN HUNDRED AND FIFTY DOLLARS ($750.00), and in addition thereto, MAKER shall pay an appearance fee of SEVEN HUNDRED AND FIFTY DOLLARS for each appearance at a closing or rescheduled closing by the attorney for the PAYEE. MAKER shall additionally be liable for all reasonable filing fees incurred by the PAYEE.

    h. As further consideration for the PAYEE's agreement to allow

MAKER to convey to NEW MAKER, at or before closing, MAKER herein must pay the PAYEE the sum of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS in reduction of the principal balance then due ("Resale Payment"). The Resale Payment shall be in addition to of any Outstanding Arrearages. If the total of the Outstanding Arrearages and the Resale Payment exceed the Promissory Note principal balance with interest, then MAKER shall first pay the Outstanding Arrearages, with the balance to be paid to satisfy the remaining Promissory Note principal balance with interest through the date of satisfaction.

7. The parties hereto recognize the need to agree upon a settlement procedure to be utilized in the event that prior to the satisfaction of the PAYEE's Promissory Note, the Distributor Agreement expires, and MAKER is not permitted by the The Pepsi-Cola Bottling Company of New York, Inc. ("COMPANY") to operate the distributorship in the territory annexed hereto. For the purpose of this paragraph, payments made by the COMPANY to purchase MAKER's rights to the route, for a restrictive covenant pertaining to MAKER's principal officer, or any other payments directly or indirectly to MAKER or MAKER's principal officer, or MAKER's successors or assigns, for the extinguishments or release of rights held by MAKER relating to the Distributor Agreement then in effect, shall be considered to be part of the BUYOUT PAYMENT as used herein. Payments to MAKER for vending equipment, vehicles, or other equipment shall be included in the calculation of the BUYOUT PAYMENT to the extent that such payments exceed the fair market value of such equipment. In the event that the COMPANY purchases from MAKER the rights which MAKER possesses to distribute PRODUCTS pursuant to the Distributor Agreement then in effect, MAKER agrees to pay

to PAYEE the principal balance of this Promissory Note with interest, fees, and expenses ("TOTAL BALANCE") then due PAYEE subject to the following terms:

    a. In the event that the payment by the COMPANY is to be pursuant To certain terms (i.e. payment of x years, principal payment without interest, etc.), the PAYEE agrees to accept further payments based upon the BUYOUT terms to be paid to the COMPANY.

    b. If permitted by the COMPANY, MAKER shall direct the COMPANY to pay directly to the PAYEE, the amounts due PAYEE.

    c. MAKER and PAYEE hereby agree to execute the documents and/or authorizations required by the COMPANY, and to close in a timely manner with the COMPANY in the event of a COMPANY buyout. As part of PAYEE's rights pursuant to this paragraph, MAKER agrees to provide PAYEE with a copy of the final COMPANY proposal within not later than forty-five (45) days prior to the BUYOUT closing scheduled by the COMPANY.

    d. The parties recognize that notwithstanding the provisions of this paragraph, PAYEE has made no representations that the COMPANY will make an offer to purchase the distributorship. It is further acknowledged that the COMPANY may not extend the term of the current Distributor Agreement, and accordingly, the rights to operate the distributorship being conveyed may expire without a BUYOUT prior to the satisfaction of this Promissory Note. In the event that the distribution rights expire, the MAKER is not permitted to operate the distributorship, and MAKER receives no BUYOUT PAYMENT, subject to the provisions of 7(e), MAKER shall only be obligated to pay PAYEE the principal,

interest, and fees due through the last day that MAKER operates the route. As used herein, the term MAKER shall include any agent or successor in interest to the MAKER.

   e. If MAKER, MAKER's principal officers, or MAKER's successor or assigns (jointly referred to as "Plaintiff") files a claim or commences litigation against the COMPANY relating to the Distributor Agreement, and Plaintiff obtains a settlement or judgment, then subject to the provisions of paragraph 8.00 et. seq., Plaintiff shall be obligated to pay PAYEE the TOTAL BALANCE then due and owing, in addition to fees and expenses reasonably incurred by PAYEE prior to, or in the course of such claim or litigation and/or settlement. The provisions of paragraph 8.00 et. seq. shall be applied based upon the proceeds derived by the MAKER after the payment and/or reimbursement to the MAKER of its reasonable litigation costs. Pending judgment award or settlement, if MAKER is prevented from operating the route as set forth in paragraph 8.00, MAKER will be required to make the Note payments due for the month in which MAKER's operation was terminated. Thereafter, MAKER will not make further note payments until the successful execution upon such a judgment, award, or settlement.

