UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

BUHRE BEVERAGE DISTRIBUTION, INC.,            Chapter 11

                                                                                              Case No. 14-22048-rdd

                                         Debtor.
-----------------------------------------------------------------X

WILLIAM SANCHEZ,
                                      Plaintiff,

-against-

                                                                             Adv. Pro. No.: 14-08218-rdd

BUHRE BEVERAGE DISTRIBUTION, INC.,
BHAVEEN SAPRA and BRUCKNER BEVERAGE, INC.

                                      Defendants.
-----------------------------------------------------------------X

## DEFENDANTS' STATEMENT UNDER LOCAL RULE 7056-1 AND IN OPPOSITION TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7056

**BUHRE BEVERAGE DISTRIBUTION, INC.** (the "Debtor"), **BHAVEN SAPRA** ("Sapra") and **BRUCKNER BEVERAGE, INC.** ("Bruckner") (collectively the "Defendants") respectfully submit this statement pursuant to Local Bankruptcy Rule 7056 in opposition to the motion of Plaintiff William Sanchez ("Sanchez") Summary Judgment. The assertion made by Sanchez is set forth followed by the response of the Defendants in bold. References to underlying documents supporting Sanchez's assertion are omitted. References to the Affirmation of Bhaveen Sapra in Opposition to the Motion for Summary Judgment are made as Sapra Aff. At ¶__.

        1.        At all times relevant herein, Sanchez is an individual residing in the state of

Connecticut at 145 Georgetown Road, Weston CT 06883.

**UNDISPUTED.**

2. At all times relevant herein, the Debtor is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 22 Stony Hollow, Chappaqua, NY 10514.

**UNDISPUTED.**

3. At all times relevant herein, Sapra is an individual residing in the state of New York at 22 Stony Hollow, Chappaqua, NY 10514.

**UNDISPUTED.**

4. At all times relevant herein, Bruckner Beverage, Inc. ("Bruckner") is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 22 Stony Hollow, Chappaqua, NY 10514.

**UNDISPUTED.**

5. Upon information and belief, at all times relevant herein, Pepsi-Cola Bottling Company of New York, Inc. ("Pepsi") is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 650 Brush Avenue, Bronx, NY 10465.

**UNDISPUTED.**

## BACKGROUND

6. Since 1995, Sanchez has been the owner/operator of various soda distribution routes of Pepsi.

**UNDISPUTED.**

7. At all times relevant herein, prior to July 31, 2013 Sanchez was the 100% owner of Buhre.

**UNDISPUTED.**

8. Buhre is, and at all times relevant herein was, the owner of a certain Pepsi distribution route that covered certain territory in the Bronx, New York (the "Buhre Pepsi Route"), together with two delivery trucks, and other miscellaneous assets.

**UNDISPUTED.**

9. In or about September 2012, Sanchez decided to sell the Pepsi route that he owned and operated through Buhre.

**DISPUTED only to the extent that the Debtor believes that Sanchez was interested in selling the route a few months earlier than September 2012. Sapra Aff. at ¶ 7.**

10. B. Sapra wanted to take over the Buhre Pepsi Route, and in order to do this, his father Pratap Sapra ("P. Sapra") arranged for him to purchase said Route from Sanchez.

**UNDISPUTED.**

11. Sanchez agreed to sell Buhre's assets, including the Buhre Pepsi Route, to B. Sapra for $1,175,000.00 (which sum was later voluntarily reduced by Sanchez to $1,153,000.00), and as B. Sapra did not have sufficient cash to close on the transaction, it was agreed that Sanchez would hold a note in the sum of $900,000.00 for the balance of the purchase price, and take back a purchase money security interest in Buhre's assets until such time as the note was paid in full.

**DISPUTED with respect to the statement that B. Sapra did not have sufficient cash to close. As set forth in Sapra Aff. at ¶ 20, Sapra does not at all recall any discussions regarding lack of availability of cash. Cash was not a significant issue particularly since**

**Sapra had already paid Sanchez $275,000.00.**

12. All operators of Pepsi distribution routes must be approved by Pepsi, and as such, B. Sapra applied to Pepsi for approval to operate such a route.

