UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| BUHRE BEVERAGE | . | Case No. 14-22048 (RDD) |
| DISTRIBUTION, INC., | . | |
| | . | |
| Debtor. | . | |
| _____ | . | |
| WILLIAM SANCHEZ, | . | Adv. Case No. 14-08218 (RDD) |
| | . | |
| Plaintiff, | . | |
| | . | |
| vs. | . | |
| | . | |
| BUHRE BEVERAGE | . | |
| DISTRIBUTION, INC., | . | 300 Quarropas Street |
| | . | White Plains, New York 10601 |
| Defendant. | . | |
| | . | Monday, November 3, 2014 |
| . . . . . . . . . . . . . . | . | 11:40 a.m. |

TRANSCRIPT OF MOTION TO APPROVE (1) SALES PROCEDURES;
(2) BIDDING PROCEDURES; (3) BREAKUP FEE, IF APPLICABLE;
(4) THE FORM AND MANNER OF NOTICE; (5) THE SCHEDULE FOR
AN AUCTION AND SALE HEARING; (6) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR
OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,
GRANTING THE SUCCESSFUL BIDDER GOOD FAITH STATUS,
WAIVING THE TEN-DAY STAY OF THE SALE ORDER, AND
(7) GRANTING SUCH OTHER RELIEF AS PROPER; MOTION TO FILE
PROOF OF CLAIM AFTER CLAIMS BAR DATE; MOTION FOR
RELIEF FROM STAY; MOTION FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES: (Continued)

ECRO:                          Claire Logue Togher

Transcription Company:         Ad Hoc Transcription, LLC
                               241 Sussex Avenue
                               Newton, New Jersey 07860
                               (888) 516-5553
                               www.adhoctranscription.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Anne J. Penachio, Esq.<br>PENACHIO MALARA, LLP<br>235 Main Street<br>Sixth Floor<br>White Plains, NY 10601 |
| For William Sanchez: | Michael G. McAuliffe, Esq.<br>68 South Service Road<br>Suite 100<br>Melville, NY 11747 |
| For Thomas Poli and<br>John Brown: | Christopher A. Smith, Esq.<br>TRIVELLA & FORTE, LLP<br>1311 Mamaroneck Avenue<br>Suite 170<br>White Plains, NY 10605 |
| For Pepsi-Cola Bottling<br>Company of New York, Inc.: | Thomas A. Waldman, Esq.<br>GREENBAUM, ROWE, SMITH &<br> DAVIS, LLP<br>75 Livingston Avenue<br>Roseland, NJ 07068 |
| For Soft Drink and Brewery<br>Workers Union Local 812<br>Retirement Fund: | Susan M. Bruno, Esq.<br>CARY KANE, LLP<br>1350 Broadway<br>Suite 1400<br>New York, NY 10018 |
| For Cappelli: | Kevin B. Faga, Esq.<br>399 Knollwood Road<br>Suite 301<br>White Plains, NY 10606 |

eScribers, LLC · 352 3rd Avenue
Suite 206
New York, NY 10016
800-257-0885 · info@escribers.net
www.escribers.net

 WHITE PLAINS, NEW YORK, MONDAY, NOVEMBER 3, 2014, 11:40 A.M.

THE COURT:  Okay.  In Re: Buhre Beverage Distributions as well as Sanchez v. Buhre Beverage Distribution.  Okay.  Are we ready to go ahead?

MS. PENACHIO:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  So there are a number of matters on the calendar today but it seems to me it's probably best to proceed with the sale motion first.

MS. PENACHIO:  Your Honor, I agree.  Anne Penachio for the debtor.

THE COURT:  Okay.  All right.  And everyone can sit down unless they're speaking.  Just say who you are when you first speak and who you represent.

MS. PENACHIO:  Your Honor, this is the debtor's motion to approve the sale of the -- substantially all of its assets pursuant to Section 363 and related provisions of the Bankruptcy Code.

Your Honor, you approved bidding procedures in or about August 2014.  In accordance with those bidding procedures, I actively noticed the sale to all -- or I think a broad range of potential bidders.  Approximately ten bidders expressed an inquiry.  I promptly sent of anyone that made an inquiry a copy of the bid package.

I received one deposit and offer, however -- from Mr. Poli.  Unfortunately, Mr. Poli had not been approved by Pepsi

1  and was not considered a qualified bidder.  I returned his

2  deposit upon learning that he was not -- had not been approved

3  by Pepsi and was not qualified.  The only -- I would

4  respectfully request that the Court request the debtor's motion

5  to sell the property to the stalking horse bidder, Mr. Cappelli

6  [ph] who's here in the courtroom today.

7      THE COURT:  Okay.  And he has of course been approved

8  by Pepsi.

9      MS. PENACHIO:  Your Honor, he has been approved by

10  Pepsi.  There is a letter approving him.  And he was the only

11  bidder that is qualified at this point, and I believe that the

12  sum paid is fair and reasonable particularly after aggressively

13  trying to get other people to bid as set forth in my reply

14  affidavit.

15      THE COURT:  Okay.  All right.  I reviewed the

16  objection and declarations filed in connection with this matter

17  including Mr. Israel's declaration.  I'm happy to hear from

18  anyone on the objection.

19      MR. MC AULIFFE:  Good morning, Your Honor.  Michael

20  McAuliffe on behalf of William Sanchez.  We had filed a very

21  brief objection to the sale relying principally upon the

22  arguments we've set forth in our adversary proceeding that Mr.

23  Sanchez we believe should be declared to be a secured creditor.

24  We maintain that he's owed in excess on a million dollars.  We

25  also believe that the collateral which should be the subject of

1 his security interest includes the route as well as the trucks.

2          Background, Judge:  We had filed a limited objection

3 initially when the debtor brought on the motion to have the

4 sale initially teed up.  We submitted a counteroffer.  That

5 counteroffer was not approved by Your Honor, and we understood

6 that my client needed to be approved by Pepsi as part of his

7 application.

8          Pepsi had made it abundantly clear to us in the

9 record that he was never going to be satisfactory to them so we

10 never tendered a bid.  But we would ask that Your Honor deny

11 the debtor's application based upon the reasons that we believe

12 we will prevail in the adversary proceeding.

13          THE COURT:  But if you -- I'm sorry.  So the

14 objection is not on the basis that you have a higher and better

15 bid, right?

16          MR. MC AULIFFE:  Well, I think there are other

17 parties that are interested.  I don't want to speak for them --

18          THE COURT:  But yours is not on that basis.

19          MR. MC AULIFFE:  No, Judge, because you had said that

20 we needed to be approved by Pepsi in order to tender a bid and

21 --

22          THE COURT:  Right.

23          MR. MC AULIFFE:  -- since we knew that that was Your

24 Honor's directive, we also knew that Pepsi would never approve

25 us as per their own stated position.  So --

1      THE COURT:  Right.

2      MR. MC AULIFFE:  -- we did not tender a bid.  We're

3  not approaching this from that perspective, Your Honor,

4  although I do understand that there other individuals and

5  entities who have --

6      THE COURT:  Have raised that issue.

7      MR. MC AULIFFE:  Correct, Your Honor.

8      THE COURT:  But not in respect of your client's

9  interest to buy it; it's really in respect to their interest to

10 buy the --

11     MR. MC AULIFFE:  Correct, Judge.  They stand on their

12 own --

13     THE COURT:  It would -- okay.  And, as far as Mr.

14 Poli and Mr. Brown, are they here?

15     MR. SMITH:  Yes, Your Honor.  My name is Christopher

16 Smith and I represent their interests.  They're here; they're

17 ready to answer any questions that you'd like.  Their position

18 is they are ready, willing, and able to submit a higher and

19 better bid than the current -- our understanding of what the

20 current bid is of the stalking horse.