8. MAKER is a participant in the SOFT DRINK AND BREWERY LOCAL 812 RETIREMENT FUND ("Pension Plan"). Both the MAKER and PAYEE have been advised that the transaction herein may constitute or result in a "withdrawal" or "partial withdrawal" from the Pension Plan by the PAYEE. In the event that this sale is hereinafter determined to constitute a withdrawal or partial withdrawal from the Pension

Plan, the signatories hereto agree that this transaction shall not be treated as such by the Pension Plan, and that §4204 of the Employee Retirement Security Act of 1974 as amended ("ERISA") shall apply to the transaction. It is agreed that:

    a. The MAKER shall make Pension Plan contributions for not less than five (5) years for the number of employees equivalent, as determined by the Pension Plan, to the number of employee paid to the Pension Plan by the PAYEE; or

    b. The MAKER shall provide to the Pension Plan a bond or other acceptable security as required by ERISA §4204(a)(1)(C), and as hereinafter required by ERISA §§4204(a)(1)(B) and (C).

    c. The MAKER shall defend, indemnify, and hold harmless the PAYEE, its agents, officers, and employees from and against all claims, damages, losses, judgments, expenses and other costs, including but not limited to litigation expenses and reasonable attorney's fees, arising out of or resulting from MAKER's acts or omissions relating to compliance/noncompliance with the Pension Plan, or, attributable to the MAKER's withdrawal or partial withdrawal from the Pension Plan during the five years immediately following the closing of this transaction. These obligations will be hereinafter jointly referred to as "MAKER's Indemnification Obligations". The MAKER's Indemnification Obligations extend to any withdrawal liability incurred by the PAYEE to the Pension Plan as a result of this Agreement and ERISA §4204.

    d. The MAKER's Indemnification Obligations shall include but not be limited to:

10

i. The PAYEE's withdrawal liability attributable to MAKER's withdrawal or partial withdrawal from the Pension Plan, including the interest attributable thereto;

ii. The arbitration or litigation fees, including reasonable attorney's or consultant's fees incurred by the PAYEE with respect to MAKER's Indemnification Obligations.

e. PAYEE's delay or failure to enforce any provision of this paragraph will not waive PAYEE's right to subsequently enforce such provision, unless so indicated by the PAYEE in writing.

f. Pursuant to paragraph 6, MAKER may sell the Pepsi-Cola distribution rights and territory referred to herein to a Subsequent Purchaser. If the MAKER seeks to sell all or a portion of the distribution rights and territory being conveyed herein to a Subsequent Purchaser prior to five years from the date of closing, or until such time as MAKER is relieved of MAKER's Indemnification Obligations or as provided in this Contract, said sale will be conditioned upon the Subsequent Purchaser executing an agreement identical to this paragraph 8. Although the Subsequent Purchaser will thereafter become the primary obligor with respect to MAKER's Indemnification Obligations, in the event that the Subsequent Purchaser is in default of such MAKER's Indemnification Obligations, then the Pension Plan and the PAYEE will continue to require the MAKER to pay the amount(s) due pursuant to MAKER's Indemnification Obligations.

g. Subsequent to the closing of title, the parties hereto agree to execute and deliver to the Pension Plan such documents as required by the Pension Plan to effect the terms hereof.

9. This Note is secured by a loan Security Agreement made by the MAKER, as mortgagor, to the PAYEE of mortgagee on even date, encumbering among other assets the MAKER's distributorship business described in the territorial map attached hereto.

10. This Note may be prepaid at any time and from time to time without penalty, in ONE THOUSAND ($1,000.00) DOLLAR increments, and to be paid in reduction of principal in inverse order. Interest upon said prepayment shall be due as of the date of payment, and shall be paid simultaneous with the prepayment.

11. Nothing contained in this Note or in any other agreement between the MAKER and the PAYEE requires the MAKER to pay, or the PAYEE to accept interest in an amount which would subject the PAYEE to any penalty or forfeiture under applicable law. In no event shall the total of all charges payable hereunder, whether of interest or of such other charges which may or might be characterized as interest, exceed the maximum rate permitted to be charged under the laws of the State of New York. Should the PAYEE Note receive any payment which is or would be in excess of that permitted to be charged under said laws, such payment shall have been, and shall be deemed to have been made in error and shall automatically be applied to reduce the principal indebtedness outstanding on this Note.

12. This Note may only be modified by a written instrument executed by the party to be charged therewith, and executed in the same manner as this Note.

12

13. This Note may be executed in duplicate and such duplicate original shall be deemed to constitute but one and the same instrument.

14. This Note shall be governed by and construed in accordance with and pursuant to the laws of the State of New York.

15. The MAKER acknowledges that this Note constitutes a valid and binding indebtedness for NINE HUNDRED THOUSAND ($900,000.00) DOLLARS.

Dated: July 31, 2013
Bronx, New York

BRUCKNER BEVERAGE INC.

_____
BHAVEEN SAPRA, President

Witnessed:

_____

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF WESTCHESTER  )

On the 31st day of July in the year 2013, before me, the undersigned Notary Public in and for the State of New York, personally appeared BHAVEEN SAPRA, residing at 22 Stony Hollow, Chappaqua, New York 10514, to me known, who, being by me duly sworn, did depose and say that he is the President of BRUCKNER BEVERAGE INC. the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation, and that he signed his name thereto by like order.

JOHN C LETTERA
Notary Public, State of New York
No. 02LE6211723
Qualified in Westchester County
Commission Expires September 21, 2013

_____
NOTARY PUBLIC

13