**UNDISPUTED.**

13. At an interview with Pepsi's Transfer Committee on December 13, 2013, Pepsi denied B. Sapra's application based on his lack of experience and the fact that he did not hold a Commercial Driver's License ("CDL") or a green card, and Pepsi advised B. Sapra that in order to obtain approval from Pepsi he would need to secure a green card and a CDL, and provided him with criteria to follow in order to gain the requisite experience.

**UNDISPUTED.**

14. On December 27, 2012, Sanchez entered into a contract for the sale (the "December 2012 Contract") of Buhre's assets to PBR Beverage, Inc. ("PBR"), a corporation wholly owned by B. Sapra. The parties anticipated that B. Sapra would expeditiously satisfy the requirements that would enable him to obtain the requisite approval from Pepsi, and that a closing on the December 2012 Contract would take place in January or February of 2013.

**UNDISPUTED.**

15. In accordance with the terms of the December 2012 Contract, certain documents were prepared that would effectuate the sale pursuant to said Contract. These documents (collectively, the "2012 Documents") were:

    a.    A promissory note with PBR as "maker" and Buhre as "payee", pursuant to which PBR promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 1/2 percent interest;

    b.    A security agreement with PBR as "debtor" and Buhre as "secured party", pursuant to which PBR granted Buhre a security interest in the Pepsi Cola

Distributor Agreement, together with all accounts receivable and equipment;

c. A bill of sale listing Buhre as "seller" and PBR as "purchaser"; and

d. Two motor vehicle bills of sale for the two trucks owned by Buhre, listing Buhre as "seller" and PBR as "buyer".

**UNDISPUTED.**

16. In accordance with the terms of the 2012 Documents, B. Sapra secured a green card, and Sanchez allowed B. Sapra to work the route with him in order to gain the necessary experience.

**UNDISPUTED.**

17. B. Sapra, however, never obtained his CDL, and in or about April 2013, Pepsi again denied his application for approval.

**UNDISPUTED that Pepsi denied Sapra's application for approval.**

18. B. Sapra then determined to enter into a partnership with John Brown ("Brown") to purchase the Buhre Pepsi Route, as Brown had the requisite experience and CDL, and had been previously approved by Pepsi as a route operator. Approval from Pepsi was obtained and memorialized in a letter from Peter Gaudet, Vice President of Labor Relations at Pepsi (the "Pepsi Approval Letter") and a closing date was fixed for mid-July, but on the day of the closing, Sanchez was advised that the closing was being adjourned due to alleged "concerns about Brown."

**DISPUTED. Sapra expressed concerns about Brown. As set forth in the Sapra Aff. at ¶17, it was Sanchez who was promoting a partnership with Brown. After he learned of the rejection by Pepsi, Sapra asked Sanchez for his deposit back as the transaction was contingent upon Pepsi's approval. Sanchez refused indicating that he was "working on getting approval" despite the rejection by Pepsi. Several days later, Sanchez advised Sapra that he had "a new way" of procuring Pepsi's approval. He assured Sapra that he would be approved if he**

5

**engaged John Brown, a driver, as an employee. Sapra was uncomfortable with this arrangement and again requested return of the down payment. Sanchez refused. Sanchez explained that, in his 25 years as a Pepsi distributor, similar routes were transferred to people that lacked experience for example, as a result of divorce and death. Sanchez assured Sapra that Pepsi would approve the transfer as a "stock" sale rather than an "asset sale." Sapra trusted Sanchez both as a friend and a seasoned businessman familiar with Pepsi's policies.**

**Sapra Aff. at ¶ 17.**

19. Over the next several days the parties engaged in various discussions. During these discussions, it was determined that B. Sapra did not have the cash available that was required at the closing (the December 2012 Contract required the payment of $100,000.00 cash at the closing), and Sanchez agreed to reduce the purchase price by $22,000.00 and to take the balance due in the form of a promissory note in the sum of $78,000.00 payable on or before November 1, 2013, instead of cash. As the parties had resolved Sapra's cash deficiency problem, the alleged "concerns about Brown" evaporated and it was agreed that the parties would move forward with a closing.