21     Additionally, their position is that the -- by your

22 deadline of September 5th that they submitted a bidding package

23 to debtor's counsel complying with all of the conditions except

24 they never did have approval from Pepsi despite -- and they're

25 ready again to give testimony that they sought -- we recently

sought it before today's hearing as well in writing and we were turned down.

While Pepsi certainly has the right to weigh in on who they think are appropriate bidders, I think that there should be some limit placed on that ability. Here -- the only reason that Mr. Israel gave for turning down my client is suppose -- Mr. Poli is because he has a vending company that delivers a lot of Pepsi products, has done so since at least 1980; in fact is one of the ten largest vending -- from what he tells me one of the ten largest vending companies for Pepsi Beverages, and so because of that, they don't typically approve a distributorship for somebody who is also involved in vending.

My client has advised me after he was advised of Mr. Israel's declaration that he would be willing to divest himself of that vending business, sell it to another entity so that he could become a qualified bidder and that he has the wherewithal to bid, and particularly whereas here it appears that the stalking horse bidder might be significantly less than both what my client is willing to offer and what the fair value for the route is that I thought that we should be here before Your Honor --

THE COURT: What is your client willing to offer?

MR. SMITH: Well, so far, we have -- I think the current stalking horse bid as I understand it. There's a five-hundred-thousand-dollar note and another hundred thousand

1  dollars on the table.  My client has on the able at least

2  615,000 which would be -- include the 500,000 on a note plus

3  another 115,000 but he's willing to go up over that and I could

4  caucus with him for a couple of minutes if you need to know a

5  number that's significantly more than that.  My understanding

6  is he's willing to go higher and --

7         THE COURT:  Okay.

8         MR. SMITH:  -- and he has the wherewithal to do so.

9  We posted earnest money of $60,000 with debtor's counsel back

10 on September 5th when we submitted the bidding package.

11 Debtor's counsel when she didn't schedule the auction -- and

12 understandably so -- returned the check which we've been

13 holding in this office.  So it's our understanding that that

14 money should still be in her court.

15        If the Court were to schedule an auction or otherwise

16 qualify Mr. Poli and Mr. Brown to bid, then we would of course

17 return the check and leave the earnest money in place.  We're

18 also willing to participate in any due diligence that debtor's

19 counsel or anybody else may need here to ascertain their

20 wherewithal.  I've brought some information related to

21 appraisals of my client's residence and the mortgage.  We

22 believe there's more than enough equity to go well above the

23 current stalking horse bid.

24        THE COURT:  When did your client learn of the reason

25 for being turned down by Pepsi?

1    MR. SMITH:  Well, in writing, we received it -- just

2  recently we received -- when we filed last week, we filed

3  something in writing to Mr. Peter Gorday [ph] and Mr. Israel

4  and he responded in writing the reasons that they would not

5  approve him.

6    He did have -- it's my understanding that he did have

7  some verbal conversations with Pepsi previously and it wasn't

8  clear to him at that -- it was clear to him that he would not

9  be approved but it wasn't clear to him exactly the reason why

10 he would not be approved by Pepsi.

11   THE COURT:  And -- okay.

12   MR. SMITH:  And it's still not completely --

13   THE COURT:  And what is involved in giving up the

14 vending business?  What's involved in that?  I mean, how hard

15 is that to do?  Can it be done promptly?  I don't know.

16   MR. SMITH:  Yeah.  I mean, it depends on who it would

17 have to be transferred to.  It's -- from what I understand,

18 it's a thriving vending business that could probably be sold.

19 He could transfer it either to another family member relatively

20 quickly or he could transfer it to a third party and, you know

21 -- I could certainly look into that and get you a better answer

22 to that question if Your Honor needs that.

23   THE COURT:  Okay.  Why don't you talk to him about

24 what he's prepared to offer.

25   MR. SMITH:  All right.

1     (Pause.)

2          MR. SMITH:  Judge, after caucusing with my clients

3     and this again isn't written in stone, it's subject to even

4     further inquiries but they're willing to increase from 615

5     another $50,000 so we can make it 665.

6          Now, I would also mention, Judge, that Mr. Brown was

7     previously approved by Pepsi for the purchase of -- I have a

8     letter that's dated June 12th, 2013.

9          THE COURT:  So --

10          MR. SMITH:  He was with another partner --

11          THE COURT:  So are they working together, Mr. Poli

12     and Mr. Brown?

13          MR. SMITH:  If they were successful in bidding on a

14     distributorship, then the understanding is -- because Mr. Brown

15     has significant experience in running the route, driving the

16     route so he would be involved in logistics, operations, and

17     continuing that process.  And Mr. Poli would be providing the

18     financing and other administrative tasks necessary to run the

19     distributorship.

20          THE COURT:  Okay.

21          MR. SMITH:  And that number again is not written in

22     stone.

23          THE COURT:  Right.

24          MR. SMITH:  We just added 50,000 --

25          THE COURT:  Right.

1       MR. SMITH:  -- because it's a round number.

2       THE COURT:  Right.  Okay.  All right.  Is anyone here

3  for -- from Pepsi?

4       MR. WALDMAN:  Yes, Your Honor.  Thomas Waldman,

5  Greenbaum, Rowe, Smith & Davis.

6       THE COURT:  Is Mr. Israel here?

7       MR. WALDMAN:  Mr. Israel is not here today.

8       THE COURT:  Okay.

9       MR. WALDMAN:  My understanding, Your Honor, first of

10  all with respect to Mr. Brown as is set forth in Mr. Israel's

11  declaration, Mr. Brown's approval was in connection with a

12  totally different transaction.  In fact --

13       THE COURT:  No, I understand Mr. Brown.  He --

14       MR. WALDMAN:  Yeah --

15       THE COURT:  -- he's really tied into Mr. Poli as far

16  as --

17       MR. WALDMAN:  With Mr. Poli --

18       THE COURT:  -- his transactions.  Sorry.

19       MR. WALDMAN:  -- the concern is that Mr. Poli's

20  vending machines are in territories far and wide, and if Mr.

21  Poli is a distributor -- Mr. Poli's vending business purchases

22  from distributors.  The distributorship arrangement is based on

23  exclusive territories.  There are sound business reasons why

24  Mr. Poli was not --

25       THE COURT:  I agree with that --

1        MR. WALDMAN:  -- and --

2        THE COURT:  -- although he's now saying he will get

3   out of that business.

4        MR. WALDMAN:  Well, he's saying he'll get out of the

5   business and sell it to family member or to a third party.  Who

6   knows if that's a legitimate sale or a sale to a straw person -

7   -

8        THE COURT:  Well, it's to a third party I'm assuming.

9   Does Pepsi need to approve that business or that transfer?

10       MR. WALDMAN:  I don't know, Your Honor.  I don't

11  believe so.