**DISPUTED. As set forth in Sapra Aff. at ¶ 20, Sapra does not at all recall any discussions regarding lack of availability of cash. Cash was not a significant issue particularly since Sapra had already paid Sanchez $275,000.00. According to Sapra, the $78,000.00 note was payable contingent upon Pepsi's approval of him as an owner. Sapra Aff. at ¶ 27.**

20. B. Sapra was anxious to close as soon as possible as it was July and the Summer months are the most lucrative for a soda distribution route.

**DISPUTED.** As set forth in the Sapra Aff. at ¶ 23, Sanchez's statement that Sapra was eager to close before the summer is false. Sapra was unfamiliar with the nuances of the business and seasonal revenues. It was Sanchez who insisted upon closing. Sapra Aff. at ¶ 23

21. On July 31, 2013, a meeting was held (the "July 31" Meeting") between B. Sapra, his counsel John Lettera, Esq. ("Lettera"), Sanchez and his counsel Allan Stem, Esq. ("Stem"), which meeting was held at Lettera's office.

**UNDISPUTED.**

22. At the July 31st Meeting, the parties agreed that due to Brown and Pepsi's unavailability to close in August, the parties would amend the December 2012 Contract to provide for a sale of the stock of Buhre to B. Sapra's corporation instead of a sale of the assets, which transaction could be effectuated without the participation of Brown or Pepsi.

**UNDISPUTED that the parties agreed to change the agreement to provide for a stock sale. However, Sapra is unaware as to whether such a transaction could have been effectuated without the approval of Pepsi.**

23. To that end, at the July 31st Meeting, the parties negotiated and entered into a second contract of sale dated July 31, 2013 (the "July 2013 Contract") between Sanchez and Bruckner, a corporation wholly owned by B. Sapra, for the sale of 100% of the shares in Buhre to Bruckner. Paragraph 1 of the July 2013 Contract expressly incorporated the terms of the December 2012 Contract.

**UNDISPUTED.**

24. At the July 31" Meeting, the parties confirmed the terms of the transfer of the shares of Buhre from Sanchez to Bruckner (the "Agreed-Upon Transaction") as follows: (a) Sanchez would transfer 100% of the shares in Buhre to Bruckner for the sum of $1,153,000.00, payable by

way of $175,000.00 at the closing and two promissory notes for the balance; (b) Sanchez would receive two promissory notes from Bruckner, one in the sum of $78,000.00 payable on or before November 1, 2013 and one in the sum of $900,000.00 payable over 144 months at 6 ½ percent interest; (c) Sanchez would receive a security interest in the shares of Buhre and all of it's tangible and intangible assets, including the Buhre Pepsi Route which was initially held under the distributor agreement between Buhre and Pepsi, and would later be held under a distributor agreement between Bruckner and Pepsi (once B. Sapra was able to obtain same); (d) Sanchez would retain one share of stock in Buhre until such time as Bruckner obtained its distributor agreement with Pepsi, at which time the remaining one share in Buhre would be transferred by Sanchez to Bruckner for no further consideration.

**DISPUTED. The foregoing was not the Defendants' understanding of the transaction. As set forth in Sapra Aff. at ¶ 26, the following reflect the terms of the agreement as Sapra understood them: (a) Sanchez would transfer 100% of the shares in Buhre to Bruckner for the sum of $1,175,000.00, payable by way of $275,000.00 which was paid in December 2012, and a promissory note for the balance of $900,000.00; (b) Sanchez would receive a note from the Debtor for the balance ($900,000.00); (c) Sanchez would receive a security interest in the tangible assets of the Debtor which included the trucks and cash but not intangibles or the Route; (d) The Debtor agreed to pay an additional $78,000.00 to Sanchez conditioned upon approval by Pepsi; (e) Sanchez was to assist Sapra with operations for approximately 6 months; and (f) the transaction was subject to Pepsi's approval. Sapra Aff. at ¶ 26**

25. During the course of the July 31st Meeting, the parties discussed the documents necessary to effectuate the Agreed-Upon Transaction, and such documents were drafted by Lettera at the Meeting.

**Defendants' lack knowledge as to who drafted the documents. According to the Sapra Aff. at ¶ 24, Sanchez insisted that his counsel, Allan Stern, prepare the documents.**

26. The closing on the July 2013 Contract took place at the July 31st Meeting, at which time the parties executed various documents (the "Inaccurate Documents") for the purpose of effectuating the Agreed-Upon Transaction.