12       THE COURT:  When did Pepsi give Mr. Poli the actual

13  reason for --

14       MR. WALDMAN:  Well, it was given in writing as Mr.

15  Smith said at the end of last week, but Mr. Poli had not

16  submitted a written application until last week.  My

17  understanding is that there were telephone conversations during

18  the period when bids were being accepted and Mr. Poli was told

19  that he would not be approved.

20       THE COURT:  But not why.

21       MR. WALDMAN:  I don't know whether the reason was

22  given, Your Honor.  I don't believe he was ever told

23  specifically why.  Also we've had great difficulty getting an

24  audience from Pepsi to even discuss that.

25       MR. SMITH:  Judge, I would just point out that with

1  respect to Mr. Brown he was approved for the purchase of the

2  Buhre Beverage --

3         THE COURT:  No, I -- the point that's -- it's a

4  legitimate point that Pepsi is making is that it appears to me

5  and I think to Pepsi that Mr. Brown while a -- an experienced

6  driver and someone who understands this business is not the

7  money behind the deal, is not the ultimate administrative party

8  behind the deal, and therefore, that person is important and

9  here it's Mr. Poli, and if Mr. Poli continued on as the

10 principal of the vending machine business, then it seems to me

11 a deal with Mr. Poli which Mr. Brown is associated with is --

12 you know, is perfectly fine for Pepsi to reject.

13         MR. SMITH:  Well, but Mr. Brown is certainly an

14 integral part of this deal.  He signed --

15         THE COURT:  Well, I know but that's -- but the --

16 when you say this deal, it's the deal with Mr. Poli.  So the

17 conflict issues are present there.  Mr. Brown isn't offering to

18 buy it separate and apart from Mr. Poli, right?

19         MR. SMITH:  Well, we discussed that.

20         THE COURT:  Well, but he -- if he was, he would have

21 made an offer.  I mean --

22         MR. SMITH:  Well, he did make an offer with -- in

23 conjunction with Mr. Poli.

24         MR. SMITH:  But I mean, he would have made a separate

25 offer where he would buy the business as opposed to working

1  with Mr. Poli.

2          MR. WALDMAN:  And, Your Honor, I would add that Pepsi

3  may well have other legitimate reasons.

4          THE COURT:  Well, they haven't been stated.

5          MR. SMITH:  I think we all need additional

6  information at this point, Judge, and the Judge shouldn't

7  approve the sale at this point.  Let me see if I can address

8  the vending machine issue.  I mean, any business transaction

9  has the potential for a situation to arise as Pepsi has

10 discussed, and that's not a valid reason for not approving them

11 as a qualified bidder.

12         THE COURT:  Well, it is a valid reason if he stays

13 owning that business.

14         MR. SMITH:  Yeah, but he's ready to represent that

15 we'll -- that would be a condition precedent to him bidding is

16 that we come up with something -- some kind of arrangement

17 that's acceptable to the Court --

18         THE COURT:  Well, timing is important here thought.

19 But I understand your point.

20         Has there -- is there any consideration to Pepsi from

21 the stalking horse bid or bidder?

22         MR. WALDMAN:  Well, Your Honor, there's the cure

23 provision.

24         THE COURT:  Right.

25         MR. WALDMAN:  And, of course, that would apply to any

1  -- you know, to any purchaser.

2          THE COURT:  Right.

3          MR. WALDMAN:  I don't think I understand Your Honor's

4  question.

5          THE COURT:  Is Mr. Cappelli providing any separate

6  consideration to Pepsi?

7          MR. WALDMAN:  No, Your Honor.

8          THE COURT:  Okay.

9          MR. WALDMAN:  I mean, there's a question about

10  whether -- I think there's an issue about how the cure

11  provision is interpreted, whether the cure comes from sale

12  proceeds or whether the cure comes from the purchaser above and

13  beyond sale proceeds.

14          THE COURT:  Right.

15          MR. WALDMAN:  And I think that Your Honor's -- Your

16  Honor's bid procedures order insofar as it required Mr. Sanchez

17  to post a bond for the full purchase price plus the cure

18  indicates that Your Honor considers the cure provision would

19  come directly from the purchaser above and beyond the purchase

20  price.

21          THE COURT:  Right.  And is that --

22          MR. WALDMAN:  So, in that respect --

23          THE COURT:  Is that Mr. Cappelli's bid?

24          MR. WALDMAN:  Mr. Cappelli is represented here today.

25          THE COURT:  Okay.

1      MR. FAGA:  Respectfully, Your Honor, Kevin Faga for

2  Mr. Cappelli.

3      Our understanding is that the Court's order indicates

4  that the cure money to Pepsi has to be paid from the closing

5  table.  The money at the closing table is the purchase price,

6  and as long as Pepsi is satisfied, that is a -- that's

7  currently a debt that's owed to Pepsi by the debtor.

8      So, from these assets, in order for the debtor to

9  sell the assets to Mr. Cappelli or to anyone, the debtor has to

10  ensure that these debts -- that these assets transfer free and

11  clear of all encumbrances.  As such, it has to satisfy its

12  franchise agreement with Pepsi so Pepsi will be made whole.  We

13  submit it should be made whole from the purchase price because

14  again, it's the debtor's obligation to Pepsi.

15      THE COURT:  Well --

16      MR. WALDMAN:  Except, Your Honor, that --

17      THE COURT:  -- is Pepsi -- is the way this would be

18  documented Pepsi accepting on consent an assignment of the

19  distribution agreement or is there a new distribution agreement

20  that's --

21      MR. WALDMAN:  I believe what happens, Your Honor, is

22  that a new distribution agreement is entered into.

23      THE COURT:  And has that happened?

24      MR. WALDMAN:  Has it happened?  No.  If I may, Your

25  Honor, Mr. Cappelli was given an approval letter by Pepsi --

1           THE COURT:  Right.

2           MR. WALDMAN:  -- as part of the process prior to Mr.

3  Cappelli submitting the stalking horse bid, and the approval

4  letter specifically conditioned approval on the cure.

5           THE COURT:  Right.  Okay.

6           MR. WALDMAN:  Actually, you know what, from a

7  practical standpoint, I don't think Pepsi cares whether it's

8  paid out of the sale proceeds or out of the separate -- out of

9  a -- you know, a payment made above and beyond the sale

10 proceeds.

11          THE COURT:  What is Pepsi's cure?

12          MR. WALDMAN:  Pepsi's cure is the thirty-six-

13 thousand-dollar administrative claim that it has filed and all

14 of its attorney's fees incurred in connection with both the

15 Sanchez adversary proceeding and this proceeding.

16          THE COURT:  Okay.  Maybe I'm wrong.  My understanding

17 is that the debtor really hasn't been engaged in business for a

18 while.  Is that correct?