**UNDISPUTED. Various documents were executed and some were inaccurate. Sapra Aff. at ¶ 27.**

27. Unfortunately, the Inaccurate Documents inadvertently contained several mistakes that served to potentially alter the effectiveness of the Inaccurate Documents.

**UNDISPUTED. Defendants acknowledge that there were errors in the documents. However, they disagree with Sanchez as to the extent of the errors. Sapra Aff. at ¶ 27.**

Specifically, the Inaccurate Documents, and the mistakes contained therein, were:

a. A promissory note with Bruckner as "maker" and Buhre as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $900,000.00 over one-hundred and forty-four months at 6 1/2 percent interest (the "900K Promissory Note") The "payee" on the 900K Promissory Note should have been Sanchez, not Buhre;

**UNDISPUTED.**

b. A promissory note with Bruckner as "maker" and Sanchez as "payee, pursuant to which Bruckner promised to pay Buhre the sum of $78,000.00 on or before November 1, 2013, with interest to accrue at 12% only if the full balance was not paid in full by November 1, 2013 (the "78K Promissory Note"). There were no mistakes contained in this document;

**DISPUTED. According to Sapra, the smaller note was only payable when and if Pepsi approved him as a distributor. Sapra Aff. at ¶ 27(b).**

9

c.  A security agreement with Bruckner as "debtor" and Buhre as "secured party", pursuant to which Bruckner granted Buhre a security interest in the shares of Buhre and the Pepsi Cola Distributor territory, together with all accounts receivable and equipment related thereto (the "2013 Security Agreement", a copy of which is annexed hereto at Exhibit "K"). The "secured party" should have been Sanchez, not Buhre, and the collateral description should have been:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013

**DISPUTED. According to Sapra, the security description does not reflect his understanding of the arrangement. Sapra understood that the distributorship agreement would not serve as collateral. Sapra Aff. ¶¶ 27-28.**

d.  A bill of sale listing Sanchez as "seller" and Bruckner as "buyer" (the "2013 Bill of Sale"). There were no mistakes contained in this document;

**Defendants are unsure whether there are any errors in the Bill of Sale.**

e.  A stock power pursuant to which Sanchez transferred one share of Buhre stock to Bruckner. There were no mistakes contained in this document;

**DISPUTED. According to Sapra, this entire document is incorrect as he was to be the sole owner of Buhre through Bruckner. Sapra Aff. ¶ 27.**

e.  A UCC-1 financing statement listing the "debtors" as Buhre and Bruckner and asserting a lien against the following collateral: (a) shares of stock of Bruckner; and (b) assets of Buhre.

**UNDISPUTED with respect to the assertion that the assets of Buhre were to be encumbered. DISPUTED to the extent that the shares were to be unencumbered. It was Sapra's understanding that the shares would not be encumbered. Sapra Aff. ¶ 28.**

28. Thereafter, on or about November 4, 2013, a UCC-3 amendment), was filed to amend the UCC-1 which restated the collateral as being:

> "[t]he Distributor Agreement by and between Bruckner Beverage, Inc. and the Pepsi-Cola Bottling Company of New York, Inc. and pertaining to a certain Pepsi-Cola distribution territory conveyed July 31, 2013, beverage trucks with vehicle identification Numbers 1HTMAAN74H607626 and 2NKMLZ9X95M100779, and pertaining to that said territory, all of the Debtor's equipment, parts, inventory, accounts receivable and the proceeds derived therefrom, now or hereinafter owned by or due the Debtor." (For the purposes of this adversary proceeding, the UCC-3 Amendment shall be included in the Inaccurate Documents.

**DISPUTED. The UCC is correct in so far as it does not list the Route as collateral. Sapra's understanding was that tangible assets of Buhre would serve as collateral. Sapra Aff. at ¶28.**

29. The collateral description contained in the UCC-3 Amendment should have read:

> A certain distributorship agreement by and between Pepsi-Cola Bottling Company of New York, Inc., Buhre Beverage Dist., Inc. and William Sanchez, and all of the sales proceeds, and other assets associated with the performance of the distributor agreement including a 2004 International Harvester truck bearing VIN 1HTMMAAN74H607626, a 2005 Kenilworth van VIN 2NKMLZ9X95M100779, miscellaneous hand trucks and computer records related to the distributorship, and the shares of Buhre Beverage Dist., Inc. conveyed by a security agreement dated July 31, 2013.