19          MS. PENACHIO:  Yes, Your Honor, that is correct.

20 Shortly after the filing, Pepsi -- there were some checks that

21 were dishonored.  Pepsi exercised its right to take over the

22 route.  Mr. Sapra, Bhaveen Sapra, the principal of the debtor

23 did not oppose that Pepsi would run the route and has been

24 cooperating with Pepsi to --

25          THE COURT:  So Pepsi has been running the route.

1          MS. PENACHIO:  Pepsi has been running the route.

2          THE COURT:  Okay.

3          MS. PENACHIO:  So --

4          THE COURT:  All right.

5          MS. PENACHIO:  -- you know --

6          THE COURT:  I --

7          MR. SMITH:  Your Honor, I'm sorry to interrupt but

8   there's one other thing just for policy considerations, it's --

9   I think it's in the debtor's best interest to have at least a

10  process where --

11         THE COURT:  I agree.

12         MR. SMITH:  -- and you could address the vending

13  issue if you establish new bidding procedures and --

14         THE COURT:  Well --

15         MR. SMITH:  -- because of the time that's elapsed you

16  may want to put that on the short leash but by establishing new

17  bidding procedures seeing if my client can qualify --

18         THE COURT:  I don't need to establish new bidding

19  procedures but I do believe that there should be some extra

20  time for Pepsi and Mr. Poli to talk about the potential for a

21  satisfactory resolution of the impediments to Pepsi granting an

22  approval.

23         MS. PENACHIO:  Your Honor, may I be heard on that

24  point?  Mr. Poli contacted me back in early September.

25         THE COURT:  Right.

1          MS. PENACHIO:  I was very, very accommodating.  I

2    promptly sent him information.  I spoke to his attorney --

3          THE COURT:  It's not -- the only --

4          MS. PENACHIO:  He didn't do anything for months.

5          THE COURT:  No, no, he --

6          MS. PENACHIO:  And --

7          THE COURT:  I think the issue -- Pepsi told him they

8    weren't going to take him.  Okay?  And --

9          MS. PENACHIO:  Right.  But he waited a month before

10   submitting an application, two months --

11         THE COURT:  Fine.  But Pepsi just told him the reason

12   a few days ago.  And if there's a potential here to get an

13   auction going, it's to everyone's interest.

14         MS. PENACHIO:  Absolutely.

15         THE COURT:  And I don't see who's being hurt in the

16   meantime.

17         MS. PENACHIO:  I agree with that; it's just very

18   frustrating because -- on both ends because I think Mr. Poli

19   should have promptly submitted a written application instead of

20   waiting for two months.

21         THE COURT:  Well, I --

22         MR. FAGA:  Respectfully, Your Honor, on behalf of the

23   -- of Mr. Cappelli, Mr. Poli says he just got an answer last

24   week.  He just submitted an application last week.  Had he

25   followed the bidding procedures and submitted an application at

1  least, then I could see him coming in and saying, Judge, I need

2  more time, we're trying to work it out with Pepsi.

3  　　　　MR. SMITH:  He's been trying to get --

4  　　　　MR. FAGA:  He didn't even do that.

5  　　　　MR. SMITH:  He's been trying to get an audience with

6  Pepsi for months.

7  　　　　THE COURT:  I don't --

8  　　　　MR. SMITH:  I've been trying to get an audience with

9  Pepsi.

10  　　　　THE COURT:  I don't know if the application has a

11  line for -- or the response says, you know, you have to give a

12  reason.  As far as I can find for today --

13  　　　　MR. WALDMAN:  I don't believe it does, Your Honor --

14  　　　　THE COURT:  Right.

15  　　　　MR. WALDMAN:  -- and frankly --

16  　　　　THE COURT:  I need a reason and it hasn't been given

17  until recently and Mr. Poli has given a -- I believe a good

18  faith response to it which is he's willing to divest his

19  business.  So I think that Pepsi should speak with him

20  promptly.  I don't want to delay this too long but on the other

21  hand the route is being run by Pepsi so I don't think Pepsi is

22  hurt by the delay.

23  　　　　MR. SMITH:  Well, Your Honor --

24  　　　　THE COURT:  And Pepsi is right.  I mean, it obviously

25  -- it has two goals here.  One is to get its cure claim paid,

whatever that is as a proper allowed claim and the other is to
have a third party take over the route promptly but there's
another goal here, too, which to maximize the value of the
estate and I think that's an important one, and I think that
perhaps there is a fault to the bidding procedures in that it
didn't require Pepsi to say why they were turning someone down
but I think they should look at that promptly. And I can give
you an adjourn date within thirty days on that score.

I believe there was enough of an ambiguity in the
procedures for that. I'm not going to open this up to anyone
else but I am going to put a deadline on the conclusion of the
discussions with again, you know, a reason -- if there is to be
an objection a reason given that would be ten days before the
hearing date that you'll get for this lead and if Pepsi is okay
with him or what he's proposing, has a way to divest himself of
his vending business, then we'll have an auction which could be
a day before the hearing.

MS. PENACHIO: Very well, Your Honor. So I will
circulate a proposed order that -- should I make a new auction
date or --

THE COURT: Yeah. You need to get a date from Ms.
Lee of the hearing --

MS. PENACHIO: Okay.

THE COURT: -- and I would want that within a month.
I don't -- that will be a contested hearing so hopefully we can

1  do it before a month but the auction would be a day or two

2  before then if Pepsi provides consent to Mr. Poli which would

3  be, you know, a week before then if they do it one way or

4  another.

5          MS. PENACHIO:  Very well, Your Honor.  And the debtor

6  welcomes a bidding process.  It's just frustrated that --

7          THE COURT:  Okay.

8          MS. PENACHIO:  -- it didn't happen in September.

9          THE COURT:  Right.

10         MR. WALDMAN:  And, obviously, Your Honor, from

11 Pepsi's perspective, we don't -- we feel as though we've been

12 through a bidding process --

13         THE COURT:  I don't.

14         MR. WALDMAN:  -- so Pepsi has very patient --

15         THE COURT:  You know what?  It could have given him

16 the reason since he said he's willing to adjust his whole

17 business based on the reason that was given.  And it may just

18 want the guy.

19         MR. WALDMAN:  I'm sorry, Your Honor?

20         THE COURT:  And they may just want the guy.  You

21 know, if it truly is just the conflict and he says I'm prepared

22 to deal with the conflict and he has the driver in his deal,

23 maybe they would have.

24         MR. WALDMAN:  I suppose that's possible, Your Honor.

25         THE COURT:  Well, I hope it is.

1        MR. WALDMAN:  In the interim --

2        THE COURT:  And I hope it isn't just because they

3   like someone else for whatever reason.  You know, I will want

4   to hear Mr. Israel as to whether there's any, any notion of any

5   inside deal here.  All right?  On the record.  He submitted a

6   declaration and he's not here, and that's the other reason I'm

7   adjourning this.

8        These franchise-type situations can get very ugly

9   very fast.  Witness the Dunkin Donuts case that began the

10  calendar today.  I think it was in litigation for about five

11  years.  So I think Pepsi wants its T's crossed and I's dotted

12  on this.

13       Okay?  So, on the other objection, Mr. McAuliffe, as

14  you say it -- the basis for your objection is really the

15  debtor's reliance on 363(f)(4)

16       MR. MC AULIFFE:  Correct, Your Honor.

17       THE COURT:  So we can turn to that now because you

18  have your summary judgment motion on.

19       MR. MC AULIFFE:  Yes, sir.

20       THE COURT:  I will say that there will -- and I'm

21  holding off Pepsi's motion for a stay because if I conclude

22  that your client essentially has a veto here, then in all

23  likelihood I would lift the stay but I want to hear the summary

24  judgment motion first.