**DISPUTED. The agreement did not contemplate the Route serving as collateral according to Sapra. Sapra Aff. at ¶ 28. To the extent that the Amendment includes the Route, it is incorrect.**

30. Following the transaction through the date upon which issue was joined in this Adversary Proceeding, despite the inadvertent mistakes contained in the Inaccurate Documents, Sanchez, B. Sapra, the Debtor and its counsel continued to act in compliance with the true intent of the parties regarding Agreed-Upon Transaction and what the Inaccurate Documents should have

stated from the time of their execution, which is that Sanchez is the proper payee on the $900k Promissory Note, the proper secured party on the 2013 Security Agreement, and that the collateral listed on the 2013 Security Agreement and the UCC-3 Amendment should have been as set forth above.

**DISPUTED IN PART and UNDISPUTED IN PART. Defendants recognize that Sanchez should have been the proper payee under the Promissory Note in the amount of $900,000.00 and the proper secured party. However, Defendants dispute that the listing of the collateral on the amended UCC is correct. Sapra Aff. at ¶¶ 27 and 28.**

31. In keeping with the terms of the Agreed-Upon Transaction, the Debtor's schedules, sworn to under oath by B. Sapra, list Sanchez as a secured creditor on Schedule "D"4. The Debtor's Schedule "D" lists the obligation to Sanchez as being secured by a UCC filed in August of 2013 giving Sanchez a security interest in the Debtor's stock and two vehicles. As of the date of this statement, the Debtor has not amended its Schedule "D", as confirmed by the Court Docket for this case.

**DISPUTED. Defendants recognize that Sanchez should have been the proper payee under the Promissory Note in the amount of $900,000.00 and the proper secured party. However, Defendants dispute that Sanchez's assertion that the listing of the collateral on the amended UCC is correct and the amount claimed by Sanchez is correct. Sapra Aff. at ¶¶ 27 and 28. As set forth in the Sapra Aff. at ¶ 30, the Debtor filed for bankruptcy protection on an emergency to avoid imminent seizure of its assets by Sanchez. Sapra listed Sanchez as a disputed creditor on the Debtor's schedules. Sapra disputes the validity, classification as well as extent of the amounts alleged to be due. Sapra Aff. at ¶ 30.**

32. On May 19, 2014, Sanchez filed a proof of claim in the Debtor's case asserting a secured claim in the sum of $978,000.00 (the "Sanchez Proof of Claim"). The Sanchez Proof of Claim annexed a copy of the Complaint in this Adversary Proceeding as the basis for perfection of the secured claim. As of the date of this statement, the Debtor has not interposed any objection to the Sanchez Proof of Claim.

**DISPUTED in so far as Sanchez suggests that, by not filing an objection to the claim, the Debtor acknowledges its validity. The Debtor intends to object to the proof of claim Sanchez filed. The Debtor has not done so because it has been focusing on the outcome of the sale motion. It is possible that a sale will not be consummated. As such, the Debtor believes that it makes more sense to wait until the sale is approved. Once a sale is approved, the claims can be addressed. Sapra Aff. at § 33.**

33. The Debtor previously filed an Order to Show Cause with this Court dated March 10, 2014 (the "Debtor's Prior Motion"). In further keeping with the terms of the Agreed-Upon Transaction, the Debtor's Prior Motion and the affirmation of Debtor's counsel submitted with the Debtor's Prior Motion repeatedly refer to Sanchez as the secured creditor of the Debtor.

**UNDISPUTED in that Debtor acknowledges that Sanchez is a secured creditor. The extent and validity of his security is disputed. Sapra Aff. at ¶¶ 30 and 33.**

34. Subsequent to the hearing on the Debtor's Prior Motion, it appears that B. Sapra has repeatedly been taking actions with regard to the Debtor ("Sapra's Improper Actions") that have been in direct derogation of his fiduciary duty as the operator of a Debtor-In-Possession.