25       MR. MC AULIFFE:  Thank you.  Judge, I think this has

1 been fairly extensively briefed by both Mr. Sanchez and we've

2 received opposition from the debtor.

3          THE COURT:  Right.

4          MR. MC AULIFFE:  If I can summarize what we believe

5 are the key points.  We are seeking to have Your Honor reform

6 the transfer documents related to the sale of the Buhre

7 Distribution route as well as certain property items consisting

8 of two trucks that have been used in connection with servicing

9 the route.

10          The case law that we have cited in our memorandum --

11          THE COURT:  Well, you're looking for more than that.

12 You're also looking to have relief under UCC -- let me try to

13 find the right section here -- UCC 9-506(a) saying that the UCC

14 one that was filed contained only minor errors or omissions and

15 that the UCC is not seriously misleading --

16          MR. MC AULIFFE:  Correct, Judge.  And, in fact, there

17 were two UCC filings; there was the initial UCC-1 filed and

18 then there was an amendment filed prior to the filing date.

19          THE COURT:  Right.

20          MR. MC AULIFFE:  Attempting to correct it.  I don't

21 believe it fully accomplished that.

22          THE COURT:  Right.

23          MR. MC AULIFFE:  And that was performed by my

24 client's predecessor counsel --

25          THE COURT:  Right.

1          MR. MC AULIFFE:  -- who was involved with the

2   transaction.

3          Judge, we think that the intent of the parties can be

4   gleaned from the record before you.  I think that the debtor

5   has acknowledged there was mistake involving the transfer

6   documents.  I believe the debtor has also acknowledged that my

7   client was indeed intended to be a secured creditor with regard

8   to the assets being transferred.

9          THE COURT:  I don't think they have acknowledged

10  that.

11         MR. MC AULIFFE:  I'm sorry.  I believe they've

12  acknowledged that we're entitled to be a secured creditor.  I

13  think their position is, Judge, that the -- which I believe is

14  not a credible position is that the Buhre Distribution route

15  was not intended to be included in the collateral.  We think

16  that that position is not credible --

17         THE COURT:  Well, the agreements and the UCC -- and

18  the amended UCC-1 all say that what secures the obligation is

19  the distribution agreement by and between Bruckner Beverage and

20  Pepsi which in essence is a future agreement, right?

21         MR. MC AULIFFE:  Correct, Judge.  It was in artfully

22  drafted.

23         THE COURT:  Well, that's pretty specific.

24         MR. MC AULIFFE:  But we're -- I think there can be no

25  rational dispute that the asset means almost a Buhre route.

1          THE COURT:  Well, can I --

2          MR. MC AULIFFE:  And the truck --

3          THE COURT:  You say it's absurd to provide for that

4    type of collateral but isn't at least arguably equally absurd

5    to agree to pay $900,000 for something where you need Pepsi's

6    approval and you don't have it yet?

7          MR. MC AULIFFE:  Well, I believe there was an

8    approval letter.  That's the June 2013 approval letter issued

9    to Mr. Sapra and to Mr. Brown.  Now, Pepsi has argued that that

10   is not the same transaction which was memorialized by that July

11   31st transaction --

12         THE COURT:  Right.

13         MR. MC AULIFFE:  -- but it essentially is the same

14   transaction.  They -- Mr. Brown is known to Pepsi.  Mr. Brown

15   is a driver.  Mr. Brown I believe is still driving for other

16   distributors at that location.  Again, Judge, we think it's --

17   I think the intent of the parties can be gleaned from the

18   evidence.  I understand that there is a dispute that has been

19   interposed with -- in connection with what the collateral was

20   but I think it's been admitted in the affidavit -- the

21   affirmation, Your Honor, from Mr. Sapra as well as their

22   counter 7056 statement and memo of law that they do acknowledge

23   that there was intended to be a secured transaction here.

24   Inartfully drafted, we all know that.

25         THE COURT:  Well, the issue though is secured by

1  what?  I mean, I don't -- maybe I'm wrong.  Looking at the Rule

2  7056 statement or more aptly counter statement, I think that

3  they don't admit that or the debtor and Mr. Sapra never did.

4          They admit that -- who the purchaser was and who the

5  seller was, was backwards or incorrect.  They're very clear on

6  that.  So we're really just talking about the collateral and,

7  you know, he says the UCC was correct for example, on Page 11,

8  Paragraph 28, again in Paragraph 31, in his affidavit,

9  Paragraph 30.

10         MR. MC AULIFFE:  Judge, I acknowledge their counter

11 --

12         THE COURT:  Put it differently, if you can't sell the

13 route unless you have Pepsi's approval, how could he grant a

14 lien on it?  He could only grant a lien on the future deal.

15         MR. MC AULIFFE:  I think they were basing it upon the

16 July 2013 approval letter but that evidenced Pepsi's --

17         THE COURT:  But I think that -- isn't that a factual

18 issue on whether Pepsi had actually signed off on this deal?  I

19 mean, otherwise, he wouldn't have it to pledge.

20         MR. MC AULIFFE:  Judge, my understanding is Pepsi did

21 not have a problem with this transaction until this case was

22 filed.

23         THE COURT:  Well --

24         THE COURT:  Because it's not been articulated to me.

25         THE COURT:  But --

1    MR. MC AULIFFE:  I've never seen any evidence of

2  their questioning the transaction that took place.  Again, this

3  filing was precipitated by my client's scheduling a UCC sale by

4  his predecessor counsel and then there was the filing.  And

5  then Your Honor may recall the debtor brought on an order to

6  show cause to punish my client for violating the automatic stay

7  for purportedly operating the route and interfering.

8    My client was present that day.  We filed opposition,

9  and if you recall, Your Honor, my client took the stand and he

10  was determined to be credible --

11    THE COURT:  Right.

12    MR. MC AULIFFE:  -- with regard to his statements and

13  averments.  I believe he has credibility.  I would also counter

14  by saying that the debtor's principal does not have

15  credibility.

16    THE COURT:  Well, but let me just -- I mean, just on

17  the 7056 statement, Paragraph 24 of Mr. Sanchez's 7056

18  statement says that:

19    "At the July 31st meeting the parties confirmed the

20  terms of the transfer of the shares of Buhre from Sanchez to

21  Bruckner, the agreed-upon transaction."

22    And it lists, you know, that Sanchez would transfer a

23  hundred percent of the shares to Buhre -- in Buhre to Bruckner

24  for the sum of 1,150,000 payable as he sets forth there.

25  Sanchez would receive two promissory notes from Bruckner, again

1  reflecting the consideration.  Sanchez would receive a security
2  interest in the shares of Buhre and all of its tangible and
3  intangible assets including the Buhre Pepsi route which was
4  initially held under the distributor agreement between Buhre
5  and Pepsi and would later be held under the distributor
6  agreement between Bruckner and Pepsi once B. Sapra was able to
7  obtain same.  So he hadn't gotten it yet, and then D says
8  Sanchez would retain one share of stock in Buhre until such
9  time as Bruckner obtained its distributor agreement with Pepsi.