**DISPUTED. At no time did Sapra breach his fiduciary obligation to the Debtor or anyone else. He tried to operate the Route to the best of his ability. It should be noted that he did not receive any assistance from Sanchez (as required under the agreements) and was subjected to**

Sanchez's obstruction and control over finances. Sapra has not filed operating reports because he is not operating the Route. Pending the sale to the Buyer, Pepsi is operating the Route pursuant to its policy. He has not attempted to conceal anything from the Court. Sapra Aff. ¶¶ 34-36.

35. Apparently, Sapra's Improper Actions began almost immediately after the hearing on the Debtor's Prior Motion.

**DISPUTED. At no time did Sapra breach his fiduciary obligation to the Debtor or anyone else. He tried to operate the Route to the best of his ability. Sapra Aff. ¶¶ 34-36.**

36. Upon information and belief, of the six known checks B. Sapra has written to Pepsi, three of them have bounced, as follows: (a) March 21, 2014 - $15,976.75; (b) March 26, 2014 - $1,493.50; and (c) March 27, 2014 - $10,519.37, for a total of $27,989.62. The Debtor should have had sufficient monies to cover all of the bounced checks.

**UNDISPUTED that checks were dishonored and that there should be funds to cover them. However, the shortage of funds was not the fault of Sapra. Sanchez continued to control the Debtor's finances and Sapra experienced difficulties in collection from customers who would not deal with him. Sapra Aff. at ¶ 29.**

37. There are two trucks that are used in the Debtor's operations, Truck 112 and Truck 114. Upon information and belief, the Debtor's cash sales for the two (2) weeks ending March 27, 2014 were $59,102.69, $25,365.29 from the operation of Truck 112 and $33,737.40 from the operation of Truck 114. The majority of sales from the operation of Truck 114 come from one account, Tremont Beverage, the majority of which are paid in the form of checks. The majority of sales from the operation of Truck 112 are paid in cash. At the end of this period, B. Sapra showed Sanchez the Debtor's bank account on-line which, at that time, showed approximately only

$33,000.00 in deposits.

**DISPUTED. Sapra never assumed control of the Debtor's business. Sanchez continued to hold himself out as the owner and to interact with customers. Sanchez controlled the checkbook and payables. Sapra Aff. at ¶ 29.**

38. Brown, the Debtor's primary driver, advised Sanchez that subsequent to March 17, 2014, at the end of each day he gave all cash proceeds to B. Sapra. Brown further advised that B. Sapra alone had been responsible for collecting from Tremont Beverage. Sanchez was advised by Ricky at Tremont Beverage that during the two week period ending March 27, 2014, Tremont had paid B. Sapra cash in the approximate sum of $30,000.00.

**DISPUTED. Sapra had ongoing difficulties with customers who would not deal with him. Sapra Aff. at ¶ 29. The allegations of Ricky at Tremont are hearsay.**

39. Upon information and belief, for the two (2) weeks ending March 27, 2014, B. Sapra only deposited checks into the Debtor's bank account and failed to deposit any of the cash collected into the Debtor's bank account.

**DISPUTED to the extent that the statement implies that Sapra misappropriated cash. Sapra had ongoing difficulties with customers who would not deal with him. Sapra Aff. at ¶ 29.**

40. Had B. Sapra deposited all funds, both cash and checks, into the Debtor's bank account for the two (2) weeks ending March 27, 2014, there would have been sufficient funds to cover all of the checks written to Pepsi.

**DISPUTED to the extent that the statement implies that Sapra misappropriated cash. Sapra had ongoing difficulties with customers who would not deal with him. Sapra Aff. at ¶ 29. Sanchez had sole control over the Debtor's finances.**

15

41. On March 27, 2014, Sanchez received a call from David Downs ("Downs"), the head of Bronx Sales for Pepsi, who informed Sanchez that due to the continued bounced checks, the Debtor was going to be placed on COD.

**Defendants lack knowledge as to the conversation between Downs and Sanchez but does not dispute that the Debtor was placed on COD.**

42. On March 28, 2014, Downs again called Sanchez and advised that he had spoken with B. Sapra regarding the Debtor's balance owed to Pepsi, and that B. Sapra told him that he would be coming in to the warehouse with a certified funds in the sum of $20,000.00 by 9:00 a.m. that day. Downs further advised that when B. Sapra didn't arrive by 9:00 a.m., he called him again and was advised by B. Sapra that he had been delayed, and would be coming by with certified funds in the sum of $15,000.00, instead of $20,000.00. When B. Sapra finally appeared at 10:45 a.m., at which time Sanchez was with Downs, B. Sapra advised Downs that he had no certified funds, and only had $4,000.00 in cash which Downs had him turn in to Pepsi's cashier.