10            So I mean under his 7056 statement, it's clear that
11  they hadn't gotten the agreement yet.

12            MR. MC AULIFFE:  Actually, Your Honor, I -- with all
13  due respect, I'm referring to that letter and this is also
14  annexed to Mr. Poli's declaration.  This is the June 12th, 2013
15  Pepsi -- it's a conditional approval letter and Your Honor has
16  seen -- I have an extra copy I can pass up if it's helpful but
17  it says:

18            "We are happy to inform you that your request for the
19  purchase of Buhre Beverage Distributor, Inc. has been approved.
20  Final approval is based upon the update on your" -- and says
21  paren -- "Bhaveen Sapra green card status and details on
22  allowances and restrictions attached to this green card."

23            We would submit there was a conditional approval, the
24  parties relied upon it, and then closed the transaction.
25  Unfortunately, the transfer documents were completely in error.

1  Remarkably in error and --

2          THE COURT:  Well --

3          MR. MC AULIFFE:  -- I know we have a -- you know, in

4  a normal bankruptcy context, Judge, it's difficult to use

5  reformation to create a security interest that's not properly

6  recorded.  I would submit that these facts of this case would

7  allow Your Honor to reform the transfer documents.

8          To the extent that Your Honor believes that there may

9  be at least one issue of material fact that's in dispute, we're

10 prepared to endeavor to do some discovery very quickly on that,

11 come back, have an evidentiary hearing if necessary.  Again, we

12 only received the debtor's opposition papers midweek last week.

13 Our motion had been teed up in early September.  So we moved

14 quickly in preparing our reply.  Frankly, from my personal

15 perspective, I thought that the debtor's contention regarding

16 the Buhre route not being included in the collateral was really

17 on its face not a very credible statement.

18         THE COURT:  But isn't it the case that if a

19 distributor has a hundred or ninety-nine percent change in

20 ownership from Mr. X to Mr. Y that Pepsi has to approve Mr. Y

21 before the route is still affected.  Don't they have that --

22         MR. MC AULIFFE:  I believe so, Judge, and I think

23 that happened and it was memorialized by this letter --

24         THE COURT:  But --

25         MR. MC AULIFFE:  -- which is again a conditional

1  approval letter.  I think its face --

2          THE COURT:  But --

3          MR. MC AULIFFE:  It says approved.

4          THE COURT:  -- it wasn't -- but that was the first

5  one, right?  That was the first --

6          MR. MC AULIFFE:  No, no, no, Judge.  No, the first

7  transaction occurred in December of 2012.  Never happened.

8  This was June of -- June 12th, 2013.  That's the Pepsi

9  conditional approval letter and then the second transaction

10 occurred July 31st, 2013.  So the second transaction occurred

11 in reliance of this Pepsi approval letter which again it says

12 in the first sentence:

13          "We are happy to inform you that your request for the

14 purchase of Buhre Beverage...has been approved."

15          THE COURT:  But it --

16          MR. MC AULIFFE:  Subject to conditions thereafter to

17 be satisfied.  That was the conditions referenced with the

18 transfer documents.  Again, Your Honor, it was inartfully

19 drafted by my predecessor but if we could just consider the

20 extreme prejudice to my client --

21          THE COURT:  But if you have a conditional approval

22 that hasn't happened yet how can they really grant the lien?

23          MR. MC AULIFFE:  Well, Judge, perhaps I'll need to do

24 some discovery of Pepsi and find out how they traditionally and

25 in other situations have approved transactions.  I don't know

1  if they're deviating from a prior procedure in place.  I don't

2  know if they're acting --

3          THE COURT:  Well, I don't know if it's really Pepsi

4  or the parties' understanding.  I mean, one of the limits on

5  reformation under New York law is where the parties contract

6  based on uncertain or contingent events.  There are

7  contingencies or conditions in that -- you know, in that

8  approval.

9          MR. MC AULIFFE:  Judge --

10          THE COURT:  And, you know, I --

11          MR. MC AULIFFE:  -- I would submit many of these

12  contingencies are -- again, looking on Page 2 of the Pepsi

13  approval letter, "secure your Class 3 license, make

14  arrangements for proper uniforms, deposit 53,000 in your

15  corporate checking account, continue to ride the route."  This

16  letter memorializes --

17          THE COURT:  According to Mr. Sanchez, they didn't do

18  any of that.  They didn't know how to do it.

19          MR. MC AULIFFE:  Mr. Sapra?

20          THE COURT:  Yeah.

21          MR. MC AULIFFE:  Mr. Sapra -- it's my understanding

22  Mr. Sapra did not work the route as diligently as he could have

23  and --

24          THE COURT:  Did he ever get the license?

25          MR. MC AULIFFE:  I'm not sure, Judge.

1          THE COURT:  Did he ever post the 56,000?

2          MR. MC AULIFFE:  As I sit here right now, I'm not

3    sure, Judge.

4          THE COURT:  I mean, I --

5          MS. PENACHIO:  Your Honor, if I may, it may -- this

6    whole transaction is absurd including selling the route to a

7    twenty-four-year old who didn't have a green card who had no

8    experience --

9          THE COURT:  Well --

10         MS. PENACHIO:  -- and including giving $100,000 in

11   cash to Mr. Sanchez at two different banks, meeting him in

12   Greenwich and handing him 30,000 in cash and meeting him in the

13   Bronx.  I just -- I need discovery.  I don't -- and I don't

14   know what happened.

15         THE COURT:  Well, to me, the main issue is you both -

16   - I mean, as I said earlier, it would be -- it's argued by Mr.

17   McAuliffe that it's absurd for Mr. Sanchez to turn over his

18   business to Mr. Sapra and his son without having a lien on the

19   business including the most important asset which is the route.

20         On the other hand, Mr. Sapra argues with some

21   credibility that it would be absurd for him to agree to pay

22   over a million dollars for a business where he doesn't

23   ultimately he can run it because Pepsi hasn't actually signed

24   off on the dotted line on its consent.

25         Also, ameliorating Mr. Sanchez's argument is the fact

1  that he's argued that part of the deal was -- and I don't think

2  Mr. Sapra disputes this -- that Mr. Sanchez was going to stay

3  involved for several months, probably those months that it

4  would take for there to be a clear answer on whether Pepsi was

5  going to finally sign off on this thing.

6         So to me I don't think I can grant summary judgment

7  here.  It may turn out that that really was the deal, that, you

8  know, everyone knew that Pepsi had signed off but I -- you

9  know, looking at that letter, there are material conditions

10 there, and the UC -- it's not -- I mean, every document says

11 this.  It's not just the contract, the UCC-1 and UCC-3 say

12 this.  You think if you're going to correct it, you'd correct

13 it correctly.  It still says Bruckner on the UCC-3, and it's --

14 in my mind, it's a lot -- that's in many -- leaving aside the

15 summary judgment issue, to me when you're looking at UCC 9-506

16 you're looking at the notice provided to parties checking the

17 UCC filings as to whether the collateral description if it's

18 inaccurate would at least lead you somehow to find what the

19 right collateral description is.

20        And I think it's a real stretch to say that listing

21 the distribution agreement as the one between Bruckner and

22 Pepsi as opposed to the one between Buhre and Pepsi or some

23 other agreement -- you know, for example, I could certainly see

24 them assigning the -- whatever rights are under that interim --

25 or initial consent but I have real doubts that a third party

1  wouldn't be seriously misled by the UCC-1 and the UCC-3 as to

2  who -- as to what the collateral is.