**DISPUTED.**

43. Pepsi placed the Debtor on COD effective Monday, March 31, 2014.

**UNDISPUTED.**

44. Upon information and belief, B. Sapra has not paid for Pepsi product COD, and as a result, the Debtor ceased operating effective March 31, 2014.

**DISPUTED. The Debtor ceased operating the Route because it was not approved to operate by Pepsi and Pepsi indicated that its policy was to operate the Route. Sapra Aff. at ¶ 31. Moreover, Pepsi would not allow Sanchez to operate the Route because, according to Pespi, he breached the distribution agreement.**

16

45. Brown, the Debtor's primary driver, tendered his resignation on March 28, 2014, effective immediately, citing an inability to work with B. Sapra.

**Defendants lack knowledge as to why Brown resigned.**

46. The Debtor has purposefully concealed all of it's financial information since the filing of it's Chapter 11 case by failing to file a single operating report with the Court, despite its requirement to do so.

**DISPUTED. The Debtor has not purposefully concealed any information. The Debtor is not operating the Route. Pepsi is operating the Route in accordance with its rules pending the proposed sale. Sapra Aff. at ¶¶29, 31, and 34.**

47. At the Section 341(a) meeting of creditors in this case, Sanchez requested that Sapra provide him with an accounting of all of the monies, cash or otherwise, that have been collected by or on behalf of the Debtor, by B. Sapra or any other party, since the Filing Date, but none has ever been provided.

**DISPUTED. Counsel was present at the 341 meeting and does not recall any request being made for an account. Moreover, the Debtor did not assume control of the business. Sanchez controlled the Debtor's checkbook attended to payables. Sapra Aff. at ¶ 29.**

## FACTS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED

The following genuine issues of fact exist which require a trial:

1. The extent and description of collateral securing the Promissory Note are triable issues of fact. While the Defendants acknowledge that Sanchez should have been the payee under the Promissory Note, the extent, if any, of his security interest is in dispute. Sanchez, who was paid an additional $100,000.00 in cash by Sapra, asserts that the interest extends to all assets of the Debtor including its interest in the Route. The Defendants assert that the Route and other intangible assets were not included as collateral. The intent of the parties and the extent of any mistakes are disputed and constitute triable issues of fact. Moreover, the credibility of Sanchez, his attorney, Allan Stern ("Stern"), and John Brown ("Brown") are seriously questioned and Defendants should be entitled to cross-examine them. Both Sanchez and Stern, who supervised the execution of the documents in question, have a vested interest in the outcome of the action. Brown, a former employee of both Sanchez and Sapra,

In sum, the Defendants are entitled to discovery on issues relating to Sanchez's attempt to reform the sale documents. In this regard, it should be noted that the Plaintiff has already served a notice deposition (which implies that he also requires discovery). A copy of the notice is attached hereto as Exhibit A.

2. Whether Sanchez properly perfected his security interest in the Debtor's property is a triable issue of fact. There are issues of fact as to whether Sanchez properly perfected his security interest in the Debtor's vehicles and whether the UCC's, which deviate from the security agreement, are valid.

3. Whether the Debtor should be compelled to account to Sanchez under New York law presents triable issues of fact. While the Debtor recognizes that it will be required to

report its financial activity to the Court, it is disputed whether Sanchez is entitled to a formal accounting.

4. Whether the Defendants' affirmative defenses which include waiver, acquiescence and estoppel should be dismissed as a matter of law present issues of fact which require discovery. The willful and intentional circumvention of Pepsi's policies by Sanchez, who operated the Route for decades, the superior knowledge possessed by Sanchez, and the one time close and friendly relationship between Sanchez and Sapra form the basis for these defenses.

Dated: White Plains, New York
October 29, 2014

Respectfully submitted,

PENACHIO MALARA LLP

By: ___s/ Anne Penachio___
Anne Penachio
Counsel for Debtor
235 Main Street, Suite 610
White Plains, New York 10601
(914) 946-2889