3          Because, again, there's this underlying issue as to

4  what it was that Buhre as owned by Sapra could assign.  I just

5  don't know how you could assign something that isn't yours.

6          MR. MC AULIFFE:  Your Honor, this may lead us to an

7  existential question.  If this transfer which we believe --

8  which we're seeking to reform did not occur and was not

9  effective, it wasn't transferred, does my client still own it?

10         THE COURT:  Well, there was a transfer.  It's just --

11  you're just basically saying that I should assume that what was

12  meant by the transfer is different than what the documents say.

13         MR. MC AULIFFE:  Which is exactly why we're relying

14  on reformation, Judge.

15         THE COURT:  Well, I know you're relying on it but

16  it's a difficult standard.

17         MR. MC AULIFFE:  I acknowledge that --

18         THE COURT:  I mean, it's a clear and convincing proof

19  standard, and I think you're basically ultimately relying on an

20  argument that it would be absurd to hold otherwise and I can

21  certainly see an alternative argument there, and the debtor

22  submitted an affidavit that says, yeah, we didn't think that

23  you were assigning the Buhre route.

24         MR. MC AULIFFE:  We could do discovery; we'll find

25  out if Mr. Sapra ever had any other interest in another Pepsi

1  route and I would doubt that he does --

2          THE COURT:  Well, no, no, he would have a future

3  interest in the Bruckner route, and to me it's logical that

4  that's what he would assign, my future interest in it if I get

5  one because otherwise why am I paying over a million dollars

6  for something I can get kicked out of the next day if Pepsi

7  sees, you know, that there's been a transfer.

8          Now, you may say that Pepsi knew all about it and

9  everyone knew about it and -- but I think that's a matter for

10 evidence.

11         MR. MC AULIFFE:  And I totally understand, Your

12 Honor, and I think we will need discovery on Pepsi's knowledge

13 --

14         THE COURT:  Well, maybe --

15         MR. MC AULIFFE:  -- and when --

16         THE COURT:  Maybe so.

17         MR. MC AULIFFE:  -- they learned about the

18 transaction.

19         THE COURT:  Or -- well -- yeah, although I think

20 ultimately it's the two parties to the transaction's knowledge

21 really.  I mean, your client basically said this is clear.  It

22 was meant to be an assignment of Buhre and so we'll see what

23 Mr. Sapra and your client say under oath on that issue.

24         MR. MC AULIFFE:  Yes, sir.

25         THE COURT:  Okay.  So I am going to deny the motion

1  for summary judgment which seeks reformation of various

2  transaction documents but only insofar as the motion seeks

3  reformation of the transaction documents describing the

4  collateral for the sale transaction.  Because otherwise I

5  believe that the defendant -- the only remaining defendant has

6  acknowledged that the -- that otherwise the documents were

7  mistaken in describing the buyer and the seller inaccurately.

8        So, just to be clear, the portion of the motion that

9  I'm denying is that portion that seeks to reform the

10  description of the collateral in the transaction documents as

11  well as seeks a declaration that -- the description of that

12  collateral in UCC-1 and UCC-3 that were filed satisfies UCC 9-

13  506(a) in that it contains -- or they contain only minor errors

14  or omissions that do not make the financing statement seriously

15  misleading.

16        The parties accurately set forth the standard for

17  summary judgment under Bankruptcy Rule 7056 which incorporates

18  Federal Rule of Civil Procedure 56.

19              "Summary judgment shall be granted if the pleadings,

20              depositions, answers to interrogatories, and

21              admissions on file together with affidavits, if any,

22              show that there's no genuine issue as to any material

23              fact and that the moving party is entitled to

24              judgment as a matter of law."  See Celotex Corp. v.

25              Catrett at 477 U.S. 317, 322 (1986).

1    In deciding the motion therefore, I must determine if
2 there are any material factual issues to be tried while at the
3 same time since the non-moving party would be precluded from a
4 trial if the relief were granted resolving ambiguities and
5 drawing reasonable inferences against the moving party.  Knight
6 v. U.S. Fire Insurance Company, 804 F.2d 9, 11 (2nd. Cir.
7 1986).

8    The burden therefore rests on the moving party to
9 establish the absence of a genuine issue as to any material
10 facts.  Celotex, 477 U.S. 322, 323.

11    While the courts have held that the mere existence of
12 a scintilla of evidence in support of a non-moving position
13 would be insufficient and that there must be evidence on which
14 a jury could reasonably find for the non-moving party and that
15 the non-moving party may not defeat a summary judgment motion
16 by relying on self-serving or conclusory statements and that
17 there must be something more than some metaphysical doubt as to
18 material facts.  See generally Anderson v. Liberty Lobby, Inc.,
19 477 U.S. 242, 247-48 (1986) and Matsushita v. Zenith Radio
20 Corp., 475 U.S. 574, 586 (1986).

21    Once evidence of a material disputed fact has been
22 submitted in support of an objection to a summary judgment
23 motion, the Court although that evidence need not be probative
24 must move on to the trial stage and deny the motion for summary
25 judgment as long as that evidence raises a reasonable inference

in the non-moving party's favor. See <u>Binder & Binder, P.C. v. Barnhart</u>, 481 F.3d 141, 148 (2nd. Cir. 2007) and <u>Amnesty America v. Town of West Hartford</u>, 361 F.3d 113, 122 (2nd Cir. 2004).

Here, as I noted, the standard for a private reformation based on mutual mistake under New York law which would govern this dispute is a high one. Procedurally, there is a "heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties and a correspondingly high order of evidence is required to overcome that presumption." <u>Backer Management Corp. v. Acme Quilting Company</u>, 46 N.Y. 2d 211, 219-20. See also <u>Chimart Associates v. Paul</u>, 66 N.Y. 2d 570, 573-74 (1986).

Given that heavy burden, most courts in New York have acquired a showing of mutual mistake that would contradict the terms of the parties' agreements by clear and convincing evidence. <u>Westinghouse Electric Corp. v. New York City Transit Authority</u>, 735 F.Supp. 1205, 1218 (S.D.N.Y. 1980). And <u>Seebold v. Halmar Construction Corp.</u>, 146 A.D. 2d 886, 886 (Third Dept. 1989).

Such evidence can be shown in a number of ways. In part, it depends on the parties' sophistication and/or advice from counsel. Compare <u>Chimart</u>, 66 N.Y. 2d at 570 where there was sophisticated parties with counsel and <u>Biscone v. Carnivale</u>, 186 A.D. 2d 942, 945 (App. Div. 1992) where the

parties were not sophisticated.  The presence of contradictory

terms in an unreformed contract may also support a reformation

claim.  Winmar Co. v. Teachers Insurance and Annuity

Association of America, 870 F.Supp. 524, 535-36 (S.D.N.Y.

1994).  And the parties' course of performance or subsequent

behavior also may indicate their true intentions including the

ultimate result which would be a mutually agreed correction

after the fact.  See Gulf Insurance Company v. Transatlantic

Reinsurance Company, 69 A.D. 3d 71, 85 (1st Dept. 2009) and

Henderson v. U.S. Postal Service, 1996 W.L. 662624 (W.D.N.Y.

October 31, 1996).

Here, the key dispute is over whether a

distributorship agreement which gave Buhre Beverage, the

debtor, a exclusive route to deliver Pepsi products was

assigned for security purposes to the plaintiff, Mr. Sanchez

under the July 2013 transaction.

The document is consistent in describing the

agreement that was assigned is not an assigned agreement

between Buhre Beverage and Pepsi but rather an agreement

between the prospective buyer, Bruckner Beverage Inc. -- or

ultimate buyer and Pepsi which never came into effect.  That

was also what was reflected in the UCC-1 that was filed as well

as the UCC-3 that was filed ostensibly to correct the parties'

error.

The parties' Rule 7056 statements and their

respective affidavits or declarations dispute this very factual
issue; i.e., was it intended by the parties that the
prospective Bruckner Pepsi distribution agreement be assigned
or alternatively as Mr. Sanchez contends the existing Buhre
Beverage Pepsi agreement.

I conclude based on the record before me for purposes
of this summary judgment motion that factual dispute is
material and cannot be decided based on the materials that I
need to take into account for a summary judgment motion.  It's
argued that it would be absurd to have sold the business or
ninety-nine percent of the business to Messrs. -- to Mr. Sapra
and ultimately to Bruckner without getting an assignment back
of the business's route but drawing as I must reasonable
inferences in favor of the non-moving party, I do not believe
it is so clearly absurd, particularly given that if Sapra and
Bruckner did not in fact have that agreement with Pepsi their
money would be -- their purchase that is would be wasted.

So I conclude that I cannot on a summary judgment
motion enter an order reforming the agreement to reflect the
collateral that the plaintiff believes was -- or should have
been pledged to him.

I also conclude that the UCC-1 and UCC-3 as filed at
least for purposes of Mr. Sanchez's summary judgment motion
cannot be said to contain only minor errors or omissions that
would not render the statements seriously misleading.  The name

1 of the route -- I'm sorry, the name of the contract under which

2 the route was assigned is not a matter of a typo or a

3 transposition.  Bruckner is very different from Buhre Beverage

4 and I believe third parties quite arguably therefore would be

5 seriously misled by both the UCC-1 and the UCC-3.  See In Re:

6 Sterling United, Inc., 2014 W.L. 49669 -- I'm sorry, 4966293 at

7 Page 4 (Bankruptcy W.D.N.Y. October 3, 2014), and In Re: Soft

8 Talk Publishing Company, Inc., 856 F.2d 13281332 [sic] (9th

9 Cir. 1988) as well as ProGrowth Bank, Inc. v. Wells Fargo Bank,

10 N.A., 558 F.3d 809, 812-813 (8th Cir. 2009).

11         So I'll enter an order denying the motion and the

12 parties should meet and confer on a discovery schedule.

13         Given that result, I conclude that I should overrule

14 Mr. Sanchez's objection to the sale.  Clearly, his asserted

15 security interest in the primary asset to be sold here the

16 right to assume and assign a distributorship agreement is

17 subject to bonafide dispute under Section 363(f)(4) of the

18 Bankruptcy Code.

19         I had serious doubts whether given the colloquy at

20 the beginning of this hearing the sale price does clearly

21 reflect the fair value of the assets to be sold, and therefore,

22 I was uncomfortable ruling on the objection under Section

23 363(f)(3).  See In Re: Boston Generating, LLC, 440 B.R. 302,

24 332 (Bankr. S.D.N.Y. 2010).

25         And I trust that I'll have a clearer record on that

1 at the adjourned hearing but that would only be an alternative

2 basis for denying the objection, that separate basis being

3 363(f)(4).

4       So, to be clear, the only two possible prospective

5 bidders here if in fact Pepsi determines in the exercise of its

6 reasonable judgment to withhold its approval of Mr. Poli would

7 be Mr. Poli and the stalking horse bidder.  I'm not reopening

8 the auction generally but I do believe that there has been

9 sufficient lack of clarity as to the basis for Pepsi's denial

10 of approval as well as insufficient time to review Mr. Poli's

11 proposal to cure the problem that Pepsi identified last week

12 that would warrant extending the potential for an auction here

13 until that process plays out.

14       And so I would like the debtor to submit an order

15 just laying out the time table there after you get a date from

16 Ms. Lee.

17       MS. PENACHIO:  Yes, Your Honor, and I would just like

18 to point out one minor -- albeit minor point.  There is a small

19 carve out for Mr. Cappelli.  So if -- and that carve out --

20       THE COURT:  You mean a breakup fee --

21       MS. PENACHIO:  A break --

22       THE COURT:  Yeah.

23       MS. PENACHIO:  -- I'm sorry, a breakup fee.  So it's

24 -- you know --

25       THE COURT:  Right.

eScribers
eScribers, LLC
(973) 406-2250
operations@escribers.net
www.escribers.net

1          MS. PENACHIO:  -- he's hung in there.  I don't --

2    that -- if he doesn't win, it's a small breakup fee but it will

3    cover his expenses.  So it's --

4          THE COURT:  Right.

5          MS. PENACHIO:  -- you know, everyone is a winner if

6    there is an auction and --

7          THE COURT:  Correct.  Okay.  So you should get that

8    date from Ms. Lee.  She was actually here so she knows that she

9    needs to give you that hearing within thirty days.  I'm happy

10   if it's before then frankly but it should be at least within

11   that time frame.

12         MS. PENACHIO:  Thank you, Your Honor.  Your Honor,

13   there's one last motion.  That's the Union's motion to --

14         THE COURT:  Oh, yeah, that's unopposed.

15         MS. PENACHIO:  That's unopposed and --

16         THE COURT:  And it does appear that the Union didn't

17   get sufficient notice and -- of the bar date.  I'll grant your

18   motion to file a late proof of claim.

19         MS. BRUNO:  Thank you, Your Honor.  If I may just

20   make a correction to debtor's counsel -- by the way, I'm Susan

21   Bruno from Cary Kane.  Actually, the motion is not on behalf of

22   the Union --

23         THE COURT:  It's the Fund.

24         MS. BRUNO:  -- the Fund is a separate entity --

25         THE COURT:  Right.

1          MS. BRUNO:  -- fund.

2          THE COURT:  Right.  The Union Fund.

3          MS. BRUNO:  Yes.  Thank you, Your Honor.

4          THE COURT:  Right.  So --

5          MR. WALDMAN:  And --

6          THE COURT:  -- you can e-mail that order to chambers.

7          MR. WALDMAN:  Pepsi's motion for stay relief will be

8  adjourned --

9          THE COURT:  It's adjourned.

10          MR. WALDMAN:  -- to the hearing date.

11          THE COURT:  And it probably will become moot if the

12  sale goes through but if for some reason the sale doesn't go

13  through I'm in all likelihood going to grant it.

14          MR. WALDMAN:  Thank you.

15          THE COURT:  Okay.

16          MS. PENACHIO:  Thank you, Your Honor.

17          MR. WALDMAN:  Thank you, Your Honor.

18      (Concluded at 12:53 p.m.)

19                          *  *  *  *  *

20

21

22

23

24

25

**C E R T I F I C A T I O N**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Kathleen M. Price_     DATE: November 14, 2014

Kathleen Price, AAERT Cert. No. 325

Certified Court Transcriptionist

AD HOC TRANSCRIPTION, LLC